UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA,

      -against-

COURTNEY DUPREE, THOMAS FOLEY, AND
RODNEY WATTS,

                Defendants.
----------------------------------X

**MEMORANDUM AND ORDER**

10-CR-627(KAM)

**MATSUMOTO, United States District Judge:**

## INTRODUCTION

      The government charges defendants Courtney Dupree ("Dupree") and Thomas Foley ("Foley") with various counts of Bank Fraud, Making a False Statement, and Conspiracy to Commit Bank, Mail, and Wire Fraud.  Presently before the court are the government's motions *in limine* to admit and preclude certain evidence at trial pursuant to Federal Rules of Evidence 401, 402, 403, 801, and 803.  For the following reasons, the court grants in part and denies in part the government's motions.

## BACKGROUND[1]

### I.   The Charges Against Defendants

      Defendant Dupree is charged in all five counts of a five-count second superseding indictment, and Foley is charged in three counts of the same indictment.  (*See* ECF No. 295,

----

[1]  Familiarity with the facts and prior opinions of this court in this matter is presumed and only the background relevant to this motion is set forth below.

1

Superseding Indictment ("S-2 Indictment").)  A third co-defendant, Rodney Watts ("Watts") (together with Dupree and Foley, "defendants"), is charged in four counts of the S-2 Indictment, and his trial has been stayed pending a Second Circuit appeal. (*See* Minute Entry dated October 17, 2011.)

Count One charges all defendants with Conspiracy to Commit Bank, Mail, and Wire Fraud in violation of 18 U.S.C. §§ 1349, 3551 *et seq.* (S-2 Indictment ¶¶ 18-19.)  Count Two charges all defendants with Bank Fraud in violation of 18 U.S.C. §§ 1344, 2, 3551 *et seq.* (*Id.* ¶¶ 20-21.)  Count Three charges defendants Dupree and Watts with Making a False Statement in violation of 18 U.S.C. §§ 1014, 2, 3551 *et seq.* (*Id.* ¶¶ 22-23.)  Count Four charges all defendants with Making a False Statement by "knowingly and intentionally mak[ing] a false statement and report, and willfully overvalu[ing] property and security, for the purpose of influencing the action of Amalgamated Bank upon one or more loans" in violation of 18 U.S.C. §§ 1014, 2, 3551 *et seq.* (*Id.* ¶¶ 24-25.)  Finally, Count Five charges only defendant Dupree with an additional count of Bank Fraud in violation of 18 U.S.C. §§ 1344, 2, 3551 *et seq.* (*Id.* ¶¶ 26-27.)

The S-2 Indictment charges that Dupree was the president and chief executive officer of GDC Acquisitions, LLC ("GDC") and that Foley was GDC's outside counsel and subsequently its chief operating officer. (*Id.* ¶ 2-3.)  Watts

is charged as having been GDC's chief financial officer and chief investment officer.  (*Id.* ¶ 4.)  The first four counts arise out of an alleged scheme to defraud Amalgamated Bank ("Amalgamated"), a financial institution, and C3 Capital, LLC, a private equity investment firm, by obtaining, and attempting to obtain, loans for GDC and its subsidiaries on the basis of false financial statements and other material misrepresentations between January 2007 and July 2010.  (*Id.* ¶¶ 5, 6, 8.)

Count Five was originally added in a superseding indictment filed on March 25, 2011 (ECF No. 155, Superseding Indictment ("S-1 Indictment")), and charges only Dupree with an additional count of bank fraud for "knowingly and intentionally execut[ing] and attempt[ing] to execute a scheme and artifice to defraud Amalgamated Bank, and to obtain moneys, funds, credits and other property owned by, and under the custody and control of, Amalgamated Bank, by means of materially false and fraudulent pretenses, representations and promises" between August 4, 2010 and March 1, 2011.  (S-2 Indictment ¶ 27.)

## II.  The Instant Motion

The government's motions *in limine* consist of the following requests:  (1) preclude references to the possible consequences of defendants' potential convictions and punishment; (2) preclude cross-examination or direct testimony concerning a government witness's treatment for depression; (3)

3

preclude cross-examination regarding a government witness's
husband, who is a former Federal Bureau of Investigation ("FBI")
agent; (4) preclude evidence regarding defendants' allegations
of prosecutorial misconduct; (5) admit recordings of
coconspirator statements on a conditional basis at trial,
subject to the later submission of the evidence needed to
establish the prerequisites for admission of coconspirator
statements under Federal Rule of Evidence 801(d)(2)(E); and (6)
admit against Dupree a temporary restraining order issued in a
related, concurrent state court proceeding. (ECF No. 359, First
Motion *in Limine* by USA ("Mot.").)

Dupree and Foley both filed responses opposing the
government's motions *in limine*. (ECF No. 382, Foley's Response
in Opposition to First Motion *in Limine* by USA ("Foley Opp'n");
ECF No. 383, Dupree's Response in Opposition to First Motion *in
Limine* by USA ("Dupree Opp'n").) The government filed a reply
to Foley's and Dupree's opposition papers. (ECF No. 403, Reply
to Response in Opposition to First Motion *in Limine* by USA
("Reply").) Finally, Foley filed an unauthorized sur-reply to
the government's reply papers.[2] (ECF No. 417, Motion in *Limine*

---

[2] The Third Amended Criminal Pretrial Scheduling Order required
all briefing on any pretrial motions, including motions *in limine*, to be
provided to the court by October 24, 2011. (ECF No. 331, Third Amended
Pretrial Scheduling Order.) Foley filed his sur-reply on October 31, 2011
without notifying or seeking permission from the court. The court will,
however, consider Foley's sur-reply despite its untimeliness because it was a
narrowly tailored reply.

Sur-Reply ("Foley Sur-Reply").)  The court has considered all of the foregoing submissions, and each of the government's motions *in limine* will be discussed in turn.

**DISCUSSION**

### I.   Standard for a Motion *in Limine*

The purpose of a motion *in limine* is to allow the trial court to rule on the admissibility and relevance of certain forecasted evidence before the evidence is actually offered at trial.  *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).  "Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds."  *United States v. Paredes*, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001). Courts considering a motion *in limine* may reserve decision until trial so that the motion is placed in the appropriate factual context.  *See Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 286-87 (S.D.N.Y. 1996). Furthermore, the court's ruling regarding a motion *in limine* is "subject to change when the case unfolds, particularly if the actual testimony differs from what was [expected]."  *Luce*, 469 U.S. at 41.

## II.   Admissibility of Evidence Pursuant to the Federal Rules of Evidence

The Federal Rules of Evidence govern the admissibility of evidence at trial.  Rule 402 requires that evidence be relevant to be admissible.  Fed. R. Evid. 402.  Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  The court's determination of what constitutes "relevant evidence" is guided by the nature of the charges and the defendants' defense theories.

In addition to the relevancy of the evidence that the government seeks to admit or preclude, however, such evidence is subject to the probative-prejudice balancing test of Federal Rule of Evidence 403.  Rule 403 permits the exclusion of evidence, even if relevant, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  The Second Circuit has stated that the "district court is obviously in the best position to do the balancing mandated by Rule 403, and, accordingly, this Court grants 'broad discretion' to the

district court to admit or exclude evidence pursuant to Rule 403." *United States v. George*, 266 F.3d 52, 63 (2d Cir. 2001) (quoting *United States v. Birney*, 686 F.2d 102, 106 (2d Cir. 1982)) (internal citation and quotation marks omitted). The court applies the foregoing analysis to the government's pending motions.

### III. The Government's Motions *in Limine*

#### A. *Preclusion of References to the Possible Consequences of Conviction*

The government moves to preclude the defense from making any references at trial to the possible consequences of any punishment the defendants may receive if they are convicted. (Mot. at 1.) Dupree argues in response that "[i]f the government believes that a statement or question by the defense is inappropriate due to a reference to the consequences of conviction, it should exercise its right to object *at that time*," and that a ruling at this time precluding such references would be "unfair and prevent Mr. Dupree from putting on a vigorous defense." (Dupree Opp'n at 1.) Foley only opposes this motion to the extent it seeks to restrict cross-examination of prosecution witnesses on issues relating to their cooperation agreements. (Foley Opp'n at 1.) Because the government's motion only seeks preclusion of references to the possible consequences of *defendants*' potential convictions and not any

other witnesses, the court does not consider Foley's objection to this particular motion.[3]

It is firmly established law that the jury has a limited function — to determine guilt or the lack thereof - and that the jury has no role in sentencing with the exception of certain types of cases, such as capital cases, that are not relevant here. In *Shannon v. United States*, 512 U.S. 573 (1994), the Supreme Court stated the following about a jury's role at trial and whether jurors should hear evidence of the possible consequences of a defendant's convictions:

> It is well established that when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed. The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. *Information regarding the consequences of a verdict is therefore irrelevant to the jury's task.* Moreover, providing jurors sentencing information invites them to ponder matters that are not within

---

[3] The defendants mistakenly construe the government's motion to seek preclusion of the possible consequences of punishment for *all* witnesses, including the defendants. As clarified by the government:

> The government has moved to preclude the defense from making any reference to the possible consequences of punishment *to the defendants* should *the defendants* be convicted. The government is not moving to preclude the defendants from cross-examining government witnesses about their cooperation agreements or allocutions, or from cross-examining a witness about the consequences to him or her should he or she be convicted.

(Reply at 1 (emphasis in original).)

their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

*Id.* at 579 (emphasis added) (internal citations and quotation marks omitted).

Applying *Shannon*, which held that a district court is not required to instruct the jury regarding the consequences to the defendant of an acquittal by reason of insanity, the Second Circuit found that *Shannon* "makes clear that defendant had no legal right to a charge informing the jury of the sentencing consequences of its decisions." *United States v. Pabon-Cruz*, 391 F.3d 86, 94 (2d Cir. 2004) (holding that defendant was not entitled to a jury instruction on the sentence he could receive). More recently, the Second Circuit reaffirmed that *Shannon* and *Pabon-Cruz* remain controlling precedent and reversed a district court's finding that the defendant had a Sixth Amendment right to have the jury instructed on the applicable mandatory minimum sentence. *United States v. Polouizzi*, 564 F.3d 142, 160-61 (2d Cir. 2009).

Because of the jury's limited role in fact-finding, the possible consequences of a defendant's conviction are irrelevant and potentially confusing and misleading to the jury. *See United States v. Blume*, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences." (citation omitted)); *Brown v. Artus*,

No. 04 Civ. 3601 (DLC)(KNF), 2008 U.S. Dist. LEXIS 104863, at
*26 (S.D.N.Y. Dec. 24, 2008) ("'Where the jury is permitted to
speculate concerning a defendant's possible punishment, a jury
cannot properly perform th[e] function' of 'determin[ing] guilt
or innocence based upon an impartial consideration of the
evidence, unswayed by emotion, fear or prejudice.'" (quoting
*United States v. Cook*, 776 F. Supp. 755, 757 (S.D.N.Y. 1991)));
*United States v. Maisonneuve*, 954 F. Supp. 114, 116 (D. Vt.
1997)("It is well settled that juries are not to consider
penalties in reaching their verdicts.").

While the Second Circuit has left open the possibility
that "in some, albeit limited, circumstances it may be
appropriate to instruct the jury regarding th[e] consequences"
of its verdict, *Polouizzi*, 564 F.3d at 161, the court finds that
this is not one of those limited circumstances.[4] Because of the
established precedent that jurors should not be informed about
the possible consequences of their verdict and the potential
prejudice, unfairness, and confusion that could result from

---

[4] The Supreme Court in *Shannon* provided one example of when it
may be appropriate to instruct the jury regarding the consequences of its
verdict: "If . . . a witness or prosecutor states in the presence of the
jury that a particular defendant would 'go free' if found [not guilty by
reason of insanity], it may be necessary for the district court to intervene
with an instruction to counter such a misstatement." *Shannon*, 512 U.S. at
587. The Second Circuit recognized, however, that "[t]he *Shannon* Court's
reasoning suggests that an instruction might be appropriate in such
circumstances because the jury's attention already has been drawn in an
unfair and misleading way 'toward the very thing – the possible consequences
of its verdict – it should ignore.'" *Polouizzi*, 564 F.3d at 162 (quoting
*Shannon*, 512 U.S. at 586).

allowing defense counsel to refer to defendants' possible

punishments, the court grants the government's motion to exclude

any references to the possible consequences of defendants'

convictions.

> **B.    Preclusion of Cross-Examination or Direct
> Testimony Concerning a Government Witness's
> Treatment for Depression**

The government moves to preclude any testimony,

whether by direct testimony or on cross-examination, of a

government witness's treatment for depression while employed by

the defendants.  (Mot. at 2.)[5]  Specifically, according to

materials disclosed by the government in compliance with its

obligations under the Jencks Act, 18 U. S. C. § 3500 ("Jencks

Materials"), the witness has stated that she visited a

psychiatrist approximately three times from 1993 to 1994 for

depression, and that in 2009, she took anti-anxiety medication

prescribed by a general practitioner for approximately six

months.  (Reply at 2-3.)  The witness characterized the anti-

anxiety medication as "a very mild drug."[6]  No other information

regarding the witness's medical history is known by the parties,

which do not have the witness's medical records in their

---

[5]  The name of the witness, while disclosed to the court in the
government's reply brief, is not necessary to understanding this court's
decision and will not be mentioned to protect the witness's privacy.

[6]  Although the government's motion suggests that the anti-anxiety
medication was prescribed to treat depression, there is no indication, on the
record before the court, of such a purpose for the prescribed medication.

possession and do not seek in their papers to introduce any of the witness's medical records as evidence at trial. (*See* Dupree Opp'n at 5, 7; Reply at 2.)

The government asserts that any testimony regarding the witness's treatment for or diagnosis of depression should be precluded because such information "is irrelevant, far more prejudicial than probative, would serve only to harass and embarrass the witness, and would constitute an invasion of the witness's privacy." (Mot. at 2.) Furthermore, the government contends that "[t]here is no indication that the witness's ability to perceive and recall events or to testify accurately was affected by depression." (*Id.* at 2.) Dupree argues in response that precluding such testimony would violate the defendants' Sixth Amendment Right of Confrontation because the mental condition or treatment of the government witness during the dates of the alleged conspiracy, from January 2007 to July 2010, is relevant and may have affected the witness's ability to perceive or to recall events or to testify accurately. (Dupree Opp'n at 3, 7.)[7] Foley also objects on the basis that "[p]sychological disorders, including depression, may influence

---

[7] Dupree also requests that the court order the government to make available "any information in its possession that tends to call into question the ability of a witness to perceive or recall events accurately or to recount those events truthfully and accurately at a later time." (Dupree Opp'n at 7 & n.6.) Because the government has stated that it does not have any such information in its possession that has not already been disclosed to the defendants (Reply at 2), the court finds Dupree's request to be moot.

a witness's perception and motivation and should properly be considered by a jury in evaluating the credibility of the witness's testimony."  (Foley Opp'n at 2.)

The Sixth Amendment of the United States Constitution guarantees the right of an accused in a criminal prosecution to be confronted with the government's witnesses against him, which includes the right to cross-examine the witness.  *United States v. Vitale*, 459 F.3d 190, 195 (2d Cir. 2006) (citations omitted).  A judge may, however "impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Id.* (citations omitted).

"For over forty years, federal courts have permitted the impeachment of government witnesses based on their mental condition at the time of the events testified to."  *United States v. Butt*, 955 F.2d 77, 82 (1st Cir. 1992).  In assessing the probative value of medical or psychological evidence, the Second Circuit has held that a court should consider such factors as "the nature of the psychological problem, the temporal recency or remoteness of the history, and whether the witness suffered from the problem at the time of the events to which she is to testify, so that it may have affected her ability to perceive or to recall events or to testify

accurately." *Vitale*, 459 F.3d at 196 (quoting *United States v. Sasso*, 59 F.3d 341, 347 (2d Cir. 1995)).  A condition that existed at the time the witness perceived the events about which he or she will testify is more likely to be found probative. *See United States v. Paredes*, No. 99 CR. 290 (PKL), 2001 U.S. Dist. LEXIS 18862, at *4 (S.D.N.Y. Nov. 20, 2001).

First, the court finds that the witness's three psychiatrist visits from 1993 to 1994 for depression are so remote in time to the events at issue in the trial — approximately thirteen years before — that any probative value of allowing cross-examination regarding the psychiatric visits is outweighed by confusion to the jury and the embarrassment to the witness of having to reveal, at best marginally relevant, private medical information.  *See United States v. Bari*, 750 F.2d 1169, 1179 (2d Cir. 1984) (finding twelve-year-old hospitalization for paranoid schizophrenia to be "of marginal relevance"); *United States v. Glover*, 588 F.2d 876, 878 (2d Cir. 1978) (finding that evidence concerning psychiatric treatments the witness received twelve years prior to trial was, *inter alia*, too remote to be admissible); *Paredes*, 2001 U.S. Dist. LEXIS 18862, at *3 ("A psychological condition from ten years earlier, however, is likely to be irrelevant.").  Accordingly, on the basis of Rule 403's probative-prejudice balancing test, the court grants in part the government's motion by precluding

14

any testimony regarding the three psychiatric visits in 1993 and 1994.

Second, the court will permit the defendants to cross-examine the witness regarding her use of anti-anxiety medication in 2009 for approximately six months. The period of time during which the witness used this medication occurred within the time period at issue in this case, from January 2007 to July 2010 (*see* S-2 Indictment ¶¶ 8, 19, 21), and is therefore probative of the witness's ability to perceive and recall the events about which she is expected to testify. *See Hernandez v. Kelly*, No. 09 CV 1576 (TLM)(LB), 2011 U.S. Dist. LEXIS 57114, at *15 (E.D.N.Y. May 27, 2011) (finding a psychological condition at the time of the incident to be "an issue which bears on plaintiff's ability to rationally perceive events at the time and to accurately recollect and report his perceptions"); *Paredes*, 2001 U.S. Dist. LEXIS 18862, at *6 (finding a psychological condition that existed during at least some of the events about which the witness is expected to testify "might affect her ability to testify accurately regarding those events"). While the court recognizes that, on the record before it, there is no basis to conclude that the witness's medical treatment in 2009 had any effect on the witness's "ability to perceive or to recall events or to testify accurately" about the events at issue, *Vitale*, 459 F.3d at 196, without any

documentation establishing that there was no such effect, the defendants are entitled to cross-examine the witness regarding the medication and its effects, if any, on her perception and recollection. *See Butt*, 955 F.2d at 82 ("The readily apparent principle is that the jury should, within reason, be informed of all matters affecting a witness's credibility . . . ." (citations omitted)).

All of the cases cited by the government support permitting such cross-examination. In *Vitale*, the Second Circuit affirmed a district court's denial of access to a government witness's substance abuse treatment records, partly because the district court permitted defense counsel "wide latitude when cross-examining [the witness] about his drug use and rehabilitation, including questions about the effects that the drugs had on his ability to perceive events when they occurred as well as on his memory at the time of trial." 459 F.3d at 196. The district court in the *Vitale* case allowed such cross-examination even though, in contrast to this case, the witness's treatment occurred "several years after the pertinent events and had marginal probative value concerning [the witness's] mental capacity during the events about which he testified." *Id.*

Similarly, in *Sasso*, the Second Circuit affirmed a district court's refusal to allow defense counsel to cross-

examine a government witness regarding psychiatric treatment and medication on the basis of remoteness where, in contrast to this case, "there was no evidence that [the witness] received or ingested any mood-altering drugs" during the relevant period. 59 F.3d at 348. Finally, in *Butt*, the First Circuit affirmed a district court's refusal to admit the hospitalization report of a government witness into evidence and found no violation of the defendant's Right of Confrontation because defense counsel was permitted to cross-examine the witness regarding her "psychological background – the nature of how she was feeling and her psychological problems generally – including her suicide attempt, hospitalization, and the contents of the psychologist's report." 955 F.2d at 86.

Additionally, the court agrees with Dupree that *Paredes* is persuasive. In that case, after an *in camera* review of the available psychological records, which have not been submitted to the court for its review in this case, the district court found that a government witness's medical history did not "indicate any paranoid or delusional tendencies, but rather anxiety problems, including panic attacks, and depression." *Paredes*, 2001 U.S. Dist. LEXIS 18862, at *5. Because the psychological condition of the witness existed during at least some of the events about which the witness was expected to testify and her condition appeared to have been caused by

something closely related to the subject matter of her
testimony, the court permitted the defendant to cross-examine
the witness regarding her psychological condition. *Id.* at *6-7
("Although disclosure of this information may be embarrassing to
[the government witness], the defendant's opportunity to cross-
examine [the government witness] regarding her psychological
condition may prove important to assessing her credibility,
especially because [the witness] is one of only three witnesses
the government apparently plans to call.").

Here, the government's witness was the assistant
controller of Hudson Bay Environments ("HBE"), which was
subsequently acquired by GDC, the corporate entity at the center
of the alleged conspiracy, where she continued to work as
assistant controller. The witness pleaded guilty to a single
count of Conspiracy to Commit Bank, Mail, and Wire Fraud in
February 2011 in connection with the same events that are the
basis of the charges against defendants. According to the
Jencks Materials, the witness appears to have direct knowledge
of the conspiracy and made several statements implicating the
defendants in the conspiracy. Therefore, at least at this
juncture of the case, she is likely to be a key government
witness and her credibility is particularly important.

Because the witness's use of anti-anxiety medication
may have affected her ability to perceive or to recall events,

and the witness used such medication during the time period of the alleged conspiracy, thereby making it probative, the court denies in part the government's motion to preclude testimony concerning the medication. The court will, however, only permit the defendants to cross-examine the witness about the following topics: (1) the nature and quantity of the medication prescribed; (2) the dates of use; (3) the purpose for which the witness was prescribed the medication; and (4) whether the medication affected the witness's ability to perceive and recall events or to testify accurately about the facts at issue in the case. There shall be no other topics of cross-examination regarding the witness's history of mental health and no documents shall be admitted with respect to the medication. These limits on cross-examination should adequately protect defendants' Sixth Amendment rights and minimize the embarrassment to the witness of such testimony and any confusion of the issues by the jury.

## C. Preclusion of Cross-Examination Regarding Veronica Finn's Husband

The government moves to preclude the defendants from cross-examining government witness Veronica Finn regarding her husband, Martin Finn, who is a retired FBI agent. Ms. Finn served as the controller of one of GDC's subsidiaries from May

2004 to September 2006 and then became the chief administrative officer. (Dupree Opp'n, Ex. A. at 1.)

As found by this court in a prior decision denying defendants' claims of prosecutorial misconduct in executing a search of GDC's offices in July 2010, there is a factual dispute regarding the circumstances under which Mr. Finn arrived at GDC and the areas to which he was allowed access while the FBI searched the premises. (ECF No. 133, Memorandum and Order); *United States v. Dupree*, 781 F. Supp. 2d 115, 161 (E.D.N.Y. 2011). The defendants claimed, and still claim, that Mr. Finn "played a role in shielding his wife from criminal liability and assisting the FBI during their search of the [GDC] offices," that he "chose to remain present throughout the search," and that "he also had conversations with certain witnesses and potential witnesses" during the search. (Dupree Opp'n at 10); *Dupree*, 781 F. Supp. 2d at 161. In contrast, the government contends that Mr. Finn only arrived at GDC's offices during the search in response to a phone call by Ms. Finn, that there is no evidence that Ms. Finn's "testimony would be tainted by her husband's arrival" at the search, and that Mr. Finn "did not play any role in the investigation of this case and he was unaware of this case prior to the defendants' arrests." (Mot. at 3); *see also Dupree*, 781 F. Supp. 2d at 161-62.

The government argues that any testimony regarding Mr. Finn should be precluded because it "would deeply confuse the issues in the trial." (Reply at 4.) In opposition, because Mr. Finn was an FBI agent who, according to defendants, worked closely with the original investigating agent on this case, and Ms. Finn is the sole officer of GDC who has not been charged in connection with the alleged conspiracy, Dupree seeks to inquire whether Ms. Finn's marriage to a former law enforcement officer "may have an impact on her willingness to testify truthfully or may slant her testimony in an effort to protect herself from any form of liability in this matter." (Dupree Opp'n at 9.) In addition, Dupree seeks to inquire about communications between Mr. and Mrs. Finn regarding GDC and whether Mr. Finn's presence at the search of GDC's offices affected any witness's testimony. (*Id.* at 9-10.) Finally, Foley objects to the government's motion because Mr. Finn "may well have provided some influence resulting in the non-prosecution of his wife." (Foley Opp'n at 2.)

"It is a clearly established principle of Supreme Court jurisprudence that the Confrontation Clause requires that a criminal defendant be afforded a meaningful opportunity to cross-examine witnesses against him in order to show bias or improper motive for their testimony." *Brinson v. Walker*, 547 F.3d 387, 392 (2d Cir. 2008) (citation omitted)); *see also*

*United States v. Figueroa*, 548 F.3d 222, 227 (2d Cir. 2008)
("One way of discrediting a witness is 'cross-examination
directed toward revealing possible biases, prejudices, or
ulterior motives of the witness as they may relate directly to
issues or personalities in the case at hand.'" (quoting *Davis v.
Alaska*, 415 U.S. 308, 316 (1974)).  Such cross-examination is
not unlimited, however, and "[t]rial judges retain wide latitude
insofar as the Confrontation Clause is concerned to impose
reasonable limits on . . . cross-examination based on concerns
about, among other things, harassment, prejudice, confusion of
the issues, the witness' safety, or interrogation that is
repetitive or only marginally relevant."  *Figueroa*, 548 F.3d at
229 (citation omitted).

First, according to the Jencks Materials, Ms. Finn, one
of five corporate officers of GDC, was fully aware of the
alleged accounting fraud in the middle or end of 2009 while she
was working at the company.  (Dupree Opp'n, Ex. A. at 3.)
Because she possessed direct knowledge of the alleged fraud, she
is an important witness to the case.  The fact that she is
married to a former FBI agent who is alleged to have worked
closely with the original investigating agent on the case and
that Mr. Finn was present at the search of GDC's offices
provides a basis to inquire whether she has any bias or motive
that may affect her testimony, including whether Mr. Finn's

status influenced her reasons for meeting with the government for a proffer session. *See Davis*, 415 U.S. at 317 (concluding that the "jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness's] testimony which provided 'a crucial link in the proof . . . of petitioner's act.'" (citation omitted)). Her credibility is also particularly important because, as defendants claim, her witness statements contradict with those of other government witnesses. (Dupree Opp'n at 9.)

In *United States v. Drapeau*, 414 F.3d 869 (8th Cir. 2005), a case cited by the government in support of its position (Mot. at 3), the Eighth Circuit affirmed a district court's exclusion of evidence of a confidential informant's relationship to law enforcement personnel, specifically that the informant's brother-in-law was one of the FBI agents working on the Task Force that arrested the defendant. *Id.* at 875-76. The district court based its exclusion of such evidence on the fact that the FBI lacked authority to decide whether the informant would be prosecuted and that "evidence of an FBI connection would thus be minimally probative of [the informant's] bias." *Id.* at 876. Additionally, the Eight Circuit found its conclusion to be "strengthened" by the fact that the defendant was permitted to cross-examine the informant regarding other sources of potential

bias and impeachment, including that she hoped her cooperation would lead the prosecutor's office to withhold certain charges. *Id.*

In this case, there is a much closer relationship between Mr. and Mrs. Finn – that of husband and wife – than that between the informant and her brother-in-law in *Drapeau*, which renders Mr. Finn's connections to the case more probative of Ms. Finn's bias.  The government, however, notes that Mr. Finn, a former FBI agent, had no authority with respect to whether Ms. Finn should be prosecuted and played no role in any charging decision.  (Reply at 3-4); *see United States v. Sanchez*, 517 F.3d 651, 670 (2d Cir. 2008) ("The Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996))).  Accordingly, the defendants may cross-examine Ms. Finn, subject to the spousal communications privilege discussed below, regarding Mr. Finn's position and his relationship to the case, if any, to reveal any possible biases or motives that may affect Ms. Finn's testimony. The court, however, limits such cross-examination by precluding any questioning suggesting that, *because of Mr. Finn*, the United States Attorney's Office treated Ms. Finn favorably in deciding not to charge her at this time.

In addition, defendants are precluded from making references to prosecutorial misconduct or corruption involving Mr. Finn, which are claims already denied in *Dupree*, 781 F. Supp. 2d at 162. The court finds that defendants' unsubstantiated assertions of government misconduct or corruption lack probative value and are outweighed by the potential for prejudice and confusion of the issues by the jury. Indeed, the government asserts that Ms. Finn will be testifying pursuant to a subpoena – not a non-prosecution agreement or any form of immunity from the government – and that she may still be charged for her involvement in the alleged conspiracy. (Reply at 4.) This limitation is also reasonable because the defendants may still cross-examine Ms. Finn regarding whether she hoped to curry favor with the government by meeting for a proffer session and by testifying against the defendants, which does not require referring to Mr. Finn and his former position at the FBI. *See Drapeau*, 414 F.3d at 876.

Second, with respect to Dupree's request to inquire into communications between Mr. and Mrs. Finn regarding activities at GDC, it is likely that such communications are protected by the spousal communications privilege, which shields spousal "communications made in confidence during a valid marriage." *In re Witness before Grand Jury*, 791 F.2d 234, 237 (2d Cir. 1986). "Although communications between spouses are

presumed to be confidential, this presumption is rebutted when the communicant knew that the information was or would be disclosed to third parties or to the public." *Id.* at 239 (citations and quotation marks omitted).  Because the communications between Mr. and Mrs. Finn regarding activities at GDC are presumed confidential, and there has been no showing that this presumption has been rebutted or that Mr. and Mrs. Finn were not in a valid marriage at the time of the communications at issue, the court finds that such communications are privileged and thus protected from disclosure.

Third, the court addresses Dupree's application to question other government witnesses regarding whether Mr. Finn's presence at the search of GDC's offices affected their testimony.  To the extent that defendants can establish at trial that a government witness had knowledge that Mr. Finn was present at the search of GDC's offices, the defendants may inquire whether Mr. Finn's presence affected *that witness's* testimony.  If a witness responds that he or she was not aware of Mr. Finn's presence during the search, then no further questions regarding Mr. Finn will be permitted.  The court believes that this approach to witnesses other than Ms. Finn will provide the defendants with the opportunity to conduct cross-examination on an issue that is probative – whether Mr.

Finn's presence affected any witness's testimony when such witness knew he was present – while limiting delay and waste of time from nonprobative questions.

Based on the foregoing analysis, the court grants in part and denies in part the government's motion to preclude testimony regarding Ms. Finn's husband, Martin Finn. The court grants the motion in part by (1) precluding defendants from suggesting or arguing that, *because of Mr. Finn*, the United States Attorney's Office treated Ms. Finn favorably in deciding not to charge her in this case at this time; (2) precluding references to prosecutorial misconduct or corruption involving Mr. Finn, as further discussed below, and (3) precluding any inquiry into communications between Mr. and Mrs. Finn regarding GDC on the basis that such communications are presumptively confidential and therefore protected from disclosure pursuant to the spousal communications privilege. The court denies the motion in part by (1) permitting defendants to cross-examine Ms. Finn regarding whether she has any bias or motive that may affect her testimony resulting from Mr. Finn's position as a former FBI agent, his relationship with the original investigating agent on the case, and his presence at the FBI's search of GDC's offices, and (2) by allowing defendants to inquire whether other witnesses were aware that Mr. Finn was

present at the search of GDC's offices, and if so, whether his presence affected such witnesses' testimony.

### D.    *Preclusion of Direct Testimony or Cross-Examination Regarding Any of the Defendants' Allegations of Prosecutorial Misconduct*

The government moves to preclude any testimony regarding defendants' allegations of prosecutorial misconduct on the basis that this court has previously found such allegations to be meritless. (Reply at 4.) Moreover, the government contends that defendants' allegations of prosecutorial misconduct are "wholly irrelevant to the case" and "would do nothing but confuse and mislead the jury." (*Id.*)

In opposition, Dupree argues that (1) the court should not prematurely limit cross-examination regarding allegations of prosecutorial misconduct, (2) the appropriateness of the government's investigative techniques are proper subjects for cross-examination enabling defendants to "challenge both the witnesses the government presents and the methods it used to obtain its information," and (3) defendants' allegations of prosecutorial misconduct are not "baseless" even though they do not rise to the level of a constitutional violation as found by this court. (Dupree Opp'n at 11.) Dupree further asserts that he is only required to have a "good faith basis to ask questions concerning the government's conduct during its investigation of this case," and that such a basis has been established in

numerous filings before the court. *(Id.* at 12.) Foley also submitted a summary objection. (Foley Opp'n at 2.)

The defendants' allegations of prosecutorial misconduct consist of the following: (1) the government's seizure of privileged and confidential documents during the search of GDC's offices; (2) the government's return of unexecuted seizure warrants of the Amalgamated accounts while instructing the bank not to pay defendants' salaries; (3) the government's seizure of, and subsequent refusal to release funds in, certain JP Morgan Chase bank accounts; and (4) the government's misuse of the grand jury in continuing to investigate this matter after an indictment had been returned. (Dupree Opp'n at 10.)

With respect to each of these allegations and several others, the court has found – repeatedly – that these allegations are not sufficient to constitute prosecutorial misconduct as a matter of law. *Dupree*, 781 F. Supp. 2d at 160-66. First, with respect to the allegation that the government seized privileged and confidential documents, the court held "that, as a matter of law, the government followed appropriate procedures with respect to handling potentially privileged documents." *Id.* at 163. Second, with respect to the allegation that the government instructed Amalgamated not to pay defendants' salaries, the court found that the defendants never

presented evidence that supported this allegation. *Id.* Third, with respect to the allegation that the government seized and then refused to release funds in JP Morgan Chase bank accounts, the court concluded that the government's application for and execution of the search and seizure warrants were supported by probable cause, properly issued, and properly executed. *Id.* at 161. Finally, with respect to the allegation that the government misused the grand jury, this court found that the government's "continued use of the grand jury is appropriate." *Id.* at 165.

It is established Second Circuit law that allegations of prosecutorial misconduct are properly directed to the judge, not the jury. *See United States v. Young*, 283 F. App'x. 858, 860 (2d Cir. 2008) (concluding that defendant's argument regarding alleged misconduct by the government was more appropriately directed to the court rather than to a jury); *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997) ("[W]e agree with the district court's decision to resolve for itself whether the government's conduct was lawful and to prevent Regan from presenting evidence [that the grand jury investigation was illegitimate]."); *see also United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991) ("A motion to dismiss an indictment alleging outrageous governmental conduct is a question of law directed to the trial judge . . . .").

Dupree appropriately contends that defendants' "ability to challenge both the witnesses the government presents and the methods it used to obtain its information" is an important right. (Dupree Opp'n at 11.) The defendants, however, have had more than ample opportunity to make these pretrial challenges before the court and have failed on numerous occasions. Because the court has already found the government's conduct to be "appropriate" and "proper," defendants' continued accusations of prosecutorial misconduct are without merit and irrelevant to the issues to be tried.

Even if this court had not previously ruled on defendants' allegations of prosecutorial misconduct, the government's alleged misconduct would still be irrelevant under Federal Rules of Evidence 401 and 402 because the allegations have no bearing on the reliability of the evidence offered against the defendants. For example, as the government correctly notes, whether or not the government seized privileged emails during its search of GDC's offices, instructed Amalgamated not to pay defendants' salaries, or refused to release certain funds, has no probative value with respect to the reliability of the evidence that will be offered at trial. (Reply at 7); *see United States v. Malpeso*, 115 F.3d 155, 163 (2d Cir. 1997) (finding that evidence of confidential information leaked by an FBI agent is "of little or no relevance

to the crimes charged in this case"). These are all pretrial issues that were, and should only be, dealt with prior to trial.

Finally, even if such allegations of government misconduct are relevant, permitting the defendants to once again raise each of these allegations before the jury after this court has found them to be unfounded would result in all of the concerns implicated by Rule 403, including unfair prejudice, confusion of the issues, and misleading the jury, as well as undue delay and waste of time. *See id.* ("[E]ven if the evidence [of an FBI leak] were of some marginal relevance, that relevance is far outweighed by the risk of prejudice. The likely (and presumably intended) effect of admitting [the] evidence . . . would have been to shift the focus away from the relevant evidence of the defendants' wrongdoing to the tangentially related misdeeds of one government agent. Such a diversion not only risked needlessly delaying the trial, but also created the very real possibility that the jury would improperly discredit the government's case in reaction to [the FBI agent's] allegedly gross misconduct.").

The defendants do not cite any cases that are contrary to this conclusion.[8] (Dupree Opp'n at 12-13.) In *United States v. Katsougrakis*, 715 F.2d 769 (2d Cir. 1983), the Second Circuit held that defense counsel "may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to anticipated questions," but that counsel must "provide some good faith basis for questioning that alleges adverse facts" when confronted with a demand for an offer of proof. *Id.* at 779. *Katsougrakis*, however, dealt with a defense counsel's inability to show a good faith basis for a line of questioning attacking the credibility of a coconspirator by suggesting he had a reputation as a "hit man." *Id.* The case had nothing to do with prosecutorial misconduct and did not address the situation here where the court has *already* considered the defendants' good faith basis for adverse facts and found such claims to be unsuccessful and not probative of the reliability of any evidence.

Dupree's citation to language in a footnote from the Supreme Court's decision in *Kyles v. Whitley*, 514 U.S. 419 (1995) is similarly unavailing. In that footnote, the Supreme Court stated that "[w]hen, for example, the probative force of

---

[8] The parties discuss *United States v. Carona*, 630 F.3d 917 (9th Cir. 2011) at length in their papers. (*See* Mot. at 4; Reply at 5-7; Dupree Opp'n at 13.) The portions of *Carona* that the parties largely rely upon, however, were omitted in an amended opinion issued in that case after the parties completed their briefing. *See United States v. Carona*, No. 09-50235, 2011 U.S. App. LEXIS 21720 (9th Cir. Oct. 25, 2011).

evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it." *Id.* at 446 n.15. The court does not disagree that where the circumstances by which evidence was obtained raise a possibility of fraud, evidence of such circumstances is probative as to the reliability of the evidence. The defendants, however, have not made a showing that any of the alleged misconduct by the government would tend to make particular evidence offered at trial against the defendants to be less reliable, and therefore, less convincing. *Compare United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000) (holding that district court committed error by instructing the jury that it may not consider whether or not a Postal Inspector's investigation was flawed where "[d]etails of the investigatory process [*i.e.* 'a highly damaging flaw' in the Inspector's accounts of a witness's statement] potentially affected [the Inspector's] credibility and, perhaps more importantly, *the weight to be given to evidence produced by his investigation*." (emphasis added)).

In this case, the government must prove beyond a reasonable doubt that the defendants are guilty of the crimes charged in the S-2 Indictment. The court cannot and will not permit this case to become a referendum before the jury on the

appropriateness or legality of government conduct that has already been found to be appropriate and lawful and which has no bearing on the reliability of the evidence offered against defendants. *See Malpeso*, 115 F.3d at 163. Therefore, the court grants the government's motion to preclude defendants from presenting evidence or eliciting testimony during direct or cross-examination regarding their allegations of prosecutorial misconduct. Additionally, defendants may not suggest to the jury that there has been any prosecutorial misconduct in this case.

This decision does not limit the defendants from introducing evidence regarding the methods used by the government to obtain its information in order to allow the jury to evaluate how those methods affected the reliability of the evidence.[9] The defendants are precluded, however, from suggesting to the jury that government actions and methods found to be appropriate by this court are somehow improper or the result of prosecutorial misconduct.

### E.   *Admissibility of Recordings Offered By the Government*

The government intends to introduce certain recorded statements into evidence at trial as statements of a

---

[9] Indeed, the government has stated that it "is not, at this time, moving to preclude the defendants from cross-examining [Emilio] Serrano regarding 'the manner in which [the defendants'] recorded statements were obtained.'" (Reply at 5 (quoting Dupree Opp'n at 13).)

coconspirator pursuant to Federal Rule of Evidence 801(d)(2)(E).
The government moves the court to defer a ruling on the
admissibility of such recorded statements until the conclusion
of the government's case-in-chief so that the court "may confine
its determination to those recordings that are actually offered
and objected to at trial."  (Mot. at 5.)

The defendants object to the admissibility of two
categories of recorded statements.  First, Dupree and Foley
object to the admissibility of recorded conversations between
Emilio Serrano and Frank Patello.  Second, Foley objects to the
admissibility of recorded conversations during which he was not
present, between Emilio Serrano and co-defendants Dupree and
Watts.  These two categories of recorded statements will be
discussed in turn.

> 1.   Standards Governing Admissibility of
>      Coconspirator Statements Under Rule
>      801(d)(2)(E)

"Rule 801(d)(2)(E) states that out-of-court
declarations are not excludable as hearsay if they are made 'by
a co-conspirator of a party during the course and in furtherance
of the conspiracy.'"  *United States v. Farhane*, 634 F.3d 127,
161 (2d Cir. 2011) (quoting Fed. R. Evid. 801(d)(2)(E)).  "To
admit an out-of-court declaration under this rule, the district
court must find by a preponderance of the evidence '(a) that
there was a conspiracy, (b) that its members included the

declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy.'" *Id.* (quoting *United States v. Al-Moayad*, 545 F.3d 139, 173 (2d Cir. 2008)).

As discussed further below, the court will defer ruling on the first two elements until the conclusion of the government's case-in-chief in accordance with the long-established procedures followed in the Second Circuit after *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969). With respect to the third element, the Second Circuit has recognized:

> As the 'in furtherance' term implies, the statements must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy, as by, for example, providing reassurance to a coconspirator, seeking to induce a coconspirator's assistance, serving to foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy, or by prompting the listener – who need not be a coconspirator – to respond in a way that promotes or facilitates the carrying out of a criminal activity.

*United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993) (internal citations omitted); *see also In re Terrorist Bombings of U.S. Embassies in E. Afr. v. Odeh*, 552 F.3d 93, 139 (2d Cir. 2008); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989) ("The principal question in the 'in furtherance' issue is whether the statement promoted, or was intended to promote, the goals of the conspiracy. 'Idle

chatter' does not meet the test, nor does a 'merely narrative'
description by one coconspirator of the acts of another.
Coconspirator statements may be found to be 'in furtherance' . .
. if they 'prompt the listener to respond in a way that
facilitates the carrying out of criminal activity.'" (citations
and internal quotation marks omitted)).

2.    Admissibility of the Statements Between
       Emilio Serrano and Frank Patello

The defendants object to the admissibility of four
recorded conversations between Emilio Serrano ("Serrano") and
Frank Patello ("Patello") that took place between May 17, 2010,
and June 4, 2010.  At the time of the conversations, Emilio
Serrano was a government informant who was working at GDC as an
assistant controller, and Frank Patello, a former controller and
chief financial officer at GDC, had left the company and was not
aware that Serrano was an informant or that he was being
recorded.  (Reply at 10.)  Patello was subsequently arrested in
connection with the conspiracy in July 2010.  At this time,
subject to the limitations discussed below, the court finds that
these recorded statements are admissible pursuant to Rule
801(d)(2)(E).

First, Dupree and Foley argue that Serrano cannot be a
coconspirator because he was cooperating with the government.
(*See* Dupree Opp'n at 15; Foley Opp'n at 3.)  This fact, however,

does not affect the admissibility of the conversations if
Patello's statements satisfy the requirements of Rule
801(d)(2)(E). *Farhane*, 634 F.3d at 160-62 (2d Cir. 2011)
(affirming district court's admission of tape recorded
conversations between a co-defendant, on the one hand, and a
confidential informant or undercover agent, on the other hand,
under Rule 801(d)(2)(E)); *In re Terrorist Bombings*, 552 F.3d 93
at 139 ("Though [Rule 801(d)(2)(E)] requires that both the
declarant and the party against whom the statement is offered be
members of the conspiracy, there is no requirement that the
person to whom the statement is made also be a member."
(quoting *Beech-Nut Nutrition Corp.*, 871 F.2d at 1199)); *United
States v. Sanin*, Nos. 96-1417(L), 96-1481, 96-1482, 1997 U.S.
App. LEXIS 12280, at *10-11 (2d Cir. May 23, 1997)
("[S]tatements made to a non-co-conspirator can still be
admitted under Rule 801(d)(2)(E) if the purpose of making the
statements is to facilitate achievement of the conspiracy's
goal.")[10]

---

[10]  The Second Circuit has even indicated that Serrano's
statements may be admissible as a coconspirator. *See United States v.
Monteleone*, 257 F.3d 210, 221-22 (2d Cir. 2001) ([S]tatements of a government
informant may still be admissible as co-conspirator non-hearsay. . . .
Membership in a criminal conspiracy and rendering services to the government
as an informant are not necessarily mutually exclusive roles.  The status as
a co-conspirator of one who is passing information to the government turns on
whether his efforts as an agent of the government supplant his efforts as an
agent of his co-conspirators.  We draw a distinction between a co-conspirator
who exchanges information with the government while still pursuing the
conspiracy's criminal objectives, and one whose conduct as a 'co-conspirator'
is shaped and directed by the desires of the government.").  The court cannot

Second, while not disputing that Patello *was* a member of a conspiracy, Dupree and Foley argue that Patello was no longer a member of the conspiracy at the time of the recordings. (Dupree Opp'n at 15; Foley Opp'n at 3.) In order to withdraw from a conspiracy, the defendant must "show that he performed some act that affirmatively established that he disavowed his criminal association with the conspiracy, either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators. Unless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators." *United States v. Sadiki Komunyaka*, No. 10-2994-cr, 2011 U.S. App. LEXIS 20029, at *7 (2d Cir. Oct. 3, 2011) (quotation marks and citations omitted)).

Although Patello had left GDC, the corporate entity at the center of the alleged conspiracy, at the time of the recordings, there is no showing that he performed an affirmative act to withdraw from the conspiracy. Indeed, the recordings indicate quite the opposite. In the recordings at issue, which this court has reviewed, Patello, *inter alia,* (1) inquires about

---

determine, on this record, whether Serrano was a conconspirator at the time of the recorded conversations because the court has no facts before it regarding the circumstances of his cooperation with the government. Moreover, because the court finds that the recorded conversations between Serrano and Patello are admissible under Rule 801(d)(2)(E), even if Serrano was not a coconspirator, it is unnecessary for the court to decide the issue.

what is happening at GDC, including Amalgamated's audit of GDC
and the submission of another falsified Borrowing Base
Certificate, (2) explains to Serrano how GDC created a company
to conceal information from Amalgamated, (3) recounts a recent
call he made to Dupree regarding a call Patello received from an
Amalgamated representative and Dupree's advice on how to
respond, (4) discusses how he actively calls an Amalgamated
representative after business hours, presumably to maintain the
appearance that nothing is wrong and to hide the fact that he
had left GDC, (5) comments on how he is still waiting for his
severance payment, (6) makes several statements indicating that
he hopes GDC will survive financially and that the conspiracy
will remain concealed so that he does not get caught, and (7)
reassures Serrano that, in the event the conspiracy is exposed,
he will protect Serrano. (Reply at 10.) These acts, which
involve contact with alleged coconspirators Dupree and Serrano
and contact with Amalgamated, are certainly not sufficient to
establish Patello's withdrawal from the conspiracy. *See United
States v. Friesel*, 224 F.3d 107, 118 (2d Cir. 2000)
("[R]esignation from a criminal enterprise, standing alone, does
not constitute withdrawal as a matter of law; more is required.
Specifically, the defendant must not take any subsequent acts to
promote the conspiracy . . . ." (citations omitted)).

Third, Dupree and Foley assert that Patello's statements were not in furtherance of the conspiracy because (1) Patello's expression of a fear of getting caught is not in furtherance of the conspiracy (Foley Sur-Reply at 2), (2) Patello at times counseled Serrano not to participate in the conspiracy (*id.*), and (3) the statements are primarily narratives of past events and did not incite Serrano to respond in a way to promote or carry out further criminal activity (Dupree Opp'n at 16).  In response, the government argues that the conversations between Serrano and Patello are "statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster a trust and cohesiveness, or to inform each other as to the progress or status of the conspiracy."  (Reply at 10-11 (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 959 (2d Cir. 1990))).  The court finds the government's argument to be persuasive.

Although several of the recorded statements involve narratives relating to past events, such statements "meet the in-furtherance test if they serve some current purpose in the conspiracy . . . ." *United States v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994).  Patello's acts described above, *e.g.*, inquiring about the outcome of the bank review and audit, the submission of Borrowing Base Certificates, and Serrano's work at GDC, describing calls to and from Amalgamated and Dupree, and

explaining how GDC concealed information from Amalgamated, served to inform Serrano about the progress or status of the conspiracy and to solicit information regarding the same from Serrano. In addition, although Patello counseled Serrano to avoid involvement in the ongoing conspiracy, he also reassured Serrano on many occasions that they and the others were less likely to get caught as more time had passed since their direct involvement in the conspiracy and the aging of the financial information submitted to Amalgamated. By doing this, Patello was likely ensuring that Serrano would keep quiet and not expose the ongoing conspiracy by cooperating with law enforcement. *See United States v. Eisen*, 974 F.2d 246, 269 n.8 (2d Cir. 1992) ("Because the District Court found that [defendant] did not effectively withdraw from the conspiracy when he resigned from the . . . firm, [defendant] was still a member of the conspiracy at the time of these efforts, and, clearly, acts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy."); *Beech-Nut Nutrition Corp.*, 871 F.2d at 1198-99 (coconspirator statements admissible because they were designed to "cover up" the conspiracy and encourage the listener "to not to reveal incriminating information"). Finally, the fact that Patello expressed his fear of getting caught and of being blamed by others in the conspiracy in the event it was exposed – which confirms his participation in the conspiracy –

does not necessarily require a finding that his statements were not in furtherance of the conspiracy. Indeed, such statements expressed the hope that none of the conspiratorial actors would be detected and likely fostered a relationship of trust between himself and Serrano to maintain the concealment of the conspiracy and to protect themselves in the event the conspiracy was revealed, all of which furthered the conspiracy.

For the forgoing reasons, the court finds that there is no legal basis at this time to preclude the four recorded conversations between Serrano and Patello from being offered into evidence at trial. As discussed below, subject to a finding at trial by a preponderance of the evidence that there is a conspiracy, that Patello and defendants are members of that conspiracy, and that the specific statements to be introduced are during and in furtherance of the conspiracy, the recorded conversations between Serrano and Patello will be admissible at trial against the defendants.[11]

        3.    Admissibility of the Statements Between Emilio Serrano and Dupree and Watts against Foley

Foley objects to the admission of 39 recorded conversations between Serrano and co-defendants Dupree and Watts

---

[11] Foley quotes certain of Patello's statements in his opposition brief to demonstrate that there exists substantial prejudice should the recordings be admitted. (Foley Opp'n at 3-4.) It does not appear, at this time, that the government intends to offer into evidence those particular statements.

on three grounds: (1) the recordings are hearsay because Foley was not present during any of the conversations and was not mentioned in the recordings; (2) admission of the recordings would violate Foley's Sixth Amendment Right of Confrontation as construed by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004), and (3) there is not sufficient independent corroborating evidence of Foley's participation in the conspiracy for the statements to be admissible against him. (Foley Opp'n at 2-3.) Each of these objections will be addressed in turn.

Foley's first argument is incorrect as a matter of law. The recorded conversations are "not hearsay" if they are admissible as statements of a coconspirator under Federal Rule of Evidence 801(d)(2)(E). Fed. R. Evid. 801(d)(2)(E); *Thai*, 29 F.3d at 813 ("Under Fed. R. Evid. 801(d)(2)(E), a statement made by a coconspirator in furtherance of the conspiracy is non-hearsay."). Moreover, statements of a coconspirator are admissible against other coconspirators regardless of whether they are present at the conversation or whether their name is mentioned as there are no such requirements in Rule 801(d)(2)(E). *See Farhane*, 634 F.3d at 161 (rejecting a defendant's arguments that a coconspirator's statements are not admissible against him because "he did not participate in the

conversations at issue and was not mentioned in the course thereof").

Foley's second argument regarding his Right of Confrontation under *Crawford* is also plainly incorrect. "*Crawford* conditions its bar on the admission of prior out-of-court statements that were not subject to cross-examination on whether the statements are 'testimonial,'" and the Supreme Court has suggested that a "testimonial" statement "must be such that the declarant reasonably expects that the statement might be used in future judicial proceedings." *United States v. Saget*, 377 F.3d 223, 229 (2d Cir. 2004). In *Saget*, the Second Circuit explicitly held that statements by a coconspirator to a confidential informant are not "testimonial" where the coconspirator is unaware of the status of the informant. *Id.* at 229 ("[A] declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*."); *Farhane*, 634 F.3d at 162 (same). Here, it is undisputed that, in their conversations with Serrano, Dupree and Watts were unaware that Serrano was speaking to agents for the government or that their statements might later be used at a trial. Therefore, their statements are not testimonial in nature and Foley's Right of Confrontation is not violated by admitting the recorded conversations.

Finally, the court defers ruling on whether there is sufficient independent corroborating evidence of Foley's participation in the conspiracy for the statements to be admissible against him until the conclusion of the government's case. The Second Circuit established this practice in *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969), *cert. denied*, *sub nom. Lynch v. United States*, 397 U.S. 1028 (1970): "While the practicalities of a conspiracy trial may require that hearsay be admitted 'subject to connection,' the judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances." *Id.* at 1120. The *Geaney* procedure has been widely followed by courts in the Second Circuit, and is not disputed by the defendants. *See, e.g.*, *United States v. Ferguson*, 653 F.3d 61, 75 n.8 (2d Cir. 2011) (noting that the district court "conditionally admitted co-conspirator statements during the government's presentation of its case; after the government rested, the court made the necessary *Geaney* findings and admitted the statements"); *United States v. Daugerdas*, No. S3 09 Cr. 581 (WHP), 2011 U.S. Dist. LEXIS 15753, at *3 (S.D.N.Y. Feb. 16, 2011) (permitting "the Government to offer coconspirator statements subject to connection based on evidence adduced

later"); *United States v. Saneaux*, 392 F. Supp. 2d 506, 508 (S.D.N.Y. 2005) (same); *United States v. Brodwin*, 292 F. Supp. 2d 484, 488 (S.D.N.Y. 2003) (same).

Therefore, consistent with *Geany*, the court will conditionally admit the recorded conversations during the government's case-in-chief. At the conclusion of the government's case, the court will determine whether the government has established by a preponderance of the evidence that (1) there was a conspiracy, (2) that its members included the defendants, and (3) that the statements conditionally admitted were made during the course of and in furtherance of the conspiracy. *See Farhane*, 634 F.3d at 161. In making these findings, the court may consider the statements themselves, but there must also be some independent corroborating evidence. *See United States v. Mulder*, 273 F.3d 91, 103 (2d Cir. 2001) (citation omitted). If the requisite findings cannot be made for a particular statement, *e.g.,* it is found that a statement was not made during the course of and in furtherance of the conspiracy, the court will instruct the jury to disregard the statement.

To minimize the risk of unfair prejudice to the defendants from the conditional admission of the recorded statements and to expedite trial while the jury is in session, after the conclusion of each trial day, the government shall

provide the court and the defendants with a transcript of the recorded statements that it intends to offer into evidence during the next trial day.  This procedure will enable the court to determine in advance whether a particular statement is not admissible prior to its disclosure to the jury to the extent it is possible to make such a finding prior to its presentation.

### F.    *Admissibility of New York State Supreme Court Order Against Dupree*

On August 4, 2010, in *Amalgamated Bank v. JDC Lighting, LLC et al.*, No. 651184/2010, a related proceeding initiated by Amalgamated in New York State Supreme Court, Justice Shirley Werner Kornreich granted Amalgamated's request by Order to Show Cause for, *inter alia*, an order temporarily restraining defendants, GDC and its affiliates, "and all persons or entities controlled by any of them" from "moving, removing, transferring, encumbering or otherwise taking any further action to the detriment of plaintiffs with respect to any assets . . . and . . . books [and] records . . . other than in the ordinary course of business . . . ." (ECF No. 188-10, Order to Show Cause Appointing Temporary Receiver (the "August 4 Order") ¶ 21.)  In addition, Justice Kornreich ordered that "all collections" and the funds in certain Chase accounts be deposited into accounts at Amalgamated.  (*Id.* ¶ 24.)

The government moves to admit the August 4 Order pursuant to Federal Rule of Evidence 803(8)(C) to show that Dupree knew he was obligated to deposit the collections of GDC's subsidiaries at Amalgamated and that he intended to violate that obligation. (Mot. at 6-7.) The government contends that any potential prejudice to Foley could be removed with a limiting instruction. (*Id.* at 6.) In opposition, Dupree contends that the August 4 Order is inadmissible hearsay pursuant to Rule 801(c), that the state court order does not fall within any of the hearsay exceptions, and that the purpose for which the government seeks to introduce the order – establishing Dupree's knowledge and intent to violate his obligations to Amalgamated – would require the jury to interpret the August 4 Order, which is impermissible. (Dupree Opp'n at 16-17.) Foley does not respond to this particular motion.

On July 28, 2011, the court dismissed Count Five of the S-1 Indictment, which charged Dupree with an additional count of Bank Fraud, as insufficient because it relied on the August 4 Order. As the basis for its decision, the court found the following:

> The obligation to deposit all revenue with Amalgamated, the knowing violation of which may provide a basis for the bank fraud charged in Count Five, must be found in section 5.05 of the Agreement between [Amalgamated] and the [GDC] subsidiaries, which is not specifically referenced in the [S-1 Indictment], rather than in the state court order,

which can only be interpreted by the court that issued it, and not by a federal grand jury or trial jury. Because the government concedes that the jury would be required to interpret the state court order as part of its determination of guilt under Count Five, Count Five is insufficient. In order to have sufficiently charged Count Five, the Superseding Indictment should have relied upon section 5.05 of the Agreement as a basis for alleging that Amalgamated Bank was defrauded, rather than alleging only that defendant Dupree defrauded Amalgamated via the state court's order. While the August 4 Order may properly have been referenced in the Superseding Indictment as further evidence that defendant Dupree was aware that the subsidiaries were obligated to deposit their collections with Amalgamated, the violation of that Order alone cannot be the basis of the charge.

(ECF NO. 286, Memorandum and Order); *United States v. Dupree*, 10-CR-627 (KAM), 2011 U.S. Dist. LEXIS 82817, at *13-15 (E.D.N.Y. July 28, 2011) (citing *United States v. Barnett*, 376 U.S. 681, 697-701 (1964)).[12]

Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted and is inadmissible except as provided for in the Federal Rules of Evidence. *See* Fed. R. Evid. 801(c), 802. The August 4 Order is hearsay if offered to prove the truth of the matter asserted, but the government seeks to offer it into evidence pursuant to

---

[12] In light of this decision, and because the court dismissed Count Five of the S-1 Indictment without prejudice and with leave for the government to re-present the matter to the grand jury, Dupree was subsequently charged in the S-2 Indictment returned on August 3, 2011. The S-2 Indictment amended the S-1 Indictment by adding a paragraph stating that the loan agreement between Amalgamated and GDC's subsidiaries required the subsidiaries "to maintain all of their operating bank accounts at Amalgamated Bank, and to deposit all of their revenue, upon receipt, into an operating account at Amalgamated Bank." (S-2 Indictment ¶ 13.)

Federal Rule of Evidence 803(8)(C), which does not exclude as
hearsay "[r]ecords, reports, [or] statements . . . in any form,
of public offices or agencies, setting forth . . . factual
findings resulting from an investigation made pursuant to
authority granted by law, unless the sources of information or
other circumstances indicate lack of trustworthiness."  Fed. R.
Evid. 803(8)(C).[13]  "In order to fit within the purview of Rule
803(8)(C), the evidence must (1) contain factual findings, and
(2) be based upon an investigation made pursuant to legal
authority.  Once a party has shown that a set of factual
findings satisfies the minimum requirements of Rule 803(8)(C),
the admissibility of such factual findings is presumed."
*Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000).
In addition, in criminal cases, public records evidence is not
admissible under Rule 803(8)(C) unless it is offered "against
the [g]overnment."  Fed. R. Evid. 803(8)(C); *United States v.
Yakobov*, 712 F.2d 20, 25 (2d Cir. 1983) ("Rule 803(8) therefore
did not authorize admission of the documents in a criminal
proceeding unless they were offered against the government.");
*see United States v. Davidson*, 308 F. Supp. 2d 461, 475
(S.D.N.Y. 2004) (holding that Rule 803(8)(C)permits the

---

[13]  Federal Rule of Evidence 803(8)(C), along with other Federal
Rules of Evidence discussed in this opinion, will be amended on December 1,
2011 absent contrary Congressional action.  The amendments, if they go into
effect, are intended to be "stylistic only" and thus will not affect the
court's rulings.  *See, e.g.*, Fed. R. Evid. 803 advisory committee's note.

introduction of public records evidence "against the Government in a criminal case").

First, the government is seeking to introduce the August 4 Order against Dupree, and it is therefore inadmissible because it is not being offered against the government. Second, by the government's own concession that the August 4 Order "does not contain any findings of fact" (Mot. at 7; Reply at 13), it is not admissible under the plain language of Rule 803(8)(C), which relates to "factual findings" resulting from a legally authorized investigation. *See* Fed. R. Evid. 803(8)(C). Furthermore, even if there were such findings, Rule 803(8)(C) does not apply to *judicial* findings, but is meant to apply to findings of public agencies and offices with a legal duty to make such findings after an investigation. *See United States v. Nelson*, 365 F. Supp. 2d 381, 388 (S.D.N.Y. 2005) ("[T]he Government is correct that judicial findings generally do not fall under the hearsay exception established by Rule 803(8)(C)"); *see also Nipper v. Snipes*, 7 F.3d 415, 418 (4th Cir. 1993) ("[J]udicial findings of fact are not public records within the meaning of Rule 803(8)(C) . . . ."). Indeed, the Eleventh Circuit case cited by the government in support of its position, *United States v. Jones*, 29 F.3d 1549 (11th Cir. 1994) (cited at Motion at 7; Reply at 13), explicitly states: "the plain language of Rule 803(8)(C) does not apply to judicial

findings of fact.  It applies to 'factual findings resulting from an investigation made pursuant to authority granted by law.' . . . [A] review of the advisory committee note to Rule 803 reveals that the drafters intended this portion of the rule to apply to findings of agencies and offices of the executive branch." *Id.* at 1554 (citations omitted).

The government argues that the August 4 Order "is not hearsay when it is admitted 'for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation.'" (Reply at 13 (quoting *Jones*, 29 F.3d at 1553)); *see also Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) ("A court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" (citation omitted)).[14]  The cases cited by the government involve courts taking judicial notice of state court orders for limited purposes.  *See Johnson v. Clark*, No. 2:03-cv-490-FtM-33DNF, 2006 U.S. Dist. LEXIS 7070, at *8 (M.D. Fla. Feb. 7, 2006) (permitting party to introduce evidence that (1) judicial proceedings took place, (2)

---

[14]   The language the government quotes from the Eleventh Circuit case *Jones* interprets Federal Rule of Evidence 201 governing judicial notice, which the government is explicitly not seeking (Mot. at 7), and has nothing to do with Rule 803(8)(C).  Nevertheless, the court will address this argument.

transactions were approved by probate courts in Virginia and Florida, and (3) dates of the orders and the date of the property sales as stated in the orders).

Despite its assertions to the contrary, the government is not introducing the August 4 Order for the limited purpose of establishing the existence of the civil lawsuit between Amalgamated and defendants. Instead, the government is seeking to introduce the Order for the truth of the matter asserted – to show that the August 4 Order did in fact create an obligation for Dupree and the other defendants to deposit "all collections" of GDC's subsidiaries at Amalgamated. It is only by establishing that fact that the government can then argue that "Dupree knew he was obligated to deposit the collections of GDC's subsidiaries at Amalgamated Bank, and that he intended to violate that obligation." (Mot. at 7); *see also Liberty Mut. Ins. Co.*, 969 F.2d at 1388 (finding error where the "district court relied upon the Bankruptcy Orders precisely to establish facts asserted therein, *i.e.*, 'that the Sellers listed in Schedule A attached to [the bankruptcy court's] order provided the notices required to preserve their trust rights and were cash sellers.'"). The government's attempt to introduce the August 4 Order for an improper purpose warrants its exclusion.

Finally, even if the court did find that the August 4 Order could be admitted under Rule 803(8)(C), the court would

still exclude the August 4 Order on the basis of Rule 403.  As already found by this court, the August 4 Order "can only be interpreted by the court that issued it, and not by a federal grand jury or trial jury." *Dupree*, 2011 U.S. Dist. LEXIS 82817, at *13.  If the government were to introduce the August 4 Order to show that Dupree knew that he was obligated to deposit the collections of GDC's subsidiaries at Amalgamated, the jury would be required to interpret the order and find that it created such an obligation, which this court has already been found to be impermissible and which would lead to confusion of the issues and misleading the jury.  Furthermore, several courts, including those cited by the government, have found that court orders by virtue of their having been issued by a judge cause undue prejudice.  *See, e.g.*, *Johnson*, 2006 U.S. Dist. LEXIS 7070, at *7-8 ("[T]he risk that the jury will place undue weight on the judicial opinions [plaintiff] seeks to admit is substantial, and therefore, the Court determines that the judicial orders should be excluded from evidence."); *see also Nipper*, 7 F.3d at 418 ("[J]udicial findings of fact present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, creating a serious danger of unfair prejudice." (citation and internal quotation marks omitted)).  As a final point, the government concedes that "the jury can convict Dupree of Count Five without concluding that he

violated [the August 4 Order].  Importantly, nothing in 18

U.S.C. § 1344 or the language of Count Five itself requires a

formal finding that Dupree violated [the August 4 Order]."

(Reply at 13-14.)  While the court recognizes that these

statements do not render the order irrelevant, the fact that it

is not necessary for the jury to find a violation of the August

4 Order to convict Dupree of Count Five reduces its probative

value and its centrality to the case, and risks prejudice and

confusion.  Accordingly, because the court finds that the

probative value of the August 4 order is substantially

outweighed by the danger of unfair prejudice, confusion of the

issues, and misleading the jury, the government's motion to

offer the August 4 Order against Dupree is denied.

## CONCLUSION

For the reasons set forth above, the government's

motions *in limine* are granted in part and denied in part.  (1)

The government's motion to exclude any references to the

possible consequences of defendants' convictions is granted.

(2) The government's motion to preclude testimony concerning a

government witness's treatment for depression is granted in part

and denied in part:  (a) the court precludes any testimony

regarding the witness's three psychiatrist visits from 1993 to

1994; and (b) the court will permit cross-examination regarding

(i) the nature and quantity of the anti-anxiety medication

prescribed, (ii) the dates of use, (iii) the purpose for which the witness was prescribed the medication, and (iv) whether the witness's condition and medication affected the witness's ability to perceive and recall events or to testify accurately about the facts at issue in the case. (3) The government's motion to preclude testimony regarding Veronica Finn's husband, Martin Finn, is granted in part and denied in part: (a) the court precludes defendants from suggesting that, because of Mr. Finn, the United States Attorney's Office treated Ms. Finn favorably in deciding not to charge her in this case at this time; (b) the court precludes references to prosecutorial misconduct or corruption involving Mr. Finn; (c) the court precludes any inquiry into communications between Mr. and Mrs. Finn regarding GDC; (d) the court permits defendants to cross-examine Ms. Finn regarding whether she has any bias or motive that may affect her testimony resulting from Mr. Finn's position as a former FBI agent, his relationship with the original investigating agent on the case, and his presence at the FBI's search of GDC's offices; and (e) the court permits defendants to inquire whether other witnesses were aware that Mr. Finn was present at the search of GDC's offices, and if so, whether his presence affected such witnesses' testimony. (4) The government's motion to preclude defendants from eliciting testimony during direct or cross-examination regarding their

allegations of prosecutorial misconduct is granted. (5) The government's motion to conditionally admit certain recorded conversations until the conclusion of the government's case-in-chief is granted. (6) The government's motion to admit Justice Kornreich's August 4, 2010 Order against Dupree is denied.

**SO ORDERED.**

Dated: November 22, 2011
      Brooklyn, New York

                                     _____/s/_____
                                     KIYO A. MATSUMOTO
                                     United States District Judge
                                     Eastern District of New York