UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X

UNITED STATES OF AMERICA                    **MEMORANDUM AND ORDER**

        - against -                         10-CR-627 (S-2)(KAM)

COURTNEY DUPREE,

            Defendant.
--------------------------------X

**MATSUMOTO, United States District Judge:**

        On December 30, 2011, after a jury trial, defendant

Courtney Dupree ("defendant") was convicted of a conspiracy to

commit bank fraud, bank fraud, and two counts of making a false

statement in connection with a complex $18 million scheme to

defraud Amalgamated Bank by obtaining or attempting to obtain

loans on the basis of false financial statements and other

material misrepresentations between January 2007 and July 2010.

Presently before the court are Mr. Dupree's motions for a

judgment of acquittal pursuant to Federal Rule of Criminal

Procedure 29 ("Rule 29"), or alternatively, a new trial pursuant

to Federal Rule of Criminal Procedure 33 ("Rule 33").  For the

reasons set forth below, Mr. Dupree's motions are denied.

**BACKGROUND**

**I.    The Charges Against Mr. Dupree**

        Mr. Dupree, a Wharton Business School graduate and the

chief executive officer of GDC Acquisitions, LLC ("GDC"), was

charged in all five counts of a five-count Second Superseding
Indictment. (*See* ECF No. 295, Second Superseding Indictment
("S-2 Indictment").) Count One charged Mr. Dupree with
Conspiracy to Commit Bank, Mail, and Wire Fraud in violation of
18 U.S.C. §§ 1349, 3551 *et seq.* (*Id.* ¶¶ 18-19.) Count Two
charged Mr. Dupree with Bank Fraud in violation of 18 U.S.C.
§§ 2, 1344, 3551 *et seq.* (*Id.* ¶¶ 20-21.) Counts Three and Four
charged Mr. Dupree with Making a False Statement on or about
January 6, 2010 and May 24, 2010, respectively, by "willfully
overvalu[ing] property and security, for the purpose of
influencing the action of Amalgamated Bank upon one or more
loans" in violation of 18 U.S.C. §§ 2, 1014, 3551 *et seq.* (*Id.*
¶¶ 22-25.) Finally, Count Five charged Mr. Dupree with an
additional count of Bank Fraud in violation of 18 U.S.C. §§ 2,
1344, 3551 *et seq.* (*Id.* ¶¶ 26-27.)[1]

Thomas Foley, GDC's outside counsel and subsequently
its general counsel and chief operating officer, was also
charged in Counts One, Two, and Four of the S-2 Indictment.
Rodney Watts, GDC's chief financial officer ("CFO") and chief
investment officer, was charged in Counts One through Four of
the S-2 Indictment. Mr. Foley went to trial with Mr. Dupree and
was acquitted of all charges, and Mr. Watts' trial was stayed

---

[1] Because Count Five was not tried at trial and was stayed pending
an appeal before the Second Circuit, the court will not discuss the
allegations underlying Count Five. (*See* Trial Transcript ("Tr.") 21-23.)

pending a Second Circuit appeal and is currently scheduled to begin on March 11, 2013.

The core of the fraud charges in the S-2 Indictment are that Mr. Dupree, together with others, deliberately engaged in a scheme to defraud Amalgamated Bank ("Amalgamated) by falsely overstating accounts receivable figures on borrowing base certificates provided to Amalgamated, which were used to determine the amount that GDC's subsidiaries could borrow from Amalgamated in any given month. (*Id.* ¶¶ 8-17.) Additionally, it was alleged that Mr. Dupree further defrauded Amalgamated by having GDC covertly purchase Image Lighting, Inc. in violation of the loan agreement with Amalgamated, and concealing the purchase from Amalgamated. (*Id.* ¶ 15.) Finally, the S-2 Indictment charged Mr. Dupree with attempting to obtain approximately $5 million in funding from C3 Capital, LLC ("C3 Capital"), a private equity investment firm, by submitting false financial statements and accounts receivable aging reports to C3 Capital that fraudulently inflated GDC's accounts receivable. (*Id.* ¶ 16.)

## II. The Trial and Jury Verdict

After jury selection on December 5, 2011, trial commenced with opening statements the following day on December 6, 2011. The government presented evidence over the course of

the next two weeks and rested its case on December 20, 2011.
Mr. Dupree then presented a defense case over the next week
consisting of, *inter alia*, character witnesses as well as his
own testimony, and Mr. Foley also presented an expert witness in
legal ethics.  After Mr. Dupree and Mr. Foley rested their cases
on December 27, 2011, the parties gave their closing arguments
on December 28 and 29, 2011.  Finally, on December 29, 2011, the
jury was charged and began deliberations.

On December 30, 2012, the jury returned its verdict
finding Mr. Dupree guilty of Counts One through Four and
acquitting Mr. Foley of all charges.  (*See* ECF No. 506, Jury
Verdict.)  Specifically, with respect to Count One, the jury
found that Mr. Dupree conspired to commit bank fraud but that he
did not conspire to commit mail or wire fraud.  (*Id.* at 1.)  The
jury was retained to determine issues of forfeiture in a
separate phase of the trial following the guilty verdict.  *See*
Fed. R. Crim. P. 32.2(b)(5).  On January 3, 2012, the jury found
that Mr. Dupree was liable for a forfeiture money judgment in
the amount of $18,157,000 as representing proceeds traceable to
the offenses for which he was convicted, and that the funds in
eight bank accounts and a tax refund were also subject to
forfeiture as representing property traceable to those offenses.
(*See* ECF No. 511, Special Verdict Sheet for Forfeiture.)

## III. The Government's Case-in-Chief

The case against Mr. Dupree involved a month-long trial with the testimony of over 25 witnesses, hundreds of exhibits consisting of emails and lengthy financial documents, and recorded conversations made by a government cooperator. Given the complexity of the fraud scheme, the immense volume of evidence presented at trial, and the "heavy burden" faced by Mr. Dupree in challenging the sufficiency of the evidence supporting his conviction, the court will not attempt to summarize all the evidence supporting Mr. Dupree's conviction but will highlight the most compelling evidence – which is quite extensive - from which the jury could find beyond a reasonable doubt the essential elements of the crimes charged. *See United States v. Davis*, 690 F.3d 127, 131-32 (2d Cir. 2012). In summarizing the evidence at trial, the court is mindful that "[i]n reviewing a challenge to the sufficiency of the evidence underlying a guilty verdict, [the court] 'must review the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor.'" *United States v. Cain*, 671 F.3d 271, 302 (2d Cir. 2012) (quoting *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004)).

As discussed below, in addition to the physical and documentary evidence presented, the majority of the government's case is based on the testimony of three former employees of GDC

who cooperated with the government and pleaded guilty to participating in a conspiracy to commit bank fraud with Mr. Dupree. These former employees include (1) Emilio Serrano, GDC's former assistant comptroller; (2) Irma Nusfaumer, GDC's former comptroller; and (3) Frank Patello, GDC's former CFO. All three of these former employees face a maximum prison sentence of 30 years at sentencing for their participation in the bank fraud conspiracy.

### A. GDC and Its Subsidiaries

At all relevant times between January 2007 and July 2010, Mr. Dupree was the chief executive officer and nearly sole owner of GDC.[2] (Tr. 412, 1973, 2215.) GDC was a holding company that had three wholly-owned primary operating subsidiaries, all of which were acquired by GDC prior to 2007: (1) JDC Lighting, LLC ("JDC Lighting"), which sold commercial lighting fixtures for commercial property; (2) Unalite Electric and Lighting, LLC ("Unalite"), a lighting maintenance company for corporations and other large enterprises; and (3) Hudson Bay Environments Group, LLC ("Hudson Bay"), which sold commercial office furniture to schools, hospitals, and government entities (GDC, together with JDC Lighting, Unalite, and Hudson Bay, the "Company"). (Tr. 376-78, 416-417, 1367, 1974.) As of April 2007, GDC's offices

---

[2] Mr. Dupree testified that another entity called HDL Enterprises owned approximated one to two percent of GDC. (Tr. 3670-71.) The record does not reflect whether Mr. Dupree had an ownership interest in HDL Enterprises.

were located in Long Island City in Queens, New York.  (Tr. 1696-97.)

**B.  Obtaining the Loans from Amalgamated Bank**

In or around April or May of 2008, George Jarvis, a loan officer for Amalgamated, first became aware of GDC and met with Mr. Dupree, Mr. Watts, and Mr. Patello regarding a possible loan to the Company.  (Tr. 1971-73, 2229.)  At the time of that meeting, Mr. Watts was GDC's chief investment officer and Mr. Patello was GDC's CFO.  (Tr. 1973, 2229.)  In connection with this meeting, Mr. Dupree and his employees provided Amalgamated with information concerning the financial condition of the Company, including audited financial statements, accounts receivable reports[3], aging reports, backlog reports, and acquisition documents for companies acquired, such as Hudson Bay.  (Tr. 1974, 2229-31.)

In connection with a loan application by the Company, Amalgamated was provided the draft consolidated financial statements of the Company for the period ending December 31, 2007, which were prepared by an independent auditor based on information provided by the Company (the "2007 Financial Statement").  (Government Exhibit ("GX") 148; Tr. 1975-77.)  The 2007 Financial Statement represented that "[t]he Company

_____

[3]  Accounts receivable or "A/R" is a term for the money that is owed to a company by a customer for goods delivered or services rendered to the customer.  (Tr. 344-45, 440, 1978, 1986.)  Accounts receivable are listed on the balance sheet of a company as an asset.  (Tr. 440.)

recognizes revenue at the time products are delivered to customers or when maintenance services are provided" (the "Revenue Recognition Policy"). (GX 148 at 7.) Mr. Jarvis testified that the 2007 Financial Statement, particularly the Revenue Recognition Policy, the net income figures, and the availability of collateral, played an important role in Amalgamated's decision to loan money to the Company. (Tr. 1977-78, 1992.) Specifically, the Revenue Recognition Policy was important because when the Company booked a sale and recognized revenue, it created a receivable that was collateral for the Amalgamated loan. (Tr. 1978.) Additionally, net income was important because it showed that the Company was viable, was growing its equity base, and had the ability to generate cash flow to repay a loan. (Tr. 1978-79.)

Mr. Patello testified that the 2007 Financial Statement falsely reported the Company's net income to be approximately $1.547 million when it was only half that amount, or approximately $720,000, and that Mr. Dupree and Mr. Watts knew about this false figure prior to the submission of the 2007 Financial Statement to Amalgamated. (Tr. 2231-34, 2240-43.) Furthermore, Irma Nusfaumer testified that, at the direction of Mr. Patello, she submitted reports to Amalgamated personnel in connection with the loan application process that included accounts receivable for products that had not yet been delivered

to customers, in violation of the Revenue Recognition Policy. (Tr. 1288-90.)  Mr. Jarvis testified that, had he known in August 2008 that the Company was recognizing revenue before products were delivered, he would not have recommended a loan because such a practice would indicate that the books and records of the Company were not being maintained in accordance with Generally Accepted Accounting Principles ("GAAP").  (Tr. 2064-65.)  In other words, according to Mr. Jarvis, the practice of recognizing accounts receivable for products that had not yet been delivered increased the risk of the bank relying on "false collateral."  (*Id.*)

In or around November 3, 2008, after Amalgamated had extended the loans described below, Amalgamated received the final version of the 2007 Financial Statement, which contained the same Revenue Recognition Policy and net income figures as the draft statements provided in connection with the loan application.  (Tr. 1980-81, 2245-46; GX 188.)

### C.   The Terms of the Loans

Mr. Dupree signed the loan agreement dated August 29, 2008 (the "Loan Agreement") on behalf of JDC Lighting, Unalite, and Hudson Bay (the "Borrower Subsidiaries"), and on behalf of GDC as guarantor, pursuant to which Amalgamated extended two loans to the Borrower Subsidiaries:  (1) a $2.5 million three-year term loan, which was to be repaid via monthly payments of

$41,666.67 plus interest with an approximate one million dollar balloon payment at the end of the three-year term (the "Term Loan"); and (2) an $18.5 million revolving loan or line of credit, pursuant to which the Borrower Subsidiaries could borrow up to $18.5 million (the "Revolving Loan"). (Tr. 1982-84; *see generally* GX 8 (the Loan Agreement).)

In connection with these loans, the Borrower Subsidiaries' accounts receivable and inventory served as collateral that Amalgamated could collect in the event the Borrower Subsidiaries failed to repay the loan in accordance with the Loan Agreement. (Tr. 1991-92.) The Loan Agreement also restricted the use of loan proceeds to (1) repay outstanding indebtedness to Steelcase, Inc., a creditor of the Company, and PNC Bank, the Company's former lender; (2) working capital to assist in financing the expansion of the principal businesses, capital expenditures, and general corporate purposes; and (3) payment of fees and expenses in connection with the loans. (Tr. 1993; Loan Agreement § 1.07.) Although GDC was not a borrower under the Loan Agreement, it guaranteed all the obligations of the Borrower Subsidiaries in connection with the Loan Agreement. (Tr. 1983; Loan Agreement § 1.08; *see also* GX 8 (the Guarantee Agreement (DOJ-GDC-000000637-44).)

The maximum amount that could be borrowed under the Revolving Loan was calculated using a formula based on the

Borrower Subsidiaries' "eligible" accounts receivable ("Eligible
A/R") and inventory ("Eligible Inventory").  (Tr. 1985-86.)  The
Loan Agreement defined "Account Receivable" as "any right of any
Borrower to payment for goods sold or services rendered, whether
now existing or hereafter arising," and "Inventory" as "all
finished goods, raw materials and other merchandise of the
Borrowers . . . held for sale."  (Loan Agreement § 8.01.)
Specifically, the Borrower Subsidiaries could borrow up to (1)
75% of the Eligible A/R, which excluded, *inter alia*, accounts
receivable recognized from "bill and hold" or deferred shipment
transactions and accounts receivable that had not been paid in
full within 120 days after the invoice date, and (2) 50% of
Eligible Inventory, which excluded, *inter alia*, obsolete,
defective, or damaged inventory.  (Tr. 1986-87; Loan Agreement
§§ 1.01(a), 8.01.)  The rationale underlying the exclusion of
accounts receivable older than 120 days was that such accounts
receivable were unlikely to be collected and could not serve as
"healthy" collateral to secure the loan.  (Tr. 1987-88.)

         The total amount that *could* be borrowed on the
Revolving Loan at any time pursuant to the formula described
above is called the "Borrowing Base," which is essentially the
amount of collateral available to secure the loan.  (Tr. 1985-
86; Loan Agreement § 8.01.)  The minimum payment the Borrower
Subsidiaries were required to make for the Revolving Loan

consisted of the interest on the outstanding principal balance on a monthly basis, a payment the Borrower Subsidiaries made each month. (Tr. 1989-90.) If, at any given time, the outstanding balance exceeded the Borrowing Base, Amalgamated could require the Borrower Subsidiaries to repay the excess amount so that the outstanding balance would not exceed the Borrowing Base. (*Id.*)[4]

The Borrower Subsidiaries were also required to provide a borrowing base certificate ("BBC") to Amalgamated on a monthly basis that calculated the Borrowing Base, reported the Eligible A/R and Eligible Inventory figures, and listed the amount available under the line of credit, which was the Borrowing Base less the outstanding balance. (Tr. 1990-91; Loan Agreement § 5.01(j); GX 11 (BBCs).) Every one of the BBCs submitted to Amalgamated was signed by either Mr. Patello, Mr. Dupree, and/or Mr. Watts, and stated in relevant part:

> The Undersigned [Mr. Dupree, Mr. Patello, and/or Mr. Watts] of GDC Acquisitions, LLC (the "Company"), do hereby certify to Amalgamated Bank (the "Bank"), intending that the Bank rely on this [Borrowing Base]

---

[4] For example, based on the formula prescribed in the Loan Agreement, assuming there is no Eligible Inventory, if the Borrower Subsidiaries had $100,000 in accounts receivable in January, but $20,000 of that amount was attributable to an invoice for products delivered that had not been paid within 120 days of the invoice date, Eligible A/R would consist of $80,000. The Borrower Subsidiaries could then borrow up to 75% of that amount, or $60,000, which would be the Borrowing Base under the Revolving Loan. If the Borrower Subsidiaries did in fact borrow $60,000 in January, but the Borrowing Base decreased to $40,000 in February due to fewer sales, the Borrower Subsidiaries would be required to pay $20,000 to Amalgamated to ensure that the principal amount borrowed did not exceed the Borrowing Base. (*See* Tr. 1986-90.)

> Certificate in extending credit to the Company, that
> based upon the books and records of the Company and
> its subsidiaries which are true and correct as of [the
> relevant date], the following items of the Company and
> its subsidiaries on a consolidated basis were as set
> forth below:

(GX 11.) From the BBC, it could also be determined whether the
outstanding balance on the Revolving Loan exceeded the Borrowing
Base. (*See id*.) Attached to the BBCs was an aging report that
showed the due date of each accounts receivable used to
calculate the Borrowing Base and whether or not such accounts
receivable were more than 120 days old. (Tr. 2039-40, 2048; *see*
Loan Agreement § 5.01(j).)

Additionally, the Loan Agreement contained negative
covenants stating that the Borrower Subsidiaries "shall not,
directly or indirectly": (1) "[c]onsolidate with, be acquired
by, or merge into or with any Person . . . except in the
ordinary course of business" (Loan Agreement § 6.03); or (2)
"[m]ake any loan or advance to, or enter into any arrangement
for the purpose of providing funds or credit to, or make any
other investment, by capital contribution or otherwise, in or
with any Person" except for a money market or investment account
at Amalgamated or "extensions of credit in the nature of
accounts receivable or notes receivable" (*id*. § 6.04). Mr.
Jarvis, who negotiated these provisions, testified that they
prevented the Borrower Subsidiaries from buying or investing in

any other companies without permission from Amalgamated. (Tr. 1997.) For example, if one of the Borrower Subsidiaries consolidated its business with that of a multi-million dollar company in another state, Mr. Jarvis testified that such a transaction would be a violation of § 6.03 of the Loan Agreement. (Tr. 2150.) Furthermore, if one of the Borrower Subsidiaries used $400,000 of loan proceeds to buy another company's intangible assets, Mr. Jarvis testified that such a transaction would violate § 6.04 of the Loan Agreement. (Tr. 2155.) Finally, the Loan Agreement required that the Borrower Subsidiaries maintain a Debt to Net Worth Ratio of not more than 3-to-1 and Earnings before Interest, Taxes, Depreciation, and Amortization ("EBITDA") of $5.5 million or greater per fiscal year. (Loan Agreement § 6.08(a)-(b); *see also* Tr. 2473-74.)

### D. The Image Lighting Acquisition Transaction

On June 30, 2008, Mr. Dupree sent an email to Mr. Foley, then GDC's outside counsel, attaching a letter of intent to purchase Image Lighting, Inc. ("Image Inc."), a lighting company owned by Jim McCarthy that was located in East Rutherford, New Jersey, for $800,000 (the "Image Transaction"). (Tr. 445, 449-50, 452; GX 53.) In this email, Mr. Dupree instructed Mr. Foley to draft a "simple asset purchase agreement" and stated that "[t]he only nuance is that we will acquire the company in two pieces": (1) a newly formed company

14

called "TDC" will acquire the intangible assets of Image Inc., such as customer lists and goodwill; and (2) the employees of Image Inc. will be hired by GDC under a separate newly formed company called Image Lighting Services, LLC ("Image Lighting"). (GX 53; *see also* Tr. 452-53, 965.) Specifically, Mr. Dupree informed Mr. Foley that "[w]e are not taking the A/R and A/P [accounts payable], which will stay with the company," and explained that this acquisition structure "is not really as confusing as it sounds and there is a business reason behind the somewhat convoluted structure." (GX 53.) Mr. Serrano, at the instruction of Mr. Dupree, Mr. Watts, and Mr. Patello, conducted due diligence on Image Inc. prior to August 2008 to determine whether or not it was a good company to purchase. (Tr. 445-46, 2248-49, 2256-57.)

Consistent with the instructions in Mr. Dupree's June 30, 2008 email, Mr. Foley formed three new companies in New Jersey in November 2008 in connection with the contemplated Image Transaction: (1) TDC Acquisitions LLC ("TDC"), which is wholly-owned by GDC (Tr. 456; GX 4); (2) Image Lighting, which is wholly-owned by TDC (Tr. 454-55; GX 5); and Interconnect Lighting LLC ("Interconnect"), which is wholly-owned by Mr. Dupree's fiancé, Stephanie Horton, who is listed as the sole member/manager of Interconnect despite not having any role in its management (Tr. 481-82; GX 85). The registered office for

TDC, Image Lighting, and Interconnect all have the same address, which is the address of Mr. Foley's law firm, Foley, Perlman, and Campbell, LLC, in Hoboken, New Jersey. (Tr. 455-56, 481; GX 4, GX 5, GX 85.) Because Image Lighting was owned by TDC, which was owned by GDC, Mr. Dupree, as the owner of GDC, also owned Image Lighting. (Tr. 458.)

On December 5, 2008, approximately three months after the Amalgamated loans were executed, Mr. Foley's law firm sent a check to Image Inc. for the acquisition in the amount of $790,000, comprised of funds from the concentration account at Amalgamated in the name of Hudson Bay, one of the Borrower Subsidiaries of GDC (the "Concentration Account"), and from Mr. Dupree personally. (Tr. 459-62, 2871-75; GX 450.)[5]

The Image Transaction was not disclosed on any of the Company's financial statements and Amalgamated was never informed of the Image Transaction because, after a conversation among Mr. Dupree, Mr. Patello, and Mr. Watts, it was determined that it would not be in the Company's best interest to inform Amalgamated of the transaction due to the fact that it was prohibited by the Loan Agreement. (Tr. 588, 2249-51, 2255, 2273-74, 2320.) Specifically, Mr. Patello testified that Mr. Dupree told him that the Image Transaction was not permitted

_____

[5] The Concentration Account was an account maintained at Amalgamated through which (1) the Borrower Subsidiaries received loan proceeds from the bank and (2) interest and other payments were made on the Revolving Loan from customer payments received by the Company. (Tr. 460-61.)

under the terms of the Loan Agreement with Amalgamated and a prior loan agreement with another senior lender, MVC Capital. (Tr. 2255; *see also* Tr. 1297-98.) As a result, Mr. Dupree, Mr. Watts, and Mr. Patello told Mr. Serrano to keep the Image Transaction a "secret." (Tr. 446-47.)

Accordingly, several efforts were made to conceal the Image Transaction from Amalgamated and no public disclosure regarding the transaction was made. (Tr. 1478-80.) First, in an effort to conceal from outside auditors the fact that $400,000 in Amalgamated loan proceeds were used to purchase Image Inc., Mr. Patello and Ms. Nusfaumer arranged a convoluted series of four $400,000 transfers among various bank accounts, including that of Interconnect.[6] (Tr. 463-73, 479-80, 2874-78; GX 449.) The net effect of these four transactions was zero, with the Concentration Account still having contributed $400,000 in loan proceeds toward the purchase of Image Inc., and thus the sole purpose of these transactions was to conceal the Image Transaction from Amalgamated. (Tr. 2874-78; GX 449.)

---

[6] The transfers consisted of the following: (1) a December 26, 2008 wire transfer of $400,000 from the Concentration Account at Amalgamated to an Interconnect bank account at Chase (Tr. 469, GX 442 at 1); (2) a December 26, 2008 withdrawal of $400,000 from Interconnect's Chase bank account to Foley's law firm (Tr. 469, GX 442 at 3); (3) a December 29, 2008 deposit of $400,000 from Foley's law firm to JDC Lighting's bank account at Amalgamated (Tr. 470-72, GX 346 at 2); and (4) a $400,000 transfer from JDC Lighting's bank account at Amalgamated to the Concentration Account (Tr. 472-73, GX 83).

Second, Mr. Serrano, in consultation with Mr. Patello, altered the legal bills of Mr. Foley, GDC's attorney on the Image Transaction, to remove any references to Image Lighting or to an employment agreement between Jim McCarthy, Image Inc.'s former owner, and JDC Lighting, to ensure the Image Transaction would not be disclosed to outside auditors. (Tr. 491-95, 2276-77; GX 6.) Mr. Serrano later destroyed the altered legal bills after they had been reviewed by the auditors. (Tr. 495.)

Third, although the operations of Image Lighting were consolidated with that of JDC Lighting after the Image Transaction (Tr. 2349-50, 2443, 2610-11), Image Lighting was falsely portrayed as a customer of JDC Lighting to outside creditors, including Amalgamated, and was listed as a customer of JDC Lighting in its books (Tr. 485). Indeed, JDC Lighting falsely booked accounts receivable owed to it by Image Lighting to perpetuate the false depiction of Image Lighting as a customer of JDC Lighting, and Interconnect was used as a shell company to pay down JDC Lighting's accounts receivable for Image Lighting so that Amalgamated would not be alerted to Image Lighting's true ownership. (Tr. 485-86, 782-83, 1297-98.)[7]

---

[7] (*See* Tr. 485 (Mr. Serrano: "So we would send the money to Interconnect, and then Interconnect would send the money to Image Lighting, and Image Lighting would send the money back to JDC so that we could write down the accounts receivable that was sitting in JDC's books for Image Lighting.").)

Due to concerns by expressed by Mr. Dupree, a Post Office Box ("P.O. Box") for Image Lighting was also established in Mt. Arlington, New Jersey to receive audit confirmations[8] so that it would be appear that Image Lighting had a separate office from GDC and JDC Lighting, like any other customer. (Tr. 500-02, 538-541, 786-88.) Both Mr. Dupree and Mr. Patello also signed checks on behalf of Image Lighting, and when a $500,000 check signed by Mr. Patello on behalf of Image Lighting bounced, Mr. Jarvis of Amalgamated immediately called Mr. Dupree to inquire why Mr. Patello was signing checks on behalf of Image Lighting, a purported customer. (Tr. 541-42, 547-49, 1297-1303.) In order to conceal Image Lighting's true ownership, Mr. Dupree lied to Mr. Jarvis and told him that Mr. Patello had accidentally signed the check after Mr. McCarthy left the check on Mr. Patello's desk during a visit to GDC's offices. (Tr. 548-49, 1301-03; *see also* GX 364 (Recording 3-5) (Mr. Watts stating that Mr. Dupree "had to come up with some cock-and-bull story, and I mean it was literally bullshit, it was literally outrageous," to explain the bounced check signed by Mr. Patello).)

---

[8] Generally, audit confirmations are used during an audit to obtain evidence from third parties regarding assertions that have been made by a client's management with respect to its financial statements. Here, audit confirmations were sent to Image Lighting in approximately February or March of 2010 to confirm the amount of accounts receivable associated with Image Lighting that were on the books of JDC Lighting. (Tr. 540-41.)

Additionally, in August 2009, after being directed, prepared, and trained by Mr. Dupree and Mr. Watts, Mr. Serrano falsely portrayed himself as a fictional Image Lighting employee named "Ernest Sullivan" using a disposable cell phone in a call with a potential creditor, C3 Capital, whose representative wanted to speak with JDC Lighting's customers in connection with performing due diligence on the Company for a potential loan. (Tr. 610-15, 631-36, 1958-65; *see* GX 37, GX 124, GX 271.) Prior to the call with C3 Capital, Mr. Dupree and Mr. Watts called Mr. Serrano into Mr. Watts' office, which was more private than Mr. Serrano's cubicle in the middle of the office. (Tr. 613-15.) Mr. Dupree and Mr. Watts then held a mock interview in which they pretended to be C3 Capital employees and questioned Mr. Serrano acting as an employee of Image Lighting to see what his answers would be to C3 Capital's questions regarding the business relationship between JDC Lighting and Image Lighting. (*Id*.) After the mock interview, Mr. Dupree and Mr. Watts "critiqued" Mr. Serrano's answers and instructed him to falsely tell C3 Capital that Image Lighting and JDC Lighting had a good relationship and that Image Lighting would continue doing business with JDC Lighting through 2009 and 2010. (Tr. 614-15.)

Subsequently, on August 5, 2009, using a telephone number for Ernest Sullivan provided by Mr. Patello via an email dated August 4, 2009 (GX 124), Jared Poland of C3 Capital called

and spoke with Mr. Serrano believing that he was speaking with an individual named Ernest Sullivan of Image Lighting (Tr. 1960-63).[9] As documented in notes Mr. Poland took to memorialize the telephone conservation, Mr. Poland testified that "Mr. Sullivan" – or Mr. Serrano - told him that Image Lighting had been a customer of JDC Lighting for two years, that JDC Lighting's management was "great" and responsive to Image Lighting's needs, and that Image Lighting's "pipeline in New York and New Jersey is still full." (Tr. 1964-65.) Mr. Serrano testified that, after he was asked to fake the identity of "Ernest Sullivan" to maintain the false appearance of Image Lighting as a customer of JDC Lighting, he "understood that [he] was committing fraud by doing all these lies for the company." (Tr. 637-38.)[10]

Significantly, as discussed above, although the Company did not purchase any of Image Inc.'s accounts receivables but only its intangible assets, Mr. Serrano falsely

---

[9] In an email dated July 27, 2009 from Mr. Patello to Mr. Poland, on which Mr. Dupree and Mr. Watts are copied, Mr. Patello attempts to deter Mr. Poland from reaching out to Image Lighting by stating that "[o]ur contact person at Image is out of the country for at least the next 2 weeks on vacation and is probably not reachable – do you want to select a different customer." (GX 271.) Mr. Poland, however, responds that "[s]ince Image is a large JDC customer, we would still like to talk to them even if it is delayed." (*Id.*) This email provides further evidence of Mr. Dupree's knowledge and participation in deceiving creditors and potential creditors as to the true relationship between Image Lighting and JDC Lighting.

[10] The head of information technology for the Company, James Bowden, also provided Mr. Serrano with a fake Image Lighting email address for "Ernest Sullivan" so that he could be contacted by C3 Capital and respond to any of its questions as a representative of Image Lighting, but the only communication between Mr. Serrano as "Ernest Sullivan" and C3 Capital was by phone. (Tr. 631-34.)

recorded approximately $2 million of Image Inc. accounts
receivables on the books of JDC Lighting, ultimately at the
direction of Mr. Dupree.  (Tr. 496-99, 902-03, 2325-27, 2267-
70.)  These false accounts receivable could never be collected
by the Company because they were actually retained by Image Inc.
and its former owner, Mr. McCarthy.  (Tr. 496-97, 902-03, 2270,
2325-27; *see also* Tr. 1466-68.)  The effect of this false
listing of accounts receivable was to increase the Eligible A/R
and thus the Borrowing Base under the Loan Agreement, thereby
permitting the Borrower Subsidiaries to borrow approximately
$1.5 million more under the Revolving Loan than they would have
been able to without the additional $2 million in accounts
receivable.  (Tr. 498.)

### E.    Inflation of Accounts Receivable in 2009 and 2010

The government presented evidence that Mr. Dupree and
his coconspirators falsely overstated the Eligible A/R on BBCs
submitted to Amalgamated, which had the effect of maintaining
the Borrowing Base at an artificially high level and thus
falsely increasing the amount that could be borrowed under the
Revolving Loan.  Even if no additional borrowing was requested
on the Revolving Loan after it was originally disbursed (*see* GX
11), by falsely maintaining the Borrowing Base at a higher level
than the outstanding amount on the Revolving Loan, Mr. Dupree
and his coconspirators ensured that the Borrowing Subsidiaries

would not have to repay the principal amount on the loan when it would have otherwise fallen below the Borrowing Base.

Mr. Dupree was actively involved in the submission of the false BBCs to Amalgamated.  In 2009, Mr. Patello provided Mr. Dupree, Mr. Watts, and Ms. Nusfaumer with handwritten summaries on an almost monthly basis reconciling the financial information reported to Amalgamated in the most recent BBC – which contained overstated accounts receivable figures - with the true state of the financial affairs of the Company.  (Tr. 2335-38; *see* GX 258 (07/31/09), GX 259 (05/31/09), GX 260 (04/30/09), GX 261 (03/31/09), GX 262 (02/28/09), GX 281 (01/31/09), GX 292 (08/31/09), GX 293 (09/30/09).)[11]  For example, the handwritten summary dated January 31, 2009 (GX 281), which was provided to and discussed with Mr. Dupree, indicates, *inter alia*, that the Eligible A/R reported in the BBC for January 31, 2009 (GX 11 (DOJ-GDC-000005227)) was overstated to such an extent that the Company had borrowed $7.6 million in excess of what it would have been able to borrow had accurate accounts receivable figures been reported in the BBC.  (Tr.

---

[11]  The dates in parentheses indicate the date for which the relevant BBC was submitted.  (Tr. 2337-38.)  For example, GX 281 is dated "01/31/09," and is reconciling the numbers reported to Amalgamated for the BBC as of January 31, 2009 (GX 11 (DOJ-GDC-000005227)) with the true state of the Company's books on that same date.  Mr. Patello also testified that the figures in these handwritten summaries were generally recorded in the thousands, and that three zeroes should be added to the end of each figure. (Tr. 2338.)  Thus, a four-digit number indicated an amount in the millions. (*Id.*)

2338-45.)  Mr. Patello also testified that the "All Accounts Receivable" figure of $24,903,342 reported in the BBC for November 30, 2009 was inflated by approximately $11 million. (Tr. 2376; GX 11 (DOJ-GDC-000005234).)

The evidence at trial established that the inflation of accounts receivables in the BBCs and the back-up materials submitted to Amalgamated was accomplished primarily via three methods:  (1) fictitious sales; (2) prebilling; and (3) reaging.[12]  In the end, although each of these methods can be distinguished from one another, the government's evidence established that they all have the same purpose – to falsely inflate the accounts receivable figures submitted to Amalgamated in order to maintain or increase the amount of money that could be borrowed on the Revolving Loan.  Each of these inflationary methods will be discussed in turn.

### 1.  *Fictitious Sales*

The government presented evidence at trial that millions of dollars of accounts receivables were recorded on BBCs submitted to Amalgamated for fictitious sales.  (Tr. 2325.) First, as previously discussed, Mr. Dupree directed Mr. Patello to falsely book approximately $2 million of accounts receivables

---

[12]  Evidence regarding other methods of inflating the accounts receivables was also presented to the jury.  For instance, the jury heard about "unapplied cash," which is when cash collected from a customer for a sale would not be applied to reduce the amount of receivables, thus inflating the receivables and allowing the Borrower Subsidiaries to borrow more on the loan.  (Tr. 686, 2340-41; GX 281, GX 262.)

associated with Image Inc. on the books of JDC Lighting.  (Tr. 2216, 2268.)  Indeed, in the handwritten summary dated January 31, 2009 provided to Mr. Dupree, Mr. Patello indicated that there were $2,043,000 of fake Image Inc. accounts receivables on the books of JDC Lighting that were included on the BBC for January 31, 2009.  (Tr. 2339; GX 281.)  Mr. Serrano also testified that these fictitious Image Inc. accounts receivables were included in the accounts receivable figure of $23,549,332 reported in the consolidated financial statement for 2008 (GX 22 at 3), which, together with other inflationary practices, overstated the accounts receivable by approximately $5 million (Tr. 1057-58).

Second, in the last quarter of 2009, ultimately at the direction of Mr. Dupree, Mr. Patello instructed Ms. Nusfaumer to copy outdated School Construction Authority ("SCA") orders with Hudson Bay from years in the past, and to create new, fake invoices totaling more than approximately $3 million with the current date, even though SCA no longer owed Hudson Bay any money for those orders.  (Tr. 1330-33, 1336-37, 2538-39.)  Ms. Nusfaumer was also instructed to accomplish this task by herself so that others would not find out about the fake invoices.  (Tr. 1331.)  In order to create the invoices in the accounting system utilized by GDC and its subsidiaries – known as "Hedberg" (Tr. 660) – without alerting Hudson Bay employees that had access to

all of Hudson Bay's orders and would have known these new SCA invoices were fake, Ms. Nusfaumer listed a former Unalite employee named "Eric Leroy" as the salesperson associated with the orders rather than a current Hudson Bay employee. (Tr. 1332, 1804-06, 2711.)

After these fake invoices were created in Hedberg, Mark Jozefowski, the former senior vice president and general manager of Hudson Bay, recognized that certain of SCA's past orders with Hudson Bay were being replicated in the accounting system with a different order number and a different salesperson - Eric Leroy - who never worked at Hudson Bay. (Tr. 1804-09.) Mr. Jozefowski thus sought an explanation from Mr. Patello regarding "what [Mr. Jozefowski] affectionately called 'garbage' in the system," and Mr. Patello then directed him to Mr. Dupree. (Tr. 1809.) Mr. Dupree explained that the invoices were created to "bring the sales from Image Lighting into our system" and were "needed to recognize the sales," and that the orders would be reversed once Image Lighting was more fully incorporated into the Company. (Tr. 1810.) During this conversation, Mr. Jozefowski voiced his concern to Mr. Dupree that these new fake invoices not be sent to SCA, one of Hudson Bay's best customer accounts, because he did not want to receive calls from SCA about orders it did not place and "the last thing we would want to do was upset that relationship." (Tr. 1811, 1859-60.)

Ultimately, the fake SCA invoices totaling approximately $3 million, which all bore dates from August 2009, appeared in the accounts receivable aging report for Hudson Bay as of November 30, 2009. (Tr. 591-92; GX 74 at 10-13 (Invoice Nos. 90199-90297).) Because the fake SCA invoices were less than 120 days old, they were included as Eligible A/R in the BBCs submitted to Amalgamated, enabling the Borrower Subsidiaries to borrow 75% of the total amount of the fake invoices. (Tr. 1337, 2327, 2358, 2538-39.) Diane Mendez of SCA testified at trial that SCA never received the August 2009 invoices created by Ms. Nusfaumer, which, except for the different date and invoice numbers, were the same as SCA invoices dating back to 2007 for which SCA had previously paid. (Tr. 2840-50; GX 454; *see also* Tr. 1811-12.)[13] Ms. Mendez's testimony thus corroborated that of Ms. Nusfaumer and Mr. Patello regarding their efforts to copy old SCA invoices and issue new, recent invoices that would not be sent to SCA for payment because they represented fictitious additional sales.

---

[13] Ms. Mendez prepared a report (GX 454) indicating that the August 2009 invoices created by Ms. Nusfaumer had been previously paid for by SCA and that the SCA purchase orders for those invoices referenced different invoice numbers from prior years. For example, the accounts receivable aging report for Hudson Bay as of November 30, 2009 lists invoice 90199 dated August 7, 2009 as an SCA order totaling $92,519.11. (GX 74 at 10.) Invoice 90199 also references SCA purchase order number 734861, which is a number that SCA assigned to its purchase order for this order. (*Id.*) According to Ms. Mendez's report, however, in connection with purchase order 734861, SCA paid Hudson Bay $92,519.11 via a check dated September 26, 2007 for invoice 78926, not invoice 90199. (GX 454.) Thus, invoice 90199 was simply a copy of invoice 78926 with a different date.

Additionally, Mr. Patello's handwritten summaries to Mr. Dupree dated August 31, 2009 (GX 292) and September 30, 2009 (GX 293) indicated that there were $3,076,000 in false accounts receivable attributable to SCA.[14]

Third, the jury heard evidence regarding approximately $500,000 in fictitious sales to Columbia University Facilities ("Columbia") that were recorded in the accounts receivable aging report for Hudson Bay as of November 30, 2009. Specifically, in or around late January and early February 2010, Mr. Patello provided Mr. Dupree with a year-end handwritten reconciliation for 2009 that had a notation stating "Columbia Double Billed 501." (Tr. 2365; GX 273 at 4 (DOJ-SW-GDC000014572).) Mr. Patello testified that this notation meant that there were approximately $500,000 in sales associated with Columbia that were erroneously booked as $1 million, but that were left on the books as $1 million despite knowledge of the error by Mr. Dupree so that the Borrower Subsidiaries could borrow against the larger amount. (Tr. 2325-26, 2372-73, 2490.)

Similarly, agents of Henegan Construction ("Henegan Construction") and Bedford Stuyvesant Family Health Center

---

[14] At some point before Mr. Patello left GDC in March 2010, Mr. Patello had convinced Mr. Dupree to reverse a portion of the fictitious SCA invoices, and Mr. Patello subsequently instructed Ms. Nusfaumer to reverse the accounts receivable. (Tr. 1338-39.) After Ms. Nusfaumer had effected the reversal, she had a conversation with Mr. Dupree in which he was upset that the reversal had negatively affected the income statement. (Tr. 1339-40.)

("Bedford Stuyvesant"), customers of JDC lighting and Hudson
Bay, respectively, testified and provided certifications that
they never received invoices that were included in the aging
reports and Eligible A/R calculations for BBCs submitted to
Amalgamated.  (Tr. 1529-35, 1568-72; GX 246, GX 247).  For
instance, the aging report for JDC Lighting as of April 30,
2010, which was submitted in connection with the BBC for April
30, 2010, listed invoice 52642 dated April 5, 2010 for Henegan
in the amount of $412,595.30 (GX 75 at 8 (DOJ-FC-GDC00005314)),
even though Henegan had not done any business with JDC Lighting
since 2008 and had never done any business in an amount greater
than $250,000 (Tr. 1533-34; GX 247).  Additionally, the aging
report for Hudson Bay as of April 30, 2010, which was also
submitted in connection with the BBC for April 30, 2010,
contained invoice 91985 dated March 17, 2010 for Bedford
Stuyvesant in the amount of $539,590.08 (GX 76 (DOJ-FC-
GDC00005387)), even though no such invoice was received by
Bedford Stuyvesant (Tr. 1572; GX 246).

   2.  *Prebilling*

   Prebilling occurred at the Company when an accounts
receivable figure was recorded on the books for a sales invoice
prior to the delivery of a product or the performance of a
service and prior to sending a bill to the customer, which was
in violation of the Revenue Recognition Policy.  (Tr. 2324-25.)

The jury heard evidence from numerous witnesses of several instances of prebilling that were used to inflate the Eligible A/R in the BBCs, which was also documented in Mr. Patello's handwritten summaries provided to Mr. Dupree and in several emails. (*See, e.g.*, Tr. 735-36, 642-43, 1308-11, 1351, 1813, 2329-31, 2339; GX 88, GX 94, GX 258-62, GX 281.)

For example, on May 19, 2009, Mr. Dupree wrote an email to Mr. Jozefowski with the subject "Frank needs another $700k in billing!!!" and stating in the text that "I need this done. Come talk to me if this isn't possible." (GX 265.) Mr. Patello testified that this email was a direct result of a conversation that he and Mr. Dupree had prior to Mr. Dupree sending the email. (Tr. 2352.) During that conversation, Mr. Patello "informed [Mr. Dupree] that in order to meet the BBC [for April 2009], i.e., keep our borrowing at the level we required, we needed an additional $700,000 in sales. Since there were no billings available, we were looking for orders that we could prebill, and Mr. Dupree issued this [email] to Mr. Jozefowski." (Tr. 2352-54.) In response to Mr. Dupree's email, Mr. Jozefowski stated that "[w]e pushed about 1.3 million that wasn't ready to hatch 30 days ago . . . . we booked close to another 2 mill since then that has been billed already." (GX 265.) Mr. Patello testified that Mr. Jozefowski's figures referred to prebilling. (Tr. 2353.) Notably, the BBC for April

30, 2009 was signed by Mr. Patello on May 20, 2009, the day after Mr. Dupree sent this email to Mr. Jozefowski.  (GX 11 (DOJ-GDC-000005219).)

Additionally, the jury heard evidence that Zwicker Electric ("Zwicker"), a customer of JDC Lighting, never received two invoices, one totaling $587,925.01 dated March 29, 2010 (Invoice No. 52617) and one totaling $1,375,000 dated April 21, 2010 (Invoice No. 52632) (Tr. 1516; GX 245), even though both invoices were included on the accounts receivable aging report for JDC Lighting as of April 30, 2010 (GX 75 at 23).  In a recording dated June 23, 2010, Mr. Serrano and Mr. Watts discussed altering Zwicker invoice 52617, and Mr. Serrano testified that he or one of his staff members created the invoice so that $587,925 could be included in the calculation of the Borrowing Base, even though the invoice was never sent to Zwicker.  (Tr. 817-21; GX 404 (Recording 14-1).)  Ms. Rohrssen of Zwicker also testified that Zwicker worked on a project with JDC Lighting involving approximately $1.375 million for the Staten Island Courthouse – the same amount as invoice 52632 – but that the project was never consummated and that JDC Lighting never delivered any products in connection with that project. (Tr. 1516-17.)

Notably, in an email dated August 19, 2009, approximately eight months prior to the date of the April 21,

2010 invoice relating to the Staten Island Courthouse, Mr. Watts
wrote the following in an email to Mr. Patello, copying Mr.
Dupree:  "Per Courtney . . . We have a P.O. from Zwicker for
Staten Island Courthouse ($1.325MM); if necessary, bill it."
(GX 285.)  Mr. Patello testified that Mr. Watts was instructing
him to prebill the $1.325 million purchase order from Zwicker if
it was necessary to meet the Borrowing Base and the sales
projections that had been promised to C3 Capital.  (Tr. 2361-
62.)  Accordingly, the $1.325 million Zwicker invoice for the
Staten Island Courthouse was first contemplated to be used to
inflate the Eligible A/R in August 2009, before it was
ultimately used for that purpose several months later, even
though the project never came to fruition.

　　　In the 2009 year-end handwritten summary that Mr.
Patello provided to Mr. Dupree in or around late January and
early February 2010, Mr. Patello wrote the following:

> We need at least 7 mil in 12/09 sales on top of USW
> [Unalite Southwest], UES [Unalite Energy Services] &
> UNY [Unalite New York] in order to keep tabs with our
> 11/09 BBC - good news!! that should get us to 4 mil
> EBITDA - Bad news there is nothing in the backlog and
> I still [need] a PO for Columbia 1.2 mil that I booked
> in Oct!  We also prebilled 1.6 mil at JDC . . . If we
> are truly talking five million EBITDA for 2009 then we
> need 12 million (not 7 million in sales) – don't think
> I can really get thru audit with 7 more never mind 12
> more.

(GX 273; *see* Tr. 2367-69.)  Mr. Patello testified that this note
conveyed to Mr. Dupree the following information:  (1) the

Company would need another $7 million in additional fake sales to maintain the Borrowing Base for November 30, 2009 at the current level; (2) if there were $7 million of additional billing, EBITDA would rise to $4 million, which would be closer to the $5 million requirement of the Loan Agreement; (3) that $1.2 million was prebilled for Columbia in October 2009 based on a job commitment from a salesperson but no purchase order had yet to be received; (4) $1.6 million was prebilled at JDC Lighting, which was a considerably higher number than previous amounts prebilled at JDC Lighting; and (5) there would need to be an additional $12 million in sales to get EBITDA to $5 million as required by the Loan Agreement, as $7 million in additional sales would only get EBITDA to $4 million. (Tr. 2367-69.) With respect to this last point, Mr. Patello testified that although he said $12 million in sales was needed to get the EBITDA to $5 million, the actual number of sales required could have been $9 million or $13 million, but that he used $12 million "just really to make a point to say no matter what we've done in the past, these numbers are just astronomical." (Tr. 2369.)

Finally, the government introduced "insider" aging or reconciliation reports for Hudson Bay and JDC Lighting. (*See* GX 267 ("insider" aging report for Hudson Bay), GX 268 ("insider" aging report for JDC Lighting).) These reports were used by GDC

employees in 2010 to differentiate between the accounts
receivable on the books that could be collected from customers
because they involved actual sales for products delivered and
services rendered, and the accounts receivable on the books that
could not be collected, at least not yet, due to prebilling or
fictitious sales used to inflate the Eligible A/R on the BBCs
submitted to Amalgamated.  (*See, e.g.*, Tr. 650-55, 680-85, 991-
92, 2465-68.)  In an email dated February 26, 2010, which was
sent to Mr. Dupree, Mr. Patello described these "insider A/R
agings" as "show[ing] what is collectible (shipped, installed
and billed) with their true aging, as well as the receivables on
the books that have not been installed and those that have not
shipped."  (GX 66.)[15]  A copy of the "insider" aging reports
were sent to Mr. Dupree via email on March 3, 2010 by Valerie
Griffin.  (Tr. 2469-71, 2978-81; GX 275, GX 276.)

    3.  *Reaging*

        Reaging (or refreshing) of accounts receivable
occurred at the Company when a credit was issued for an old

---

[15]  For example, the aging report submitted to Amalgamated for
Hudson Bay as of November 30, 2009 contained two invoices for Columbia, one
dated October 16, 2009 for $877,348.02 (Invoice No. 90812) and another dated
November 6, 2009 for $396,982.97 (Invoice No. 91282).  (GX 74 at 20
(AML0002233).)  The "insider" aging report for Hudson Bay included the dates
of these invoices and their corresponding amounts under a section titled "Not
Ordered," which means no order had yet been placed.  (Tr. 2956; GX 267 at 41
(DOJ-GDC-000001065); *see* Tr. 879-80; 1215-16.)  Valerie Griffin, a defense
witness, testified that the $877,000 Columbia job was "still in [the] quote
stage" and that the order was not finalized, even though the invoice was
included on the aging report submitted to Amalgamated as Eligible A/R.  (Tr.
2959-60.)  Hugh Horowitz of Columbia also testified that Columbia never
received invoice 90812 in the amount of $877,348.02.  (Tr. 2811-12; GX 452.)

sales invoice and the same invoice was re-invoiced with a new
date and invoice number so that it was more current, thus
permitting accounts receivable that were otherwise older than
120 days to be falsely counted as Eligible A/R and not excluded.
(Tr. 1316, 1318-19, 1625, 1628, 2327-28.)  For example, in one
of the handwritten summaries provided to Mr. Dupree, Mr. Patello
advised Mr. Dupree that $413,000 of JDC Lighting's receivables
were "credited and rebilled with more current dates."  (Tr.
2340-41; GX 281.)

**F.    The Events Surrounding Mr. Patello's Departure from
        the Company in March 2010**

On Christmas Day, December 25, 2009, Mr. Dupree sent
Mr. Patello an email stating that "[t]he head count in the
accounting department has gotten out of hand" and requesting a
plan for the long-term structure of the accounting department.
(Mr. Dupree's Exhibit ("DX") 122.)  On January 2, 2010, Mr.
Patello responding, stating, *inter alia*:

> I had however hoped that you would have at least taken
> all the gyrations and issues I had to face in 2009
> with cash management, reporting and covering bs #'s,
> my time spent with USW and Emilio [Serrano]'s short
> comings into consideration. . . . I do not know that
> you fully understand how much time, energy and effort
> truly is required to cover up all the bs I have to
> take care of in order for us to pass muster.  I think
> this is something we really need to go over.  More
> than 50% of my and Irma [Nusfaumer]'s time (and a
> significant amount of Emilio's time – not talking
> about how good he is at it) is spent covering our
> trail.

(*Id.*)  With respect to the above email, Mr. Patello testified
that "bs" referred to "prebilling, false billing, inappropriate
accounting, incorrect accounting," and that "covering our trail"
meant "changing the documents, fraudulently correcting them, and
just to make sure that they looked okay."  (Tr. 2380; *see also*
Tr. 2350.)

The next day, on January 3, 2010, Mr. Dupree wrote the
following in response to Mr. Patello's email, in relevant part:

> I do want to say that I have a **FULL** understanding of
> how much time you and your team are spending and have
> spent on getting our financials to pass muster.  It is
> the bane of my existence!  This is why I have spent so
> much time analyzing the budget.  As I have said, with
> $70 million in sales conservatively expected in 2010,
> there is no reason why we can't address the issues
> that have plagued this company. . . .  I don't want to
> spend another year complaining and fielding complaints
> about things not getting done the way they should,
> scrambling for sales at the end of months, burying
> items, and desperately grasping for liquidity where it
> can be had, etc. . . .  I'm sure that you feel that I
> was provided the information with your periodic
> updates on the BBC and our cash position.  For me,
> these updates aren't nearly as illuminating as you
> might think, because it is intuitive to me that you
> run a negative cash position when making investments
> for future positive cash flow (true cash flow, not
> EBITDA).  So, your updates saying that cash was tight
> was neither a surprise, not alarming to me.  The fact
> that we did not come out of the position in the last
> third and especially the last quarter of the year WAS
> a surprise.

(DX 122.)  The jury could certainly infer from Mr. Dupree's
email that Mr. Dupree was a knowing participant in, if not the
director of, the fraud conspiracy.  This email also corroborates

Mr. Patello's testimony that he provided Mr. Dupree with handwritten "periodic updates on the BBC[s]" (*id.*) regarding all the false billings included on the aging reports submitted to Amalgamated (Tr. 2335-48).

Although Mr. Patello had signed the BBCs submitted to Amalgamated for the books of the Company at the end of every month between August 31, 2008 and November 30, 2009, the BBC for November 30, 2009 was the last BBC that Mr. Patello was willing to sign, and he signed it on January 6, 2010. (Tr. 2478; GX 11 (DOJ-GDC-000005234).) Subsequently, Amalgamated did not receive BBCs for the months of December 2009 and January through March of 2010 (Tr. 2006-07), even though the Loan Agreement required BBCs to be submitted every month (Loan Agreement § 5.01(j)).

In or around February or March 2010, Mr. Serrano and Mr. Patello testified that Mr. Dupree handed Mr. Serrano a handwritten note (GX 347) listing additional sales that Mr. Dupree wanted to include in the books for the 2009 fiscal year, all of which involved prebilling (Tr. 697-98; *see* also Tr. 2473 (Patello's testimony that "Emilio handed me this piece of paper saying this is Courtney's guide to how we were going to get additional billing and fix our EBIDTA.")). This handwritten note specified, *inter alia*, adding a total of $6.25 million in billings, including a total of $2.7 million for Hudson Bay as well as $600,000 for JDC Lighting in connection with the Staten

Island Courthouse, the latter which Mr. Serrano incorporated into the books. (Tr. 697-700; GX 347.) Indeed, in the aging report for JDC Lighting as of April 30, 2010, there is an accounts receivable for $587,925.01 associated with a Zwicker invoice dated March 29, 2010 (GX 75 at 24 (DOJ-FC-GDC000005330)), and Zwicker provided a certification that it never received any such invoice (GX 245). Moreover, as noted above, a representative from Zwicker testified that JDC Lighting never delivered any products in connection with the Staten Island Courthouse because, although the project was contemplated, it never happened. (Tr. 1516-17.)

In early March 2010, Veronica Finn, the office manager and head of human resources for the Company, had a conversation with Mr. Foley in which she expressed her concerns regarding what was happening in the accounting department. (Tr. 1705-06.) She subsequently arranged a meeting after work, also in early March 2010, among herself, Mr. Dupree, Mr. Watts, Mr. Foley, and Mr. Patello (the "Executive Meeting"). (Tr. 1706-07.) At the Executive Meeting, Mr. Patello explained the following:

> [T]hat to get where we were, we had a significant prebilling, false billing, costs weren't recorded, accounting records weren't properly maintained, and that in order to even meet the minimum number for the December borrowing base, we needed another $7 million. That there were no orders on hand to do that. That it would have to be totally fabricated . . . . That documents would have to be forged, corrected, in order to pass muster with the auditors, both shipping and

receiving.  And that also I wanted to let everyone in management know that I was done.  That I was going to get them passed [sic] the end zone, I guess, which were both audits and I was leaving.

(Tr. 2487-88.)  Similarly, Ms. Finn testified as to what Mr. Patello told everyone at the Executive Meeting:

He said that there had been - - there were irregularities on our accounts receivable that included three levels of misinformation.  The first one being prebilling, the second being renaming [or reaging], and the third being totally fictitious sales that had been put onto the accounting system. . . . He said the accounts receivable were not accurately stated.  And that in - - that we had about $9 million of legit sales on the books and the rest of it [approximately $11 million] was falling into one of these three categories.

(Tr. 1707-10.)  Specifically, Mr. Patello mentioned at the Executive Meeting, *inter alia*, a duplicated Columbia order involving approximately $500,000 and over $1.5 million dollars in SCA orders as examples of fictitious sales that were on the books.  (Tr. 1707-08, 2489-91.)  As a proposed course of action, Mr. Patello suggested restating the Company's numbers to Amalgamated, but Mr. Dupree "was totally opposed to going to the bank.  [Mr. Dupree] said, that's an absolute way of me losing this company, and I will not lose this company."  (Tr. 2490-91; *see also* Tr. 2499.)

Shortly after the Executive Meeting and another conversation among Mr. Dupree, Mr. Watts, and Mr. Patello regarding booking additional sales (Tr. 2497-99), Mr. Patello

gave Mr. Dupree a letter dated March 12, 2010, which stated the following:

> In my opinion, we need to restate both our 2008 and 2009 financial results to:
>
> 1) exclude all pre-billing and related transaction[s]
>
> 2) properly record all costs, including trailing costs and accruals, including commissions and PM bonus
>
> 3) consolidate the full results of Image Lighting 2009's results into GDC, while reversing the receivables on JDC's books
>
> 4) re-age our trade receivables to properly reflect the actual date of sale and
>
> 5) restate the BBC's and interim financial statements provided to Amalgamated

(GX 251; *see* Tr. 2500-05.)[16] Mr. Patello also stated that there were $4 million in prebilling included in the 2009 financial statements and that he could not participate in a meeting with Amalgamated scheduled for March 17, 2010 unless the financial reporting issues were resolved. (GX 251.) After a meeting with Mr. Dupree a few days later, Mr. Patello formally resigned his position as CFO and left the Company. (Tr. 2504-05; GX 252.)

After he left the Company in March 2010, Mr. Patello received calls from Mr. Jarvis of Amalgamated and alerted Mr.

---

[16] In or around early March 2010, Mr. Patello also gave Mr. Dupree another document in which he stated that he is stepping down as CFO but will continue with the Company until the completion of certain bank audits or May 31, 2010, whichever is later. (GX 250; *see* Tr. 2475-80, 2485-86.) In that document, Mr. Patello wrote that GDC can "site [sic] health, reorg or whatever reason" for the change in his position. (GX 250.)

Dupree.  (Tr. 2507.)  Mr. Dupree told Mr. Patello to avoid Mr. Jarvis's calls by calling him after hours, which Mr. Patello subsequently did.  (Tr. 2008, 2507-08.)  Notably, when Mr. Jarvis called Mr. Dupree to inquire about why Amalgamated had not received any BBCs since the BBC for November 30, 2009, Mr. Dupree told Mr. Jarvis that Mr. Patello had been on a leave of absence for health issues and that Mr. Watts had assumed his duties as CFO.  (Tr. 2007-08; *see also* GX 158 (Mr. Jarvis stating that Mr. Patello "stepped down due to illness").)

### G.  Meetings with Amalgamated in Spring 2010

On March 17, 2010, Mr. Dupree, Mr. Watts, and Mr. Foley met with Amalgamated representatives including Mr. Jarvis, who was concerned about the Company's search for a new CFO and called the meeting to "catch up on financial information" regarding the Company because it was behind in its reporting obligations under the Loan Agreement.  (Tr. 2010-13.)  At that meeting, Mr. Dupree and Mr. Watts said that they would provide Amalgamated with the missing BBCs and financial statements as soon as possible.  (Tr. 2012.)  After March 17, 2010, Amalgamated would not permit any further borrowing on the Revolving Loan.  (Tr. 2071.)

On April 26, 2010, because Amalgamated had not yet received a new BBC and no CFO had been hired, Mr. Jarvis visited the Company to go over the issues that had not been addressed

and met with Mr. Dupree, Mr. Watts, and Mr. Foley. (Tr. 2017.)
Mr. Jarvis told Mr. Watts that he would not leave until he
received a BBC (Tr. 2018), and subsequently Mr. Watts handed Mr.
Jarvis a BBC for the books of the Company as of April 21, 2010
that was signed by both Mr. Watts and Mr. Dupree in front of Mr.
Jarvis (Tr. 2024-25; GX 11 (DOJ-GDC-000005235)). This BBC had
an Eligible A/R figure of $22,252,521, which calculated into a
Borrowing Base of approximately $16.9 million. (Tr. 2025; GX 11
(DOJ-GDC-000005235).) Because approximately $16.7 million was
outstanding on the Revolving Loan, the Borrower Subsidiaries had
not exceeded the Borrowing Base and thus no make-up payment had
to be made. (*Id.*) At the time of this April 26, 2010 meeting,
Mr. Jarvis was under the belief that Image Lighting was a
customer of JDC Lighting, based on conversations that Mr. Jarvis
had with Mr. Dupree and Mr. Watts. (Tr. 2018, 2022, 2042-43.)

On May 7, 2010, Amalgamated sent the Borrower
Subsidiaries a letter notifying them that they had defaulted
under the terms of the Loan Agreement for failing to submit
balance sheets, BBCs, and accompanying aging reports and other
documents and failing to maintain EBITDA of at least $5.5
million. (Tr. 2036-37; GX 144.) In May 2010, at the request of
Amalgamated, a collateral audit of GDC and the Borrower
Subsidiaries was performed for the period ending December 21,
2009 that revealed significant accounting irregularities. (Tr.

2044-47; GX 156.)  Specifically, the audit report stated that
the "A/R agings are full of anomalies, the aging bucket amounts
appear to be inaccurate as there are numerous irregularities in
them," that there is "[p]ossible 'refreshing' of the A/R
agings," that "past due 120 bucket amounts may be under-stated,"
and that "A/R collateral aging is 'Stretched.'"  (GX 156 (DOJ-
FC-GDC000004824); *see* Tr. 2047-49.)  Another audit performed in
June 2010 for the period ending April 30, 2010 also revealed
similar accounting irregularities.  (Tr. 2052-54; GX 157.)

On May 24, 2010, Mr. Dupree and Mr. Watts signed a BBC
for the books as of April 30, 2010.  (GX 11 (DOJ-GDC-
000005236).)  As discussed previously, the Eligible A/R figure
of $22,055,798 in this BBC was inflated by millions of dollars
due to prebilling and reaging.

On July 15, 2010, about a week before Mr. Dupree was
arrested, Mr. Dupree, Mr. Watts, and Mr. Foley met with Mr.
Jarvis and representatives from Amalgamated's credit department.
(Tr. 2054.)  Mr. Jarvis had still not received an independent
financial statement for 2009 by the time of this meeting.  (Tr.
2056.)  At that meeting, Mr. Dupree made a presentation
regarding cash flow projections for 2010, specifically a
projection of $7.1 million in EBITDA.  (Tr. 2059-61; GX 171.)
The next day, on July 16, 2010, Mr. Watts signed a BBC for the
Company's books as of May 31, 2010, which reported $22,637,402

in Eligible A/R.  (GX 11 (DOJ-GDC-000005237).)  This was the
last BBC submitted to Amalgamated.

Finally, Mr. Jarvis testified that he was never
informed by Mr. Dupree or anyone else that the Company had
changed the manner in which it recognized revenue or that the
Company recognized accounts receivable before product had been
delivered.  (Tr. 2064.)

### H.  Other Evidence of Fraud After Mr. Patello's Departure from the Company and Prior to Mr. Dupree's Arrest

After Mr. Patello left the Company, Mr. Dupree told
Mr. Serrano in March of 2010 that the Company would not be doing
any prebilling in the future.  (Tr. 718.)  Mr. Serrano, however,
testified that this statement was false, that every BBC and
aging report in the spring of 2010 included prebilling, and that
Mr. Dupree subsequently requested Mr. Serrano to continue
prebilling.  (Tr. 718-19, 726.)  Specifically, after Mr. Watts
gave Mr. Serrano a sales number that the Company's "financials
had to hit" due to upcoming bank audits, Mr. Serrano informed
Mr. Dupree that "the only way we could reach that number was if
we prebilled, and [Mr. Dupree said], 'Well, then that's what
we're going to have to do.'"  (Tr. 726-27.)

In latter half of March 2010, Ms. Nusfaumer also
became very concerned that, after Mr. Patello left the Company,
she would be the point person for the bank audits happening

later in the spring and that she could get in trouble for all the accounting irregularities. (Tr. 1723.) On April 9, 2010, Ms. Nusfaumer sent an email to Mr. Dupree and Mr. Watts stating that she will not participate in the bank audits and that she will be forced to leave the Company if management insists that she lead the audits. (GX 91.) In a subsequent meeting between Mr. Dupree, Ms. Nusfaumer, and Ms. Finn, Mr. Dupree said that "he felt Ms. Nusfaumer was exaggerating the problem" but that he needed her to remain with the Company as assistant comptroller so that the Company did not lose two of its top accounting personnel. (Tr. 1726-27; *see also* Tr. 1354-55.) Nevertheless, shortly thereafter in April 2010, Ms. Nusfaumer resigned from the Company because "she didn't really feel she had an option," and not because of another job. (Tr. 1354, 1728.)

On May 18, 2010, Mr. Serrano and Mr. Dupree had a conversation that was recorded by Mr. Serrano in which the two discussed Mr. Patello's departure and the first collateral audit by Amalgamated. (GX 363 (Recording 3-4).) In that recording, Mr. Serrano told Mr. Dupree that he would have the $22 million in accounts receivable for the April 30, 2010 BBC into the system by "the end of today," and Mr. Dupree confirmed again at the end of the conversation whether Mr. Serrano would be finished by the "end of day." (*Id.*) Additionally, Mr. Dupree commented that the "bank exam went fine. It's a miracle," which

Mr. Serrano understood to mean it was a miracle getting away with "so much fraud in the numbers." (*Id.*; Tr. 732-33; *see also* Tr. 1228-32.) Mr. Dupree stated that auditors are "pencil pushers," and that if "we give [the auditor] the back up, if it looks good, it looks like it makes sense . . . and there is nothing for [the auditor] to fucking do." (GX 363 (Recording 3-4).) Finally, at the end of the recording, Mr. Dupree appeared to be reassuring Mr. Serrano as to the future of the Company once the bank fraud was completed:

> And I know you've struggled with y'know from my professional standpoint, and where, where, this leads or what have you. This is going to be fucking fine, dude, and I'm not, I don't stick my head in the sand, I'm not oblivious to this shit that's going out, I know what the fuck I'm talking about: it's going to be fine. Um . . . and once we get passed [sic] this we're never revisiting this shit again. I don't fucking ever want to go back here. We will fucking fire half of the fucking staff before we revisit this shit again. We're not gonna be prebilling, but we do need to get this nailed this financial reporting, nailed the fuck down.

(*Id.*) Mr. Serrano testified that the "shit that's going out" was a reference to the "fraud in the financial statements." (Tr. 743.)

On the same day as the above recording with Mr. Dupree, May 18, 2010, Mr. Serrano recorded a conversation with Mr. Watts in which they were discussing the accounts receivable for the April 30, 2010 BBC, and Mr. Watts asked Mr. Serrano, "So, just to be clear: you are swapping out some of the

complete bullshit from 12/31 for some shit in the backlog, right?"  (GX 364 (Recording 3-5).)  Mr. Serrano responded in the affirmative, and testified that Mr. Watts was directing him to fill in the accounts receivable on the aging reports by taking items off of the backlog, which are "future billings" or prebilled orders that have not yet been delivered.  (Tr. 574, 1230, 1278-79.)

On June 3, 2010, Donald Carr, a financial analyst at GDC, sent an email to Mr. Dupree, Mr. Watts, Mr. Foley, and Ms. Finn stating that he is resigning because he "cannot continue to ethically perform my obligations at GDC." (GX 1A.) Specifically, Mr. Carr wrote:  "Unfortunately, over the last few months, I have become increasingly uncomfortable with what appears to be an irreconcilable difference between our actual cash position and the financials we showed at the end of the year. . . .  I have particular difficulty understanding our use of the AR that was outstanding at 2009 year end."  (*Id.*; *see also* Tr. 366 (Mr. Carr:  "My problem was I felt at that time that the accounts receivable had to be overstated . . . .").)

On the evening of July 15, 2010, the same day as the last meeting with Mr. Jarvis of Amalgamated, Mr. Serrano recorded a conversation with Mr. Dupree regarding the May 31, 2010 BBC, and during that conversation, Mr. Serrano asked Mr. Dupree for "future billings for ah . . . HBE [Hudson Bay]."  (GX

413 (Recording 16-7).)  Mr. Dupree then proceeded to provide Mr. Serrano with specific sales numbers for inclusion in the BBC that were associated with customer orders that had not been delivered – or prebilling.  (*Id.; see* Tr. 827-38.)  Finally, Mr. Dupree stated that, because the Revolving Loan was being paid down and the Company could start "posting pretty strong cash flow numbers, . . . the point is that it should come close to being legit now so, we probably got a little bit, probably got another couple of months to go before we completely catch up, but it should be pretty close."  (GX 413 (Recording 16-7); *see* Tr. 836-37.)  Mr. Serrano testified that he believed Mr. Dupree made this statement to reassure him that the financial statements would soon catch up with the prebilling and that "we wouldn't have to pre-bill any longer at some point in time in the future."  (Tr. 840.)  Mr. Serrano then stayed late at the Company that night to implement Mr. Dupree's directive to enter the prebilled accounts receivable into the system and finish the financial statements for the May 31, 2010 BBC, which Mr. Watts signed the next day on July 16, 2010.  (Tr. 871; GX 11 (DOJ-GDC-000005237).)

## IV.  The Defense Case

Mr. Dupree's defense case consisted of character witnesses, testimony by former GDC employees Martha Xenakis and Valerie Griffin, an expert witness, and multiple days of

48

testimony by Mr. Dupree.  The defense theory at trial did not

contest the existence of false statements in the BBCs (Tr.

4138), but asserted that Mr. Patello and others, including Mr.

Serrano and Ms. Nusfaumer, perpetrated the bank fraud without

any knowledge of or participation by Mr. Dupree (*see* Tr. 4144,

4147-48, 4205).  Indeed, defense counsel argued in summation

that the fraud began when Mr. Patello mistakenly booked the $2

million of Image Inc. receivables on JDC Lighting's books and

borrowed $1.4 million against those receivables on the

Amalgamated loan, and that Mr. Patello spent the next two years

trying to fix that accounting error by perpetrating the fraud.

(Tr. 4149.)  Additionally, defense counsel argued that

prebilling by itself is not an illegal or improper practice (Tr.

4146, 4188-89, 4200), and that the Company collected tens of

millions of dollars on legitimate sales (Tr. 4193-94).  Finally,

defense counsel argued that Mr. Dupree always intended to pay

back the Amalgamated loan, and that the false statements were

included in the BBCs without Mr. Dupree's knowledge.  (Tr.

4205.)

## V.    The Instant Motions

Mr. Dupree first stated his intention to make a Rule

29 motion on December 20, 2011 at the close of the government's

case.  (*See* Tr. 2902, 3244-45, 3271.)  On December 22, 2011, the

court heard oral argument on Mr. Dupree's Rule 29 motion (Tr.

3346-54, 3427-59), and reserved a decision on the motion until after the jury returned a verdict in accordance with Federal Rule of Criminal Procedure 29(b) (Tr. 3459). After the jury returned a guilty verdict, the court provided the parties with an opportunity to make written submissions on Mr. Dupree's Rule 29 and Rule 33 motions. (*See* ECF No. 521-1, Memorandum of Law in Support of Defendant's Motions for Judgment of Acquittal and for a New Trial ("Dupree Mem."); ECF No. 529, Memorandum of Law in Response to the Defendant's Motions for a Judgment of Acquittal and for a New Trial ("Gov't Opp'n"); ECF No. 530, Reply in Support of Defendant's Motions for Judgment of Acquittal and New Trial ("Dupree Reply").)

Mr. Dupree also filed an unscheduled "amendment" to his Rule 29 and 33 motions on August 6, 2012 (*see* ECF No. 577, Mr. Dupree's Letter Amendment to Rule 29 and 33 Motions ("Dupree Amdt.")), to which the government filed an opposition on August 20, 2012 (*see* ECF No. 587, Government's Opposition to Amendment to Rule 29 and 33 Motions ("Gov't Opp'n to Dupree Amdt.")).

## DISCUSSION

### VI.  The Rule 29 Motion for Acquittal

#### A.    The Rule 29 Standard

Rule 29 provides that, on a defendant's motion, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

Fed. R. Crim. P. 29(a). "[W]hen a district court reserves

decision on a defendant's Rule 29 motion at the close of the

Government's evidence, 'it must decide the motion on the basis

of the evidence at the time the ruling was reserved.'" *United

States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (quoting Fed.

R. Crim. P. 29(b)). Because the court reserved making a

decision on Mr. Dupree's motion on December 22, 2011 (Tr. 3458-

59), the court will decide the motion based on the evidence

presented up to that point in the trial. *United States v.

Velasquez*, 271 F.3d 364, 371 (2d Cir. 2001).[17]

"A defendant who challenges the sufficiency of the

evidence supporting his conviction 'bears a heavy burden.'" *Id.*

at 370. "Not only must the evidence be viewed in the light most

favorable to the Government and all permissible inferences drawn

in the Government's favor, but the jury verdict must be upheld

if '*any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt.'" *United

States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citation

---

[17] It does not appear that Mr. Dupree intended to renew his Rule
29 motion for acquittal after the jury verdict pursuant to Rule 29(c).
Indeed, in his motion papers, Mr. Dupree appears to only argue that the
government's case was insufficient to sustain its burden. Nevertheless, the
court would deny the Rule 29 motion even if the entirety of Mr. Dupree's
defense case and his testimony were considered. *See United States v.
Aulicino*, 44 F.3d 1102, 1114 (2d Cir. 1995) ("It is true that by testifying
in his own behalf at trial, a defendant waives his right to have sufficiency
assessed on the basis of the government's presentation alone. The
defendant's testimony may thus add weight to the government's case."
(citations omitted)); *see also Velasquez*, 271 F.3d at 371 (2d Cir. 2001)
("[A] jury may 'use its disbelief [of a defendant's testimony] to supplement
the other evidence against him.'").

omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319
(1979)); *see also United States v. Guadagna,* 183 F.3d 122, 130
(2d Cir. 1999) ("[T]he court may enter a judgment of acquittal
only if the evidence that the defendant committed the crime
alleged is 'nonexistent or so meager that no reasonable jury
could find guilt beyond a reasonable doubt.'").  In determining
a Rule 29 motion for judgment of acquittal, the court must "view
pieces of evidence 'not in isolation but in conjunction.'"
*United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (quoting
*United States v. Maldonado-Rivera*, 922 F.2d 934, 978 (2d Cir.
1990)).

        In resolving Rule 29 motions, a court should "avoid
usurping the role of the jury."  *Guadagna*, 183 F.3d at 129.  A
court must "defer to the jury's assessment of witness
credibility and the jury's resolution of conflicting testimony."
*United States v. Bala*, 236 F.3d 87, 93-94 (2d Cir. 2000).
Moreover, a court cannot "substitute its own determination of .
. . the weight of the evidence and the reasonable inferences to
be drawn for that of the jury."  *Guadagna*, 183 F.3d at 129
(internal quotation marks omitted).  Therefore, the jury's
verdict will be upheld even when it is based entirely on
circumstantial evidence.  *Jackson*, 335 F.3d at 180.  "In fact,
if the court concludes that either of the two results, a
reasonable doubt or no reasonable doubt, is fairly possible,

[the court] must let the jury decide the matter." *Guadagna*, 183

F.3d at 129 (internal quotation marks omitted).

**B.    Counts One and Two:    Conspiracy and Bank Fraud**

The jury found Mr. Dupree guilty of both Count One for

conspiring to commit bank fraud by defrauding Amalgamated and

Count Two for the bank fraud arising from that conspiracy, in

violation of 18 U.S.C. §§ 1344 and 1349.

First, "conspiring to commit bank fraud . . . requires

'knowingly engag[ing] in the conspiracy with the specific intent

to commit the offenses that were the objects of the

conspiracy.'"   *United States v. Bartee*, 301 F. App'x 46, 49 (2d

Cir. 2008) (quoting *United States v. Monaco*, 194 F.3d 381, 386

(2d Cir. 1999)); *see United States v. Rosa*, 17 F.3d 1531, 1544

(2d Cir. 1994) ("A conviction for conspiracy must be upheld if

there was evidence from which the jury could reasonably have

inferred that the defendant knew of the conspiracy charged in

the indictment and knowingly joined and participated in it.").

The government must also prove that there was an agreement

between two or more participants to achieve the object of the

conspiracy, here bank fraud, but "[a] tacit understanding will

suffice to show agreement for purposes of a conspiracy

conviction."   *United States v. Amiel*, 95 F.3d 135, 144 (2d Cir.

1996); *see United States v. Huezo*, 546 F.3d 174, 180 (2d Cir.

2008) (noting that "[b]oth the existence of a conspiracy and a

given defendant's participation in it with the requisite

knowledge and criminal intent may be established through

circumstantial evidence" (internal quotation marks omitted)).

Notably, "[t]he traditional deference accorded to a jury's

verdict is especially important when reviewing a conviction for

conspiracy . . . because a conspiracy by its very nature is a

secretive operation, and it is a rare case where all aspects of

a conspiracy can be laid bare in court with the precision of a

surgeon's scalpel." *Jackson*, 335 F.3d at 180 (internal

quotation marks omitted).

> Second, the bank fraud statute states as follows:

> Whoever knowingly executes, or attempts to execute, a
> scheme or artifice--
>     (1) to defraud a financial institution; or
>     (2) to obtain any of the moneys, funds, credits,
> assets, securities, or other property owned by, or
> under the custody or control of, a financial
> institution, by means of false or fraudulent
> pretenses, representations, or promises;
> shall be fined not more than $ 1,000,000 or imprisoned
> not more than 30 years, or both.

18 U.S.C. § 1344. Although a proof of a violation of either

subsection of Section 1344 is sufficient to support a

conviction, *United States v. Crisci*, 273 F.3d 235, 239 (2d Cir.

2001), the jury found Mr. Dupree guilty under both subsections,

(*see* ECF No. 506, Jury Verdict).

> "In order to show bank fraud, the government must

prove that defendant (1) engaged in a course of conduct designed

to deceive a federally chartered or insured financial institution into releasing property; and (2) possessed an intent to victimize the institution by exposing it to actual or potential loss." *Crisci*, 273 F.3d at 239-40 (internal quotation marks omitted).[18] Additionally, "the government must prove that the defendant engaged in a deceptive course of conduct by making *material* misrepresentations." *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) (emphasis added); *see also Neder v. United States*, 527 U.S. 1, 16 (1999) ("[A] false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'")). Importantly, "actual or potential loss to the financial institution need not be proven, so long as there is evidence that the defendant intended to expose the institution to such loss." *United States v. Laljie*, 184 F.3d 180, 189 (2d Cir. 1999). The fact that a defendant believes (rightly or wrongly) that ultimately no harm or loss will be suffered by the bank does not negate criminal intent

---

[18]  The parties stipulated at trial that at all relevant times Amalgamated was a financial institution as used in 18 U.S.C. § 1344 and that its deposits were insured by the Federal Deposit Insurance Corporation. (Tr. 1970-71.)

where some real and immediate harm or loss is contemplated.
*United States v. Stathakis*, 320 F. App'x 74, 76 (2d Cir. 2009).[19]

As detailed above, viewing the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor, and leaving credibility determinations to the jury, there was an abundance of evidence from which a jury could find beyond a reasonable doubt that Mr. Dupree conspired with others to defraud Amalgamated and that he committed bank fraud. The testimony of Mr. Patello, Mr. Serrano, and Ms. Nusfaumer, all of whom admitted to participating in a bank fraud conspiracy, was largely corroborated by documentary evidence and recorded conversations. Their testimony, by itself, was certainly enough to support Mr. Dupree's conviction for Counts One and Two. *See Truman*, 688 F.3d at 139 ("We have explained that even the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not 'incredible on its face,' or does not 'def[y] physical realities.'" (citations omitted)).

---

[19] *See also United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) ("[W]here a defendant deliberately supplies false information to obtain a bank loan, but plans to pay back the loan and therefore believes that no harm will 'ultimately' accrue to the bank, the defendant's good-faith intention to pay back the loan is no defense because he intended to inflict a genuine harm upon the bank – *i.e.*, to deprive the bank of the ability to determine the actual level of credit risk and to determine for itself on the basis of accurate information whether, and at what price, to extend credit to the defendant.").

Indeed, the evidence at trial directly established Mr. Dupree's knowledge and active participation in the conspiracy to defraud Amalgamated from before Amalgamated extended the loans in August 2008 and until Mr. Dupree's arrest in July 2010. In 2008, Mr. Dupree had a conversation with Mr. Patello and Mr. Watts about a net income figure that was inflated by more than $700,000 and that was ultimately provided to Amalgamated in the 2007 Financial Statement in order to obtain the loan.

After the loans were extended, the jury heard evidence of Mr. Dupree's leadership in working with Mr. Patello, Mr. Serrano, and others to conceal the Image Transaction from Amalgamated due to his belief that it was prohibited by the Loan Agreement and to falsely portray Image Lighting as a customer of JDC Lighting. Specifically, among other things, Mr. Dupree (1) instructed Mr. Foley to acquire Image Inc. "in two pieces" by forming shell corporations, (2) directed Mr. Serrano to establish a P.O. Box in New Jersey for Image Lighting to maintain the appearance that it had an office separate and apart from the Company, (3) coached Mr. Serrano on how to pose as a fictional employee of Image Lighting in order to falsely inform a potential lender about a purported business relationship between Image Lighting and JDC Lighting, and (4) lied to Mr. Jarvis of Amalgamated about a bounced Image Lighting check that Mr. Patello had signed. Indeed, Mr. Dupree's efforts were

successful because, even in the spring of 2010, Mr. Jarvis believed that Image Lighting was a customer of JDC lighting based on conversations he had with Mr. Dupree, Mr. Patello, and others regarding amounts owed by Image Lighting to JDC Lighting.

The jury also heard extensive evidence regarding successful efforts in 2009 and 2010 by Mr. Dupree, Mr. Patello, Mr. Serrano, Ms. Nusfaumer, and others to falsely inflate the Eligible A/R on BBCs submitted to Amalgamated by millions of dollars using fictitious sales, prebilling, and reaging. These efforts had the effect of maintaining the amount that could be borrowed on the Revolving Loan – the Borrowing Base - at a much higher level than would have been the case had the Eligible A/R been accurately disclosed. In essence, by falsely inflating the Borrowing Base by millions of dollars, Mr. Dupree and his coconspirators deceived Amalgamated by causing it to loan money – or maintain a loan - based on false collateral, thereby exposing it to actual or potential loss.

At discussed above in the summary of the government's evidence, the evidence at trial showed that Mr. Dupree himself was actively involved in falsely inflating the accounts receivable in 2009 and 2010. First, Mr. Dupree directed Mr. Patello to falsely book approximately $2 million of accounts receivables associated with Image Inc. on the books of JDC Lighting. Second, throughout 2009, Mr. Dupree received

handwritten summaries on an almost monthly basis from Mr.
Patello detailing the type and amounts of millions of dollars of
false accounts receivables included in the monthly BBCs and
aging reports submitted to Amalgamated. Third, after consulting
with Mr. Patello, Mr. Dupree sent an email in May 2009 asking
Mr. Jozefowski for $700,000 in orders that could be prebilled
for inclusion in the BBC for April 2009. (GX 265.)
Additionally, in the last quarter of 2009, Mr. Dupree
specifically had a conversation with Mr. Jozefowski in which Mr.
Dupree explained the need for more than $3 million of fictitious
accounts receivable associated with SCA that were created by Ms.
Nusfaumer at the direction of Mr. Patello and included on the
November 30, 2009 BBC. Fourth, at the direction of Mr. Dupree,
Mr. Watts sent an email in August 2009 to Mr. Patello
instructing him to prebill a $1.325 million order for the Staten
Island Courthouse if it was necessary to stay in formula with
the BBC. Subsequently, $1.375 million in accounts receivable
associated with the Staten Island Courthouse were ultimately
included in the BBC for the books as of April 30, 2010, even
though the project had been abandoned. Fifth, in or around
February or March 2010, Mr. Dupree handed Mr. Serrano a
handwritten note listing $6.25 million in prebilling that Mr.
Dupree wanted to include in the books for the 2009 fiscal year,
including $600,000 for the Staten Island Courthouse. (Tr. 697-

98; GX 347.)  Finally, in a recording in July 2010, Mr. Dupree provided Mr. Serrano with prebilling to include in the BBC for the books as of May 31, 2010.  (Tr. 827-38; GX 413 (Recording 16-7).)

After the Executive Meeting at which Mr. Patello fully disclosed the nature and extent of the fraud and attempted to convince Mr. Dupree to restate the Company's financials to Amalgamated, Mr. Dupree continued to meet with Mr. Jarvis and other Amalgamated representatives on multiple occasions in the spring of 2010.  Instead of restating the Company's financials or disclosing the material inaccuracies in the BBCs and accompanying aging reports, Mr. Dupree lied to Mr. Jarvis about the reasons for Mr. Patello's departure from the Company and evaded his promises to Mr. Jarvis to provide missing BBCs and financial statements as soon as possible.  The jury could infer from Mr. Dupree's failure to disclose the fraud during these meetings that Mr. Dupree knew that his conduct was unlawful and that he possessed the intent to continue to expose Amalgamated to actual or potential loss from loans based on false collateral.  Ultimately, when Mr. Jarvis would not leave the Company's offices without receiving a BBC, Mr. Watts handed Mr. Jarvis a BBC for the books as of April 21, 2010 that was signed by both Mr. Dupree and Mr. Watts in front of Mr. Jarvis.  Then, on May 24, 2010, Mr. Dupree and Mr. Watts signed a BBC for the

books as of April 30, 2010 that falsely inflated the Eligible A/R by millions of dollars.  As Mr. Jarvis testified at trial, he was never informed by Mr. Dupree or anyone else that the Company recognized accounts receivable before product had been delivered, and he would not have recommended a loan that relied on accounts receivable associated with prebilling because such a practice rendered the accounts receivable to be "false collateral" and increased the risk to the bank.  (Tr. 2064-65.)

Finally, as detailed in the summary of the government's evidence, the jury could infer that Mr. Dupree possessed the requisite intent to commit bank fraud from his own incriminating admissions in emails and recorded conversations and his reassurances to Mr. Serrano that everything was going to end up fine.  (*See, e.g.*, DX 122 ("I don't want to spend another year complaining and fielding complaints about things not getting done the way they should, scrambling for sales at the end of months, burying items, and desperately grasping for liquidity where it can be had, etc."); GX 363 (Recording 3-4) (stating that it was a "miracle" the "bank exam went fine"); *id.* ("I don't stick my head in the sand, I'm not oblivious to this shit that's going out, I know what the fuck I'm talking about: it's going to be fine.  Um . . . and once we get passed [sic] this we're never revisiting this shit again.  I don't fucking ever want to go back here.  We will fucking fire half of the

fucking staff before we revisit this shit again.  We're not gonna be prebilling, but we do need to get this nailed this financial reporting, nailed the fuck down."); GX 413 (Recording 16-7) ("the point is that it should come close to being legit now so, we probably got a little bit, probably got another couple of months to go before we completely catch up, but it should be pretty close.").)

Several of these admissions indicate that Mr. Dupree knew that what he was doing was wrong and that he was trying to fix the problems with the Company so that the fraud could become a thing of the past.  Even if, however, the jury believed that Mr. Dupree ultimately intended no harm to Amalgamated because he was going to fully pay back the loans – which is an inference in favor of Mr. Dupree and not the government, the jury could reasonably infer that Mr. Dupree intended some real and immediate harm or potential loss to Amalgamated in the short-term, which is sufficient to sustain his convictions.  *See Rossomando*, 144 F.3d at 201.

In support of his Rule 29 motion, Mr. Dupree primarily relies on a single case, *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), in which the Second Circuit reversed defendants' convictions for mail and wire fraud on a Rule 29 motion.  (*See* Dupree Mem. at 16-28.)  In the *Starr* case, the indictment alleged that the defendants engaged in a scheme to defraud

customers of their "lettershope" business "by means of 'burying' higher rate mailings in lower rate bulk mailings and failing either to pay the postal service the correct postage due or to refund the excess funds to their customers." *Starr*, 816 F.2d at 95. The evidence presented at trial established that: (1) the customers individually calculated the postage due for their mailings and wrote a check to the defendants' business for the cost of necessary postage; (2) the defendants took the customers' mail to the post office, concealed higher postage rate mail inside bulk rate mailing sacks, and paid a lower postage rate than that paid by the customers; (3) the defendants pocketed the difference between the postage paid by the customers and the lower postage paid to the postal service without informing customers; and (4) the defendants sent customers fraudulent postal receipt forms to avoid detection of the scheme. *Id.* at 96-99. The Second Circuit reversed the convictions, finding that "[t]he agreement for the timely shipment and handling of bulk mail was the basis of the bargain between the [defendants] and their customers," which was performed by the defendants, and that the defendants "in no way misrepresented to their customers the nature or quality of the service they were providing." *Id.* at 99. In a concurring opinion, Judge Newman noted that the government erred by indicting the defendants for defrauding their customers rather

than the postal service, which the defendants defrauded by paying less than the proper amount of postage.  *Id.* at 101-02 (Newman, J., concurring).

Unlike *Starr*, the government here indicted Mr. Dupree for defrauding the correct entity – Amalgamated, the creditor of his businesses.  The Loan Agreement specifically provided that the Borrower Subsidiaries could only borrow up to 75% of the Eligible A/R, which served as collateral to secure the loan. Mr. Dupree and his coconspirators, however, undermined that fundamental basis of the Loan Agreement by reporting wholly fictitious, inflated, and prebilled accounts receivable to Amalgamated, thus intending to cause actual or potential loss to the bank by depriving it of the collateral it had bargained for to secure the loan.  Although Mr. Dupree argues that the government failed to establish that prebilling is itself an illegal or improper practice or that a company must adhere to the revenue recognition policy disclosed in its financial statements (*see* Dupree Mem. at 20-25), the government presented ample evidence that the practice of prebilling in this case - as conducted by Mr. Dupree and his coconspirators – deceived Amalgamated by falsely inflating the accounts receivable on which Amalgamated relied for collateral for the loan.  Indeed, the Loan Agreement itself precluded the Borrower Subsidiaries from recognizing accounts receivable for "bill and hold" or

"deferred shipment" transactions (Loan Agreement § 8.01), which is precisely what Mr. Dupree and his coconspirators did – with the exception that no bill was even sent to the customer.

On the basis of all of this evidence, viewed in the light most favorable to the government and drawing all inferences in its favor, the jury could find beyond a reasonable doubt that Mr. Dupree was guilty of Count One because he conspired with at least one other person, Mr. Patello, Mr. Serrano, Ms. Nusfaumer, and/or others, to commit bank fraud and possessed the specific intent to commit bank fraud. Additionally, with respect to Count Two, the jury could find beyond a reasonable doubt that Mr. Dupree engaged in a course of conduct designed to deceive Amalgamated into making or maintaining loans by means of materially false representations, and that he possessed the intent to expose Amalgamated to actual or potential loss from making or maintaining loans based on false collateral. Accordingly, the court denies Mr. Dupree's Rule 29 motion with respect to Counts One and Two because the government presented sufficient evidence at trial to support those convictions.

**C.    Counts Three and Four:  Making a False Statement to a Federally Insured Bank**

Counts Three and Four of the S-2 Indictment charged Mr. Dupree with making a false statement to Amalgamated on or

about January 6, 2010 and May 24, 2010, respectively, in violation of 18 U.S.C. §§ 2 and 1014. (S-2 Indictment ¶¶ 22-27.) "Section 1014 criminalizes 'knowingly making any false statement or report . . . for the purpose of influencing in any way the action' of a Federal Deposit Insurance Corporation (FDIC) insured bank 'upon any application, advance, . . . commitment, or loan.'" *United States v. Wells*, 519 U.S. 482, 490 (1997) (quoting 18 U.S.C. § 1014). As noted by the Supreme Court, Section 1014 "makes a false statement to one of the enumerated financial institutions a crime only if the speaker knows the falsity of what he says and intends it to influence the institution." *Id.* at 499. Unlike bank fraud, the government does not have to prove the materiality of the false statements made to Amalgamated. *Id.* at 498-500; *see also United States v. Autorino*, 381 F.3d 48, 52 n.3 (2d Cir. 2004) (stating that the Supreme Court in *Wells* "ruled that a false statement need not be material to the decision at issue to give rise to a violation of § 1014.").

Under Section 2 of Title 18 of the Criminal Code, Mr. Dupree can be convicted of Counts Three and Four if he "aids, abets, counsels, commands, induces or procures" the commission of those crimes or "willfully causes an act to be done which if directly performed by him or another would" constitute those crimes. 18 U.S.C. § 2. The Second Circuit has stated that this

"statute requires only that the underlying crime was committed by someone other than the defendant and that the defendant [him]self either acted or failed to act with the specific intent of advancing the commission of the underlying crime." *United States v. Litwok*, 678 F.3d 208, 213 (2d Cir. 2012) (internal quotation marks omitted).  Viewing the evidence in the light most favorable to the government and drawing all inferences in its favor, there was more than ample evidence from which a jury could find beyond a reasonable that Mr. Dupree knowingly made or aided and abetted the making of false statements in the BBCs and accompanying aging reports submitted to Amalgamated on January 6, 2010 (Count Three) and May 24, 2010 (Count Four), for the purpose of securing advances on the Revolving Loan and influencing Amalgamated to maintain the Revolving Loan at the current levels.

With respect to the false statement submitted to Amalgamated on January 6, 2010, which references the BBC for the Company's books as of November 30, 2009 signed by Mr. Patello (GX 11 (DOJ-GDC-000005234)), the jury heard evidence that the "All Accounts Receivable" figure was falsely inflated by approximately $11 million with Mr. Dupree's knowledge and at his direction.  Furthermore, the evidence at trial established that the accounts receivable figure for the November 30, 2009 BBC included, *inter alia*, $500,000 in fictitious Columbia sales and

$3 million in fake SCA sales, the latter of which Mr. Dupree knew about prior to the submission of the BBC because of the handwritten summaries that Mr. Patello provided him on a monthly basis.

Similarly, with respect to the false statement submitted to Amalgamated on May 24, 2010, which references the BBC for the Company's books as of April 30, 2010 (GX 11 (DOJ-GDC-000005236)), the jury heard recordings involving Mr. Dupree, Mr. Serrano, and Mr. Watts discussing prebilled or fictitious sales to include in that BBC. Mr. Dupree also signed the April 30, 2010 BBC himself, indicating that he was "intending that the Bank rely on [the BBC] in extending credit to the Company." (*Id.*) Moreover, in or around the time that the April 30, 2010 BBC was submitted, Mr. Dupree specifically instructed Mr. Serrano to prebill to reach the financial numbers provided by Mr. Watts. (Tr. 726-27.) Indeed, six days before the April 30, 2010 BBC was submitted, Mr. Dupree had a conversation with Mr. Serrano in which he specifically referenced prebilling and the "shit that's going out," instructed Mr. Serrano to have the $22 million of Eligible A/R for the BBC ready by the "end of day," and reassured Mr. Serrano that "once we get [past] this we're never revisiting this shit again." ((GX 363 (Recording 3-4).) Finally, the government presented evidence of millions of dollars of false or inflated accounts receivable included in the

April 30, 2010 BBC associated with, *inter alia*, Zwicker, Henegan, and Bedford Stuyvesant.

Even without this direct evidence of Mr. Dupree's specific knowledge of the false statements in the BBCs for November 30, 2009 and April 30, 2010 and his intent to influence the actions of Amalgamated, the jury could certainly infer the requisite knowledge and intent from all the circumstantial evidence presented by the government at trial. In particular, among other things, Mr. Dupree's active role in supervising the submission of the BBCs as evidenced by Mr. Patello's handwritten summaries, his participation in particular accounting decisions that falsely overstated the accounts receivable (*see, e.g.*, the $2 million for Image Lighting, the $3 million for SCA, and the $1.375 million for the Staten Island Courthouse), and his continued concealment of the fraud from Amalgamated in the spring and summer of 2010, provided an ample basis for the jury to conclude beyond a reasonable doubt that Mr. Dupree is guilty of Counts Three and Four.

This case can be analogized to *United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000), where the Second Circuit affirmed a defendant's convictions under Section 1014 for false statements similar to those at issue in this case. In *Carboni*, a company called Cableco entered into a revolving loan agreement that enabled Cableco to borrow a percentage of "eligible"

accounts receivable and that required Cableco to submit
borrowing base certificates reporting its eligible accounts
receivable to the bank. *Id.* at 42. Under the terms of that
revolving loan agreement, like the one at issue in this case,
the bank could require Cableco to repay the amount by which a
borrowing base certificate did not support the existing loan
balance. *Id.* At some point, Cableco "began to engage in
deceptive practices that increased the amounts it could borrow
under its line of credit," including by "pre-billed invoices,
that is, it created invoices for items it had not yet shipped."
*Id.* "Cableco then included these pre-billed invoices as
eligible accounts receivable in daily borrowing base
certificates that [the defendant] periodically reviewed before
their submission to [the bank]." *Id.* Although the Second
Circuit did not decide a Rule 29 motion in affirming defendant
Carboni's convictions under Section 1014, the Second Circuit
noted that there was "overwhelming evidence" of Carboni's guilty
intent. *Id.* at 45. Like the evidence presented with respect to
Mr. Dupree, the Second Circuit noted that the "overwhelming
evidence" at trial in the *Carboni* case established that Carboni
was (1) exposed to prebilled invoices in meetings, (2)
responsible for what was to be billed; (3) reviewed the
borrowing base certificates; (4) directed others to book false
sales; and (5) that "Cableco pre-billed two large invoices

totaling over $130,000." *Id.* at 45. Additionally, like Mr. Patello, Mr. Serrano, and Ms. Nusfaumer, in *Carboni*, a number of former Cableco employees including the comptroller "testified that Carboni knew about the pre-billed invoices and understood their effect on the base borrowing certificates." *Id.* at 43.

Accordingly, for the reasons set forth above, the court finds that, like the *Carboni* case, the evidence presented by the government and viewed in its favor is more than sufficient to sustain Mr. Dupree's conviction for Counts Three and Four, and Mr. Dupree's Rule 29 motion is denied for those counts as well.

## VII. The Rule 33 Motions for a New Trial Due to Manifest Injustice

### A. The Rule 33 Standard

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted); *see also United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009) ("'The test is

whether it would be a manifest injustice to let the guilty verdict stand.'" (quoting *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir. 1992))). "While [the Second Circuit] generally allow[s] district courts greater deference to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, courts must nonetheless exercise Rule 33 authority sparingly and in the most extraordinary circumstances." *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008) (internal quotation marks omitted).

**B.  Application**

Mr. Dupree presents two principal arguments for why he is entitled to a new trial:  (1) it was manifestly unjust for the government to present evidence regarding the Image Transaction because the jury could not find as a matter of law that GDC bought Image Inc. in violation of the Loan Agreement (Dupree Mem. 51-56; Dupree Reply at 9-12); and (2) prosecutorial misconduct, including improper contact with a court reporter, improper coaching of witnesses by the government, and Mr. Serrano's role as a government agent (Dupree Mem. at 56-59; Dupree Reply at 13-20).  Both of these arguments will be discussed in turn.

*1.  The Image Transaction*

Even assuming that Mr. Dupree is correct that the jury could not find as a matter of law that GDC bought Image Inc. in

violation of the Loan Agreement,[20] there is still no basis for granting Mr. Dupree a new trial.

First, although the S-2 Indictment alleges that the scheme to defraud involved, *inter alia*, "defraud[ing] Amalgamated by having GDC purchase Image Lighting Inc. covertly, *contrary to the terms of the [Loan] Agreement*, and by concealing the purchase from Amalgamated Bank" (S-2 Indictment ¶ 15) (emphasis added), there was no prejudicial variance. "A variance is immaterial - and hence not prejudicial – where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *United States v. LaSpina*, 299 F.3d 165, 183 (2d Cir. 2002) (internal quotation marks omitted). As summarized above, the evidence at trial established that Mr. Dupree made efforts to covertly purchase the assets of Image Inc. using a straw company that he directed Mr. Foley to create for that purpose, TDC, which is wholly-owned by GDC, and to conceal the Image Transaction from Amalgamated.

_____

[20] The government presented sufficient evidence that the Image purchase was a violation of the Loan Agreement. For example, Mr. Jarvis testified that the consolidation of one of the Borrower Subsidiaries with a multi-million dollar company in another state would be a violation of § 6.03 of the Loan Agreement. (Tr. 2150.) There was evidence at trial that, although the assets of Image Inc. were purchased by TDC and the employees of Image Inc. were hired by Image Lighting, which is owned by TDC, Image Inc. was essentially consolidated or merged into JDC Lighting, one of the Borrower Subsidiaries.

73

This is a fraud case and not a contract case, and a breach of the Loan Agreement does not by itself constitute a crime. The jury, however, could infer from the evidence that Mr. Dupree – whether correctly or incorrectly – believed that the Image Transaction violated the Loan Agreement and that he concealed the Image Transaction with the intent to defraud Amalgamated and to expose it to actual or potential loss.[21] Accordingly, the evidence at trial substantially corresponded with the allegations in the S-2 Indictment and Mr. Dupree could not and was not misled at trial.

Second, Mr. Dupree was not prejudiced because he was permitted to – and did – argue to the jury that the Image Transaction did not violate the Loan Agreement, both in his opening and closing statements. (*See, e.g.*, Tr. 322-24 (Opening: "They charge Image. . . . Image is a purchase of assets and that's it. . . . [W]hat we're going to show you is a provision that specifically allows [the Image transaction], that specifically allows [the Company] to expand."), Tr. 4152

_____

[21] Even if it was legally impossible for the Image transaction to violate the Loan Agreement, Mr. Dupree's mistaken belief that the Image transaction would violate the Loan Agreement is no defense to bank fraud so long as Mr. Dupree possessed the requisite intent. *See United States v. Boisvert*, No. 11-4206-cr, 2012 U.S. App. LEXIS 20966, at *3 (2d Cir. Oct. 10, 2012) (summary order) ("Courts that have distinguished legal from factual impossibility confine the former to situations where the actions set in motion by defendant, 'even if fully carried out as he desires, would not constitute a crime.'"); *id.* (citing *United States v. Coffman*, 94 F.3d 330, 333 (7th Cir. 1996) (Posner, J.) ("recognizing that, although it is not a criminal attempt to try to do what the criminal law does not forbid you to do, attempt is nevertheless criminal where if completed in accordance with the defendant's understanding of the circumstances [it] would have resulted in a crime" (internal quotation marks omitted))).

(Closing: "[K]eep in mind that what has happened with the purchase of Image not only was perfectly proper, it was told to the government.").) Moreover, the jury was instructed that the allegations in the S-2 Indictment, including the reference to a violation of the Loan Agreement, are not evidence or proof of guilt. (Tr. 258, 4255-56.) The jury was thus entirely free to accept or disregard the government's and Mr. Dupree's arguments regarding the Image Transaction.

Finally, assuming that all of the evidence regarding the Image Transaction was improperly admitted, which it was not, there was still ample evidence at trial regarding the other aspects of the scheme to defraud alleged in the S-2 Indictment to sustain Mr. Dupree's conviction. The government correctly argues that it was not required to prove every aspect of the scheme to defraud alleged in the S-2 Indictment in order to satisfy it burden as to Mr. Dupree's guilt. (Gov't Opp'n at 42); see *United States v. Walker*, 254 F. App'x 60, 62-63 (2d Cir. 2007) (summary order) ("[T]he jury was not required to find every aspect of the scheme [to defraud] in order to convict [defendant of bank fraud], so long as it found the essential elements of that scheme." (citing *United States v. Amrep Corp.*, 560 F.2d 539, 546 (2d Cir. 1977) (distinguishing the existence of a scheme to defraud from the "means adopted to effectuate that scheme," and holding that the government need not prove

every means charged in the indictment so long as "there is sufficient overall proof that the scheme exists" (internal quotation marks omitted)))); *see also United States v. Miller*, 471 U.S. 130, 136 (1985) ("The Court has long recognized that an indictment may charge numerous offenses or the commission of any one offense in several ways.").  The allegations regarding the Image Transaction, consisting of two sentences (S-2 Indictment ¶ 15), constitute only one aspect of the complex scheme to defraud alleged in the S-2 Indictment, which spans a total of ten paragraphs (*id.* ¶¶ 8-17).  As demonstrated above, putting aside the evidence regarding the Image Transaction, there was still sufficient evidence presented at trial for the jury to find beyond a reasonable doubt that Mr. Dupree knowingly participated in a scheme to defraud Amalgamated.  Accordingly, the court finds that Mr. Dupree has not sustained his burden for a new trial based on the government's presentation of evidence that the Image Transaction violated the Loan Agreement.

> ## 2.  *Prosecutorial Misconduct*

Mr. Dupree essentially uses his Rule 33 motion to rehash the litany of arguments that he has made from the beginning of this case that the government has engaged in misconduct, and which the court has painstakingly and repeatedly addressed in several decisions, both in written and oral decisions prior to trial and orally at trial,  *See, e.g.*, *United*

*States v. Dupree*, 781 F. Supp. 2d 115, 160-66 (E.D.N.Y. 2011)
(denying motion to dismiss indictment based on various
allegations of prosecutorial misconduct); *United States v.
Dupree*, 833 F. Supp. 2d 255, 269-72 (E.D.N.Y. 2011) (precluding
testimony regarding allegations of prosecutorial misconduct).

The court will however address Mr. Dupree's specific
allegations of prosecutorial misconduct that occurred at trial,
none of which merit a new trial under Rule 33. First, Mr.
Dupree argues that the government improperly approached a court
reporter regarding making corrections to a transcript. (Dupree
Mem. at 56 n.11.) The government does not dispute that it
brought certain transcript errors to a court reporter's
attention, and the court reporter subsequently produced a
revised transcript with the corrections to Mr. Dupree, who has
never contested any portion of the transcript. (Gov't Opp'n at
43-45.) The defendant thus cannot now argue that he was somehow
prejudiced by the government's conduct with respect to the court
reporter, and certainly cannot argue that such prejudice
warrants a new trial.

Second, Mr. Dupree alleges that the government
improperly instructed two postal inspectors that were going to
testify at trial to materially change their testimony. (*See*
Dupree Mem. at 56 n.11.) Even if Mr. Dupree's allegations are
true, which the government disputes (*see* Gov't Opp'n at 43-47),

the postal inspectors did not testify at trial and thus Mr. Dupree could not have been prejudiced.

Third, Mr. Dupree argues once again that Mr. Serrano was acting as a government agent when he accessed Mr. Patello's emails that he provided to the government and when he created wholly fictitious invoices in May 2010. (Dupree Mem. at 57-59.) As the court ruled at trial on December 27, 2011, even if Mr. Serrano was acting as a government agent, suppression of the emails he collected was not warranted because Mr. Dupree did not have a legitimate expectation of privacy in emails that he gave Mr. Serrano permission to access and view. (Tr. 3983-95.) Moreover, Mr. Serrano specifically testified that he was acting at the direction of Mr. Dupree and Mr. Watts when he engaged in prebilling, both before and after Mr. Serrano approached the FBI, and that the FBI merely instructed him to continue working at GDC in the normal course, which Mr. Serrano did. (Tr. 697-700, 1086, 1093.) The crux of Mr. Dupree's Rule 33 motion with respect to Mr. Serrano is that "Counts Three and Four rest solely on fabricated invoices created by Mr. Serrano of which Mr. Dupree had no knowledge." (Def. Mem. at 58.) As discussed at length above, there was more than ample evidence, not the least of which includes Mr. Serrano's testimony and Mr. Dupree's

emails and recorded conversations, to support Mr. Dupree's conviction on Counts Three and Four.[22]

The court has considered all of the other instances of prosecutorial misconduct alleged by Mr. Dupree, both separately and together, and finds that Mr. Dupree has not satisfied his burden in establishing that a new trial is warranted. Indeed, based on the evidence at trial, there are no extraordinary circumstances here and this is not a situation where "there is a real concern that an innocent person may have been convicted." *McCourty*, 562 F.3d at 475. Accordingly, the court denies Mr. Dupree's Rule 33 motions.

## VIII. The Motion to Amend the Rule 33 Motion To Allege Prosecutorial Misconduct Based on Perjured Testimony

In a motion filed on July 11, 2012, more than six months after the guilty verdict, Mr. Dupree moved to "amend" his Rule 29 and 33 motions for a new trial on the ground that the government elicited perjured testimony by Chris Petrellese, a forensic accountant with the FBI, when he was called by Mr. Dupree as a witness after the jury verdict finding Mr. Dupree guilty and during the forfeiture phase of the trial. (Tr. 4380-81, 4436; *see* ECF No. 560.) At the outset, the court notes that because this alleged perjured testimony occurred after the

---

[22] Mr. Dupree also summarily argues that he was unable to fully cross-examine Mr. Serrano regarding his actions pursuant to FBI instructions. (Dupree Mem. at 58.) To the contrary, Mr. Dupree cross-examined Mr. Serrano extensively regarding his dealings with the FBI. (*See, e.g.*, Tr. 916-922, 926, 978-79, 1020-22, 1086, 1093-94, 1122-23.)

guilty verdict and during the forfeiture phase of the trial, such testimony could not have had any effect on the jury's guilty verdict but only could have factored into the jury's special verdict for forfeiture. Therefore, although Mr. Dupree fashioned his motion as an "amendment" to both his Rule 29 and Rule 33 motions, the court construes his amendment as a Rule 33 motion for a new trial as to the forfeiture verdict only, which appears to be what Mr. Dupree is requesting. (*See* Dupree Amdt. at 10.) Even if, however, this alleged perjured testimony is considered together with the other grounds for a new trial considered above, the court finds that no new trial as to guilt or forfeiture is warranted.

Mr. Dupree essentially argues that the government knowingly elicited false testimony from Mr. Petrellese because his testimony during the forfeiture phase of trial contradicted his prior testimony at the May 13, 2011 hearing held before Magistrate Judge Azrack pursuant to *United States v. Monsanto*, 924 F.2d 1186 (2d Cir. 1991) (the "*Monsanto* Hearing"). (*See* ECF No. 577-2, Transcript of *Monsanto* Hearing held on May 13, 2011 ("*Monsanto* Tr.").) Specifically, Mr. Dupree alleges that during the *Monsanto* Hearing, Mr. Petrellese testified that he was unable to tell which fraction, if any, of the Amalgamated loan proceeds went to a GDC subsidiary called Unalite Southwest ("USW"), whereas at trial he testified that USW was a net

borrower in that it needed loan proceeds to operate its business.  (Dupree Amdt. at 6-7.)

Before addressing the merits of Mr. Dupree's new motion, the court will first address its timeliness.  Rule 33 requires that a motion on any ground "other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty."[23]  Fed. R. Crim. P. 33(b)(2).  The court granted Mr. Dupree an extension of time until January 20, 2012 to file his initial Rule 29 and Rule 33 motions.  (Order dated Jan. 10, 2012.)  Nevertheless, the time limitations specified in Rule 33 are subject to the time modification provisions of Federal Rule of Criminal Procedure 45, which permit a court to extend the time for "good cause . . . if the party failed to act because of excusable neglect."  Fed. R. Crim. P. 45(b)(1)(B); *see United States v. Owen*, 559 F.3d 82, 83-84 (2d Cir. 2009).  Although Rule 45 does not define "excusable neglect," "courts apply an equitable test that considers all relevant circumstances, including:  (1) the danger of prejudice to the non-moving party, (2) the length of delay

---

[23]  Mr. Dupree does not argue, nor could he, that his new Rule 33 motion is based on newly discovered evidence, which would permit him to file it within three years after the guilty verdict.  *See* Fed. R. Crim. P. 33(b)(1).  Indeed, if that were the case, the "newly discovered evidence" would have to be the transcript of the *Monsanto* hearing in this very case, a hearing that Mr. Dupree's counsel attended and was certainly aware of, not the least because his counsel questioned Mr. Petrellese during the forfeiture phase of the trial regarding his *Monsanto* testimony.  (*See* Tr. 4439.)  Such evidence surely cannot fit the definition of "newly discovered."

and impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the moving party, and (4) whether the moving party acted in good faith." *United States v. Sabir*, 628 F. Supp. 2d 414, 417 (S.D.N.Y. 2007); *accord Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993).

Here, Mr. Dupree filed this new Rule 33 motion more than six months after the guilty verdict, and therefore he must establish that his failure to file it by the court's deadline of January 20, 2012 was the product of excusable neglect.  Mr. Dupree argues that he only recently became aware of the perjured testimony by Mr. Petrellese because his counsel was only an "observer" at the *Monsanto* hearing, and because defense counsel "did not have the opportunity or reason to review Mr. Petrellese's [*Monsanto*] testimony prior to trial" based on the understanding that the forfeiture portion of the trial would be bifurcated and that defense counsel would have adequate time to prepare for Mr. Petrellese's testimony during the forfeiture phase if there was a guilty verdict.  (Dupree Amdt. at 3.) Defense counsels' claim - that their ability to review Mr. Petrellese's prior testimony was "non-existent" (*id.*) - is directly contradicted by the trial record.  Indeed, defense counsel specifically asked Mr. Petrellese the following question on direct examination during the forfeiture phase of trial:

"Then at the hearing on May 13, 2011 before Judge Azrack, do you remember your testimony that no funds were ever transferred from the concentration account at Amalgamated Bank to any of the USW, meaning Unalite Southwest JP Morgan Chase accounts?" (Tr. 4439.) Further, on redirect examination, defense counsel asked Mr. Petrellese two more questions regarding his testimony at the *Monsanto* Hearing, both also regarding USW. (Tr. 4444-45.) Given that defense counsel had clearly reviewed Mr. Petrellese's *Monsanto* testimony prior to his testimony during the forfeiture phase of trial, they should have addressed any allegations of perjury during their redirect examination when it could have been corrected, and not now, six months later.

Based on (1) defense counsel's attendance at the May 13, 2011 *Monsanto* Hearing in which Mr. Petrellese was the sole witness, (2) the government's notice as early as March 2011 and again in October 2011 that Mr. Petrellese would be a government witness (see ECF Nos. 148, 404), (3) Mr. Petrellese's testimony during the guilt phase of trial, and (4) defense counsel's own questions during the forfeiture phase of trial that reference Mr. Petrellese's *Monsanto* testimony, the court finds it troubling that Mr. Dupree's counsel – members of a large corporate law firm - have even attempted to argue that they were unable to review Mr. Petrellese's prior testimony until approximately July 2012, when Mr. Dupree first alerted the court

of this new motion.  Indeed, even if defense counsel was not present at the *Monsanto* Hearing, defense counsel certainly should have reviewed a potential trial witness's prior sworn testimony in the same case prior to cross-examining him during the guilt phase of trial or calling him as a defense witness during the forfeiture phase of trial, particularly when the transcript of Mr. Petrellese's prior testimony was only 40 pages long.  Although there is limited prejudice to the government from deciding this new motion by Mr. Dupree, based on the significant six-month delay, the lack of any reason – let alone any good reason - for the delay, which was entirely within Mr. Dupree's control, and the questionable good faith that defense counsel has exhibited in arguing that this motion is timely, the court finds that Mr. Dupree has not satisfied his burden in establishing excusable neglect.  The court therefore finds that Mr. Dupree's Rule 33 motion based on allegedly perjured testimony by Mr. Petrellese is untimely.

Even if the court found that Mr. Dupree's new Rule 33 motion was timely, it would also fail on the merits.  In determining a Rule 33 motion based on allegations of prosecutorial misconduct and perjured testimony, the defendant must show that (1) the witness actually committed perjury; (2) the alleged perjury was material; (3) the government knew or should have known of the perjury at the time of trial; and (4)

the perjured testimony remained undisclosed or uncorrected during trial. *United States v. Uganda Nash*, 338 F. App'x 96, 99 (2d Cir. 2009) (quoting *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009)). Depending on whether or not the government knew or should have known of the alleged perjury, there are two standards:

> If the prosecution knew or should have known of the perjury prior to the conclusion of the trial, the conviction must be set aside where there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. . . . On the other hand, if the prosecution was not aware of the perjury, a defendant can obtain a new trial only where the false testimony leads to a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.

*United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006) (citations omitted) (internal quotation marks omitted); *see also Truman*, 688 F.3d at 141 ("Even in cases involving a witness's perjured testimony, however, a new trial is warranted only if 'the jury probably would have acquitted in the absence of the false testimony.'").

Here, Mr. Dupree cannot establish that Mr. Petrellese's testimony during the forfeiture phase of trial was perjured, or even if it was perjured, that it was material. First, in the portion of the *Monsanto* hearing cited by Mr. Dupree, Mr. Petrellese testified that the Amalgamated loan proceeds were commingled in the Concentration Account at

Amalgamated with other funds, and that he could not determine the exact amount of the loan proceeds in the Concentration Account that were deposited into the accounts of USW or any other GDC subsidiary. (*Monsanto* Tr. 32-33.) Mr. Petrellese, however, further testified at the *Monsanto* Hearing that he could "follow[] the flow of the money" and determine the trail of funds in and out of particular accounts on an aggregate basis, even if he could not determine whether any particular dollar was attributable to the loan proceeds. (*Id.* at 33-34 ("The funds were mixed together, I can't say dollar for dollar, from this place went to that place, I just know collectively this much went into these accounts and this much went out.").) This testimony is not inconsistent with Mr. Petrellese's testimony at trial that two USW accounts at Amalgamated received $700,000 more money from the Concentration Account that was commingled with loan proceeds, than they paid into the Concentration Account, thus leading to the conclusion that, with respect to these accounts, USW borrowed $700,000 more on the Amalgamated loan than it contributed to the Concentration Account. (Tr. 4441-43; GX 343.) Additionally, in response to defense counsel's questions, Mr. Petrellese reaffirmed his testimony at trial that no loan proceeds from the Concentration Account were

deposited in the USW account at J.P. Morgan Chase. (Tr. 4444-46.)[24]

Second, even if Mr. Petrellese's testimony during the forfeiture phase was perjured, which it was not, Mr. Dupree has not established that it was material. Indeed, it was Mr. Dupree who called Mr. Petrellese as a witness, not the government, and the jury certainly could have reached its special verdict on forfeiture without his testimony. As the government correctly argues, Mr. Patello's testimony during the forfeiture phase and the evidence presented in the guilt phase of trial established that the start-up costs for USW were paid for by Amalgamated loan proceeds, and that GDC and its subsidiaries had negative cash flow from operations in 2009, which were funded by the Amalgamated loan proceeds. (*See* Gov't Opp'n to Dupree Amdt. at 7 (citing Tr. 2414-18, 2447-50, 4443; GX 301, GX 302).) Accordingly, the alleged perjury by Mr. Petrellese was not material to the jury's special verdict on forfeiture.

Because the court has found that the alleged perjured testimony by Mr. Petrellese was not perjury, and even it was, it

---

[24] Mr. Dupree also argues that Mr. Petrellese testified at the *Monsanto* hearing that $700,000 from a USW account at J.P. Morgan Chase that was transferred to the USW accounts at Amalgamated was used to pay the expenses of other GDC subsidiaries. (Dupree Amdt. at 6-7 (citing *Monsanto* Tr. 37-39).) Even though Mr. Dupree's argument does not appear to be established by the cited Petrellese testimony, assuming it is true, Mr. Dupree fails to explain how this testimony, which involves payments ultimately from a USW account at J.P. Morgan Chase, contradicts his testimony during the forfeiture phase at trial, which was regarding USW accounts at Amalgamated.

was not material, the court need not address whether the government knew or should have known that the testimony was perjured.  Accordingly, for the reasons set forth above, and because Mr. Petrellese's allegedly perjured testimony could not have affected Mr. Dupree's guilty verdict and was not material to the forfeiture verdict, the court denies his Rule 33 challenge on this ground as well.

## **CONCLUSION**

For the reasons set forth above, the court denies Mr. Dupree's Rule 29 motion for a judgment of acquittal, or alternatively, his Rule 33 motion for a new trial.  The sentencing of Mr. Dupree shall proceed on December 17, 2012 at 11:00 AM, as scheduled.

**SO ORDERED.**

Dated:    October 25, 2012
          Brooklyn, New York

                              _____
                                        /s/
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York