UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
COURTNEY DUPREE,

                    *Petitioner*,                **MEMORANDUM AND ORDER**

        -against-                          17-CV-2356(KAM)
                                           10-CR-0627(KAM)

UNITED STATES OF AMERICA,

                    *Respondent*.
---------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

        In 2013, this court sentenced Courtney Dupree ("Mr. Dupree" or "Petitioner") to 84 months of imprisonment and ordered him to pay $15,324,293.92 in restitution after a jury convicted him of bank fraud, conspiracy to commit bank fraud, and two counts of making a false statement, all stemming from his part overseeing an intricate $18 million scheme to defraud Amalgamated Bank, among others.  (*See* Case No. 10-cr-627,[1] ECF No. 733, Judgment.)  Presently before the court are a petition and supplemental petition filed by Mr. Dupree, seeking to vacate his conviction pursuant to 28 U.S.C. § 2255 ("Section 2255").  (ECF No. 837, Motion to Vacate ("Pet."); ECF No. 838,

---

[1] Mr. Dupree's criminal case was assigned docket number 10-cr-627, and his petition for habeas relief pursuant to 28 U.S.C. § 2255 was assigned docket number 17-cv-2356.  All of the documents relevant to his habeas petition, however, were uploaded to the 10-cr-627 criminal case docket.  Accordingly, this Memorandum and Order adjudicates case number 17-cv-2356, but all citations to docket filings are citations to the 10-cr-627 docket.

Supplemental Filing ("Supp. Pet.").)  For the reasons herein,

the petitions are respectfully DENIED.

## Background

Following a jury trial before this court in late 2011,

Petitioner was convicted of conspiracy to commit bank fraud,

bank fraud, and two counts of making a false statement, all in

connection with a complex $18 million scheme to defraud a bank

by obtaining or attempting to obtain loans on the basis of false

financial statements, and other material misrepresentations,

between January 2007 and July 2010.  The scheme was described in

detail in previous orders by the court, including the court's

October 26, 2012 Memorandum and Order denying Mr. Dupree's

motions for acquittal or a new trial.  *See United States v.*

*Dupree*, 2012 WL 5333946, at *1-19 (E.D.N.Y. Oct. 26, 2012),

*aff'd*, 620 F. App'x 49 (2d Cir. 2015); (ECF No. 596, "Oct. 26,

2012 Order").  The relevant background is described only briefly

here, to the extent relevant to Mr. Dupree's petitions for

habeas relief.

**I. Factual Background**

At all relevant times between January 2007 and July

2010, Mr. Dupree was the owner and chief executive officer of

GDC Acquisitions, LLC ("GDC") and its three subsidiaries

(together with GDC, the "Company").  (*See* Oct. 26, 2012 Order at

6 (citing trail testimony).)  GDC was a holding company with

2

three wholly-owned primary operating subsidiaries, all of which were acquired by GDC prior to 2007: (i) JDC Lighting, LLC ("JDC Lighting"), which sold commercial lighting fixtures for commercial property; (ii) Unalite Electric and Lighting, LLC ("Unalite"), a lighting maintenance company for corporations and other large enterprises; and (iii) Hudson Bay Environments Group, LLC ("Hudson Bay"), which sold commercial office furniture to schools, hospitals, and government entities. (*Id.*)

### A.    The Loan Agreement

In the spring of 2008, a loan officer from Amalgamated Bank met with Mr. Dupree, along with Rodney Watts ("Mr. Watts"), GDC's chief investment officer, and Frank Patello ("Mr. Patello"), GDC's chief financial officer. (*Id.* at 7.) In connection with this meeting, Mr. Dupree and his employees provided Amalgamated Bank with information concerning the financial condition of the Company, including audited financial statements, accounts receivable reports, aging reports, backlog reports, and acquisition documents for companies acquired, such as Hudson Bay. (*Id.*) In connection with a loan application, the Company provided Amalgamated Bank the draft consolidated financial statements of the Company for the period ending December 31, 2007, which were prepared by an independent auditor based on information provided by the Company. (*Id.* at 7-8.) At trial, Mr. Patello testified that the 2007 financial statements

falsely reported the Company's net income to be approximately $1.547 million, when in reality it was only half that amount. (*Id.* at 8.)  A GDC employee also testified at trial that she submitted reports to Amalgamated Bank that included accounts receivable for products that had not yet been delivered to customers.  (*Id.* at 8-9.)

In August 2008, Mr. Dupree signed a loan agreement with Amalgamated Bank (the "Loan Agreement") on behalf of JDC Lighting, Unalite, and Hudson Bay (the "Borrower Subsidiaries"), and on behalf of GDC as guarantor, pursuant to which the Bank extended two loans to the Borrower Subsidiaries: (i) a $2.5 million three-year term loan, which was to be repaid via monthly payments of $41,666.67 plus interest with an approximate $1 million balloon payment at the end of the three-year term (the "Term Loan"); and (ii) an $18.5 million revolving loan or line of credit, pursuant to which the Borrower Subsidiaries could borrow up to $18.5 million (the "Revolving Loan").  (*Id.* at 10.) In connection with these loans, the Borrower Subsidiaries' accounts receivable and inventory served as collateral.  (*Id.*) The Loan Agreement also restricted the use of loan proceeds (i) to repay outstanding indebtedness to both Steelcase, Inc., a creditor of the Company, and PNC Bank, the Company's former lender; (ii) as working capital to assist in financing the expansion of the principal businesses, capital expenditures, and

general corporate purposes; or (iii) as payment of fees and expenses in connection with the loans.  (*Id.*)

The Loan Agreement contained various other terms and requirements (*see id.* at 11-14), including a negative covenant stating that the Borrower Subsidiaries "shall not, directly or indirectly . . . [c]onsolidate with, be acquired by, or merge into or with any Person . . . except in the ordinary course of business" (*id.* at 13 (citing Loan Agreement § 6.03)).  Further, the Loan Agreement prohibited the Borrower Subsidiaries from making "any loan or advance to, or enter[ing] into any arrangement for the purpose of providing funds or credit to, or mak[ing] any other investment, by capital contribution or otherwise, in or with any Person," except for a money market or investment account at Amalgamated Bank, or "extensions of credit in the nature of accounts receivable or notes receivable."  (*Id.* (citing Loan Agreement § 6.04).)  The loan officer from Amalgamated Bank, who negotiated the terms of the Loan Agreement with the Company, testified at trial that he understood that these provisions prevented the Borrower Subsidiaries from buying or investing in any other companies without permission from the Bank.  (*Id.* at 13-14.)

B. **The Image Lighting Acquisition**

In June 2008, Mr. Dupree contacted Thomas Foley ("Mr. Foley"), GDC's outside counsel, and requested that he draft an

asset purchase agreement for a transaction to purchase Image
Lighting, Inc. ("Image Inc."), a lighting company based in New
Jersey.  (*Id.* at 15.)  Mr. Dupree instructed Mr. Foley that
"[t]he only nuance is that we will acquire the company in two
pieces": a newly formed company called "TDC" will acquire the
intangible assets of Image Inc., such as customer lists and
goodwill, and then the employees of Image Inc. will be hired by
GDC under a separate, newly-formed company called Image Lighting
Services, LLC ("Image Lighting").  (*Id.*)  Mr. Foley formed three
new companies in New Jersey in November 2008 in connection with
the contemplated transaction.  (*Id.* at 16.)  Those companies
were: TDC Acquisitions LLC ("TDC"), which was wholly-owned by
GDC; Image Lighting, which was wholly-owned by TDC; and
Interconnect Lighting LLC ("Interconnect"), which was wholly-
owned by Mr. Dupree's fiancée, Stephanie Horton.  (*Id.*)

In December 2008, approximately three months after the
funds from the loans were dispersed, Mr. Foley's law firm sent a
check to Image Inc. for the acquisition in the amount of
$790,000.  (*Id.*)  The transaction was not disclosed on any of
the Company's financial statements, and Amalgamated Bank was
never informed of it.  (*Id.* at 17.)  Mr. Patello testified at
trial that Mr. Dupree told him that the transaction was not
permitted under the terms of the Loan Agreement, and so the
Company kept the transaction "secret."  (*Id.*)  The Company

organized a convoluted series of transfers between bank accounts to shield the transaction from outside auditors, altered the legal bills received from Mr. Foley to remove references to the transaction, and listed Image Lighting as a customer of JDC Lighting on its books. (*See id.* at 17-19.)

An employee of the Company went so far as to pose as a fictional Image Lighting employee in a telephone call with one of JDC Lighting's creditors, C3 Capital, LLC ("C3 Capital"). (*Id.* at 20.) The employee of C3 Capital who spoke to the employee of the Company testified at trial that he was told that Image Lighting had been a customer of JDC Lighting for two years, that JDC Lighting's management was "great" and responsive to Image Lighting's needs, and that Image Lighting's "pipeline in New York and New Jersey is still full." (*Id.* at 21.)

Although the Company did not purchase any of Image Inc.'s accounts receivables, only its intangible assets, Mr. Dupree directed the Company to falsely record approximately $2 million of Image Inc. accounts receivables on the books of JDC Lighting. (*Id.* at 22.)

### C. Subsequent Fraudulent Reporting to Amalgamated Bank

Th evidence at trial showed that throughout the rest of 2008 and 2009, and into 2010, the Company continued to falsely represent its financial information to Amalgamated Bank.

In particular, Mr. Dupree was actively involved in the submission of false financial information to Amalgamated Bank under the terms of the Loan Agreement. (*Id.* at 24.)

For example, according to Mr. Patello's testimony at trial, the Company's accounts receivable figure provided to Amalgamated Bank in November 2009 was inflated by approximately $11 million. (*Id.* at 25.) The evidence at trial established that the inflated figures provided to the Bank were accomplished through three methods: (i) fictitious sales, involving the creation of fake invoices; (ii) prebilling, where the Company would record sales before the customer received and paid for the product or service, and in some cases the product or service was ultimately not purchased; and (iii) "re-aging," where the Company would issue credits for old sales invoices so that they appeared to have been incurred more recently. (*See id.* at 24-37.)

## II. The Indictment

Mr. Dupree was indicted in August 2010 (ECF No. 22, Indictment) with superseding indictments filed in March 2011 (ECF No. 155, Superseding Indictment) and August 2011 (ECF No. 295, Second Superseding Indictment). The Second Superseding Indictment (hereinafter, the "Indictment") charged five counts against Mr. Dupree. Count One charged Mr. Dupree with conspiracy to commit bank, mail, and wire fraud in violation of

18 U.S.C. §§ 1349, 3551 *et seq.* (*Id.* ¶¶ 18-19.) Count Two charged Mr. Dupree with bank fraud in violation of 18 U.S.C. §§ 2, 1344, 3551 *et seq.* (*Id.* ¶¶ 20-21.) Counts Three and Four charged Mr. Dupree with making a false statement on or about January 6, 2010 and May 24, 2010, respectively, by "willfully overvalu[ing] property and security, for the purpose of influencing the action of Amalgamated Bank upon one or more loans," in violation of 18 U.S.C. §§ 2, 1014, 3551 *et seq.* (*Id.* ¶¶ 22-25.) Lastly, Count Five charged Mr. Dupree with an additional count of bank fraud in violation of 18 U.S.C. §§ 2, 1344, 3551 *et seq.* (*Id.* ¶¶ 26-27.)

Mr. Foley, who was GDC's outside counsel and subsequently its general counsel and chief operating officer, was also charged in Counts One, Two, and Four of the Indictment. Mr. Watts, the chief financial officer and chief investment officer, was charged in Counts One through Four of the Indictment. Mr. Foley went to trial with Mr. Dupree and was acquitted of all charges, while Mr. Watts was tried separately.[2]

### III. The Trial and Conviction

Mr. Dupree's trial began with jury selection on December 5, 2011. The trial lasted approximately one month, and featured testimony from more than 25 witnesses and the

---

[2] Mr. Watts was eventually convicted on all Counts, and sentenced to 37 months in prison.

introduction of hundreds of exhibits.  Mr. Dupree was only tried on Counts One through Four of the Indictment.  The Government presented its evidence over the course of two weeks, and rested its case on December 20, 2011.  A significant portion of the Government's case at trial was the introduction of testimony from three former GDC employees who cooperated with the Government and entered guilty pleas for participating in the conspiracy with Mr. Dupree.

Mr. Dupree was represented at trial by lawyers from the law firm Andrews Kurth LLP, including Roscoe C. Howard, Jr., Esq. ("Mr. Howard"), Meena T. Sinfelt, Esq. ("Ms. Sinfelt"), and Leasa M.W. Anderson, Esq. ("Ms. Anderson").  Mr. Dupree presented his defense during the week after the Government rested its case, calling character witnesses, and Mr. Dupree also testified.  Mr. Dupree, along with his co-defendant Mr. Foley, rested their cases on December 27, 2011, after which both the Government and the defendants delivered closing arguments.

The jury began its deliberations on December 29 and returned its verdict on December 30, 2011.  (*See* ECF No. 506, Jury Verdict.)  The jury found Mr. Dupree guilty of Counts One through Four, and acquitted Mr. Foley of all charges.  (*See id.*) In relation to Count One, the jury found that Mr. Dupree conspired to commit bank fraud, but did not find that he conspired to commit mail or wire fraud.  (*Id.* at 1.)  On January

3, 2012, following the guilty verdict, the jury found Mr. Dupree liable for a forfeiture money judgment of $18,157,000. (ECF No. 511, Special Verdict Sheet for Forfeiture.) The judgment represented proceeds traceable to the offenses for which Mr. Dupree was convicted, including eight bank accounts and a tax refund. (*Id.*)

Mr. Dupree filed motions for acquittal or a new trial in January 2012 (ECF No. 525), which the court denied in a lengthy Memorandum and Order on October 26, 2012 (ECF No. 596, Oct. 26, 2012 Order).

## IV. The Sentence

Following the denial of his motions for acquittal or a new trial, this court sentenced Mr. Dupree on May 29, 2013. Mr. Dupree was sentenced to 84 months of imprisonment for Counts One through Four, to run concurrently, with credit for time served running from March 16, 2011. (ECF No. 733, Judgment.) In addition, Mr. Dupree was sentenced to five years of supervised release, and ordered to pay $15,324,293.92 in restitution, and a $400 special assessment. (*Id.*) Mr. Dupree served his term of imprisonment and is currently serving his supervised release, while working with the Probation Department to pay the outstanding restitution he still owes.

**V. The Appeal**

On September 19, 2013, Marshall A. Mintz, Esq. ("Mr. Mintz") was appointed as Mr. Dupree's appellate counsel. (ECF No. 842-5 ("Mintz Decl.") at ¶ 4.) One year later, on September 26, 2014, before Mr. Dupree's appellate brief had been filed in the Second Circuit, Mr. Dupree filed a request to proceed *pro se* during his appeal, stating that he had "lost faith in Mr. Mintz's ability and intent regarding [the] case." (CA2 Case No. 13-2314, ECF No. 118, Motion to Proceed *Pro Se*.) The Second Circuit granted Mr. Dupree's request to proceed *pro se*. (*Id.*, ECF No. 119, Notice.) On October 29, 2014, after Mr. Dupree failed to file a scheduling notification as required by Second Circuit Local Rule 31.2(a)(1)(A), the Second Circuit ordered that his appellate brief was due December 8, 2014. (*Id.*, ECF No. 122, Scheduling Order.)

Mr. Dupree filed his *pro se* appellate brief on December 5, 2014, raising various arguments. (*Id.*, ECF No. 125.) Mr. Dupree's appeal was consolidated with Mr. Watts's appeal; Mr. Watts had been convicted in a separate trial, and was represented by attorneys from the law firm Thompson & Knight LLP on appeal. (*See id.*, ECF No. 96, Brief and Special Appendix of Appellant Rodney Watts.)

On July 28, 2015, the Second Circuit upheld Mr. Dupree's and Mr. Watts's respective convictions. *United States*

*v. Dupree*, 620 F. App'x 49 (2d Cir. 2015) (summary order).  The
court upheld Mr. Dupree's conviction "for substantially the same
reasons stated in [this] court's October 26, 2012 order denying"
his motions for acquittal or a new trial.  *Id.* at 51.  The court
held that while "[m]any of [Mr.] Dupree's sufficiency [of the
evidence] challenges rely on the premise that his companies did
not violate the [L]oan [A]greement's negative covenant on
acquisitions," his "convictions can be affirmed regardless of
the alleged acquisition, based on the other evidence of [Mr.]
Dupree's involvement in the scheme to defraud."  *Id.*

Mr. Dupree filed a petition for a writ of certiorari,
which was denied by the United States Supreme Court on June 20,
2016.  *Dupree v. United States*, 136 S. Ct. 2497 (2016).

### VI. The Instant Petitions

On April 18, 2017 Mr. Dupree timely filed a petition
pursuant to Section 2255 to vacate his conviction, averring
primarily that his trial lawyers rendered ineffective assistance
of counsel.  (*See* ECF No. 837, Pet.)  Petitioner also timely
filed a supplemental petition on June 19, 2017, focused on the
alleged ineffective assistance of his appellate counsel. (*See*
ECF No. 838, Supp. Pet.)  On November 6, 2018 the Government
opposed Mr. Dupree's petitions.  (*See* ECF No. 843.)  Mr. Dupree
filed a reply on April 1, 2019.  (ECF No. 851.)

## **Legal Standard**

"A prisoner in custody under sentence of a [federal court] claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, . . . or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  "[A] petitioner under supervised release may be considered 'in custody.'"  *Scanio v. United States*, 37 F.3d 858, 860 (2d Cir. 1994).

The Court "shall vacate and set the judgment aside" if the Court finds that "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."  28 U.S.C. § 2255(b).  To respect the finality of criminal convictions, "a collateral attack on a final judgment in a federal criminal case is generally available under [Section] 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'"  *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

14

## Discussion

Mr. Dupree contends that his trial counsel (Mr. Howard, Ms. Sinfelt, and Ms. Anderson) rendered ineffective assistance by failing to adequately contest "falsehoods" in the Indictment, and that this oversight "permanently prejudiced" his defense. (Pet. at 6-7, 14-20.) Mr. Dupree further argues that trial counsel failed to object to this court's pre-trial order excluding certain expert testimony, and that as a result, he was "forced" to personally testify in violation of his Fifth Amendment rights. (Pet. at 23-28.) Lastly, Mr. Dupree alleges ineffective assistance by his appointed appellate counsel, Mr. Mintz, arguing that Mr. Mintz was "overwhelmed by the scope and complexity of the case," which forced Mr. Dupree to file a speedy and low-quality *pro se* appellate brief. (Pet. at 4; *see generally* Supp. Pet.)

### I. Evidentiary Hearing

"In ruling on a motion under [Section] 2255, the district court is required to hold a hearing '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (quoting 28 U.S.C. § 2255). "[T]he filing of a motion pursuant to [Section] 2255 does not automatically entitle the movant to a hearing." *Id.* No hearing is necessary "where the allegations are 'vague,

conclusory, or palpably incredible.'" *Id.* (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)).  A hearing is necessary only where the petition "set[s] forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the petitioner] to relief." *Id.*

Even if a hearing is warranted, it is "within the district court's discretion to determine the scope and nature of a hearing." *Raysor v. United States*, 647 F.3d 491, 494 (2d Cir. 2011) (citing *Chang v. United States*, 250 F.3d 79, 85–86 (2d Cir. 2001)).  A full testimonial hearing is not necessary in all cases.  *Puglisi v. United States*, 586 F.3d 209, 214–15 (2d Cir. 2009).  A court does not need to hold a full testimonial hearing where "the testimony of [the petitioner] and his trial counsel would add little or nothing to the written submissions." *Chang*, 250 F.3d at 86; *see also Dolney v. United States*, 2011 WL 73076, at *5 (E.D.N.Y. Jan. 10, 2011) (attorney affidavit contradicting petitioner's Section 2255 claim was sufficient to find that a testimonial hearing is unnecessary); *Florez v. United States*, 2007 WL 162764, at *4 (E.D.N.Y. Jan. 18, 2007) ("A review of the papers submitted by the parties, including a detailed affidavit from [defendant's counsel], are sufficient to decide this issue; a full testimonial hearing is unnecessary").

Courts frequently "consider the 'trial record, letters, documents, exhibits, affidavits and written interrogatories' and may adopt a 'middle road' approach, declining to hold a hearing and 'deciding disputed facts on the basis of written submissions.'" *Rosario v. United States*, 2019 WL 5260784, at *3 (S.D.N.Y. Oct. 17, 2019) (quoting *Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003)); *see also Wang v. United States*, 458 F.App'x. 44, 45 (2d Cir. 2012) (summary order) ("[T]he District Court did conduct an evidentiary hearing, albeit one limited to the sworn, written submissions of [petitioner], his former counsel, and the interpreters.").

Here, the court directed Mr. Dupree's trial counsel and appellate counsel to respond to Mr. Dupree's allegations of ineffective assistance of counsel. Mr. Howard, who was Mr. Dupree's lead defense counsel at trial, filed a detailed five-page affidavit. (ECF No. 842-1 ("Howard Decl.").) The remainder of Mr. Dupree's trial team, Ms. Sinfelt and Ms. Anderson, each filed detailed four-page affidavits, respectively. (ECF Nos. 842-2, 842-3.) Daniel S. Seikaly, Esq., who was part of the team representing Mr. Dupree during the pre-trial period, filed a two-page affidavit. (ECF No. 842-4.) And Mr. Mintz, who was Mr. Dupree's appointed appellate counsel, filed a detailed eight-page affidavit. (ECF No. 842-5, Mintz Decl.)

The court finds this "middle road" approach is sufficient to decide Mr. Dupree's petitions, and a full-blown evidentiary hearing would add "little to nothing" to the court's analysis.  Though the matters raised in the petitions could warrant testimony from Mr. Dupree and his former counsel, based on Mr. Dupree's submissions and the declarations submitted by all of the attorneys, there is no need to hear their testimony live because any such testimony would be redundant of the record before the court.  Accordingly, the court will decide Mr. Dupree's petitions on the submitted record.

## II. Standard for Ineffective Assistance of Counsel

Under the Sixth Amendment, criminal defendants have not just a right to counsel, but a right to "effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  To prevail on a claim of ineffective assistance of counsel, a petitioner must meet the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  "*Strickland*'s standard, although by no means insurmountable, is highly demanding."  *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986). Under *Strickland*, a petitioner must show (i) that defense counsel's representation fell below an objective standard of reasonableness (the "performance prong"); and (ii) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different" (the "prejudice prong"). *Pham*, 317 F.3d at 182
(citing *Strickland*, 466 U.S. at 688, 694). The petitioner bears
the "burden of establishing both" that his counsel was deficient
and that he was prejudiced. *United States v. Birkin*, 366 F.3d
95, 100 (2d Cir.2004) (citing *Strickland*, 466 U.S. at 687). The
court need not address both prongs if the petitioner makes an
insufficient showing on either of them. *See Parker v. Ercole*,
666 F.3d 830, 834 (2d Cir. 2012).

"The performance component of the *Strickland* test asks
whether a 'counsel's representation fell below an objective
standard of reasonableness.'" *Kovacs v. United States*, 744 F.3d
44, 50 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 688). A
court must "indulge a strong presumption that counsel's conduct
falls within the wide range of reasonable professional
assistance." *Strickland*, 466 U.S. at 689. A court examines the
reasonableness of counsel's actions, keeping in mind that
"[c]onstitutionally effective counsel embraces a 'wide range of
professionally competent assistance,' and 'counsel is strongly
presumed to have rendered adequate assistance and made all
significant decisions in the exercise of reasonable professional
judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005)
(quoting *Strickland*, 466 U.S. at 690).

The prejudice component of the *Strickland* test asks
whether "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Gueits v. Kitzpatrick*, 612 F.3d 118, 122 (2d Cir. 2010) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Merely showing that counsel's errors had "some conceivable effect" on the outcome is not enough to satisfy the prejudice prong, but "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693.

### III. Effectiveness of Mr. Dupree's Trial Counsel

Mr. Dupree argues that the Indictment was "fatally defective due to multiple falsehoods," and that his counsel was ineffective in addressing them. (Pet. at 4-23.) Specifically, Mr. Dupree asserts that the Indictment charged that he and GDC violated the Loan Agreement by purchasing Image Inc., but the evidence at trial demonstrated that JDC Lighting (rather than GDC) purchased Image Inc., and in any event, GDC was not a borrower under the Loan Agreement and thus was not restricted from purchasing Image Inc. (*See id.*) According to Mr. Dupree, in light of this "falsehood" in the Indictment, his trial counsel should have brought a motion *in limine* to dismiss the Indictment, requested a specific jury instruction, and objected to the exclusion of certain expert testimony at trial. (*Id.*)

In addition, Mr. Dupree also argues that his trial counsel rendered ineffective assistance by failing to request a *Franks* hearing to challenge FBI affidavits that supported a search warrant and the arrest warrant in Mr. Dupree's case. (*Id.* at 18-19.)

### A.   Failure to Challenge Supposed Variance in the Indictment Before Trial

The court first notes that Mr. Dupree made substantively the same argument regarding the Indictment at various points throughout his criminal proceeding, including before trial, and in his motions for acquittal or a new trial, and this court rejected any potential variance in the Indictment as immaterial.  The Indictment alleged that the scheme to defraud involved, *inter alia*, "defraud[ing] Amalgamated by having GDC purchase Image Lighting Inc. covertly, contrary to the terms of the [Loan] Agreement, and by concealing the purchase from Amalgamated Bank."  (Second Superseding Indictment ¶ 15.)  Mr. Dupree contends that the reference in this paragraph to GDC as the purchaser of Image Inc. represents a variance between the Indictment and the Government's evidence at trial. The Second Circuit has consistently held that such a variance is "immaterial . . . 'where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance

is not such as to deprive the accused of his right to be
protected against another prosecution for the same offense.'"
*United States v. LaSpina*, 299 F.3d 165, 183 (2d Cir. 2002)
(quoting *United States v. Mucciante*, 21 F.3d 1228, 1236 (2d
Cir.1994)).

The reference in the Indictment to GDC's purchase of
Image Inc., in violation of the Loan Agreement, did not mislead
Mr. Dupree to the extent that he was not able to present a
defense.  As an initial matter, the entity that Mr. Dupree
claims was the purchaser, JDC Lighting, was a wholly-owned
subsidiary of GDC, which was owned by Mr. Dupree.  (*See* Oct. 26,
2012 Order at 6.)  More importantly, Mr. Dupree was
unquestionably on notice that he was charged with overseeing a
scheme to defraud Amalgamated Bank, which is the primary thrust
of the paragraph in the Indictment of which Mr. Dupree complains
(as well as the thrust of the remaining paragraphs in the
Indictment).  Notably, Mr. Dupree also devoted several pages of
his appellate brief to this argument regarding the Indictment
(CA2 Case No. 13-2314, ECF No. 125, Brief, at 4-6), but the
Second Circuit held that "[w]hen the [G]overnment charges a
scheme to defraud comprising several misrepresentations, it need
not prove each misrepresentation," *Dupree*, 620 F. App'x at 51.

Based on the declaration of Mr. Dupree's lead trial
lawyer, Mr. Howard, his trial counsel believed at the time that

22

the Loan Agreement was "at the heart of the [G]overnment's theory." (Howard Decl. ¶ 7.) However, trial counsel also understood that the Government "would most likely be given wide latitude to present [a theory of fraud] as long as it was within the bounds of their prosecutorial discretion and the Federal Rules of Evidence" (*id.*), and thus there was no point in bringing extensive pre-trial challenges of the kind that Mr. Dupree now argues should have been brought. This was a reasonable determination for Mr. Dupree's trial counsel to make. An "indictment is not meant to serve an evidentiary function"; rather, "[i]ts primary purpose is to 'acquaint the defendant with the specific crime with which he is charged.'" *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) (quoting *United States v. Berlin*, 472 F.2d 1002, 1007 (2d Cir.1973)).

     The court also notes that Mr. Dupree's trial counsel did raise the issue regarding whether the acquisition of Image Inc. violated the Loan Agreement. Indeed, counsel attempted to introduce expert testimony to interpret the terms of the Loan Agreement. (Howard Decl. ¶ 10.) This court, however, excluded that testimony because expert "testimony includ[ing] legal conclusions regarding what the [L]oan [A]greement permit[ted] or prohibit[ed] . . . [would] not assist the jury because the jury [could] convict or acquit [regardless of] whether or not the

[L]oan [A]greement was violated." (ECF No. 528, Transcript of December 1, 2011 Hearing, at 15.)

Accordingly, given that there was little or no basis to challenge the Indictment, Mr. Dupree's argument fails the first prong of the *Strickland* test. Any failure on the part of his trial counsel to challenge the Indictment before trial did not constitute constitutionally deficient performance.

Given that Mr. Dupree "fails to demonstrate constitutionally deficient 'performance,' the first prong of the *Strickland* test, this court need not reach the second 'prejudice' prong." *Palacios v. Burge*, 589 F.3d 556, 566 (2d Cir. 2009).

### B. Failure to Request a Jury Instruction

Mr. Dupree also argues that his trial counsel was ineffective because they failed to request a jury instruction stating that GDC could not violate the Loan Agreement as a matter of law. (Pet. at 19-20.) In order to prevail on an ineffective assistance claim based on a jury instruction that was not sought, a petitioner must show "that the requested instruction accurately represented the law in every respect and that, viewing as a whole the charge actually given, [the defendant] was prejudiced." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004) (quoting *United States v. Abelis*, 146 F.3d 73, 82 (2d Cir.1998)).

24

As this court previously held, even if Mr. Dupree were correct that it was legally impossible for the acquisition of Image Inc. to violate the Loan Agreement, that would not be a defense to bank fraud, so long as Mr. Dupree possessed the requisite intent to commit fraud. (*See* Oct. 26, 2012 Order at 73-74 & n.21); *see also United States v. Boisvert*, 499 F. App'x 101, 103 (2d Cir. 2012) ("[a] defense of legal impossibility would afford [petitioner] no relief because the trial evidence makes clear that his plan" was to commit a crime) (summary order). Mr. Dupree faced a fraud-based criminal prosecution, not an action for breach of contract; the relevant question for the jury was whether Mr. Dupree violated the criminal statutes with which he was charged, not whether he violated the terms of the Loan Agreement. (*See* Oct. 26, 2012 Order at 74 ("The jury, however, could infer from the evidence that Mr. Dupree – whether correctly or incorrectly – believed that the Image Transaction violated the Loan Agreement and that he concealed the Image Transaction with the intent to defraud Amalgamated [Bank] and to expose it to actual or potential loss.").)

A jury instruction regarding the interpretation of the Loan Agreement thus had no relevance to the matters the jury was to decide. "It [was] therefore not objectively unreasonable for counsel to not have asked for a jury instruction . . . [where] such a jury instruction does not accurately reflect the status

25

of the law." *Chen v. United States*, 2016 WL 519617, at *5 (S.D.N.Y. Feb. 3, 2016). Accordingly, Mr. Dupree's trial counsel was not deficient in failing to request the instruction now sought by Mr. Dupree, nor would such an instruction have changed the outcome of the case. Mr. Dupree's ineffective assistance claim, based on the failure to request a jury instruction, thus fails both prongs of the *Strickland* standard.

### C. Failure to Object to Witness Testimony

Mr. Dupree's next contention regarding his trial counsel is that, following the court's exclusion of expert testimony on the interpretation of the Loan Agreement, Mr. Dupree was "forced to choose between his constitutional right to defend himself . . . and that of his other constitutional right not to testify . . . ." (Pet. at 26.)

To the extent that Mr. Dupree is arguing that his counsel was ineffective for allowing him to testify in his own defense, that claim is rejected. A defendant's decision to testify at a criminal trial is "left for the accused to make, informed by the advice of counsel." *Campos v. United States*, 930 F. Supp. 787, 791 (E.D.N.Y. 1996); *see Brown v. Artuz*, 124 F.3d 73, 78 (2d Cir. 1997) ("Although counsel has the right, and indeed the professional duty, to advise his client of the benefits and pitfalls of a decision to take the stand on his own

behalf, . . . the ultimate decision regarding whether to testify belongs to the defendant.").

Nowhere in his petition or supplemental petition does Mr. Dupree allege that he did not make a fully informed decision to testify in his own defense.  Mr. Howard's uncontradicted declaration states that he had "numerous conversations with Mr. Dupree about his taking the stand and testifying," and that he "made sure that Mr. Dupree understood that the decision to testify was his and his alone."  (Howard Decl. ¶ 10.)  According to Mr. Howard, Mr. Dupree "never wavered on his insistence on testifying."  (*Id.*)

Mr. Dupree argues that he had no choice but to testify following the court's exclusion of certain of his proffered expert testimony, and that defense counsel failed to object to the unconstitutional choice with which he was faced.  (Pet. at 27-28.)  The court, however, did not put Mr. Dupree in a position where he was left with no choice but to testify.  The court excluded expert testimony regarding the interpretation of the Loan Agreement, because that was a factual question for the jury to decide.  For the reasons already discussed, the issue for which Mr. Dupree sought to introduce expert testimony was not relevant to whether Mr. Dupree could be found guilty of fraud.  Regardless of any pre-trial rulings made by this court, it was Mr. Dupree's responsibility to make an informed decision

to take the stand, after extensive discussions with his counsel.
Before he did so, the court advised him that he had "an absolute
constitutional right . . . not to testify," and that he could
instead seek to hold "the [G]overnment to its burden of proof
beyond a reasonable doubt." (ECF NO. 789, December 22, 2011
Trial Transcript, at 3275.) Mr. Dupree confirmed that he
understood his rights. (*Id.*)

Moreover, counsel did not render ineffective
assistance by failing to object to the court's ruling partially
excluding his expert's testimony. As it does prior to virtually
every criminal trial, the court made rulings about whether
certain expert testimony would be admissible or not. Mr. Dupree
argues that it was improper for the court to allow the loan
officer who negotiated the Loan Agreement on behalf of
Amalgamated Bank to testify about the terms of the Loan
Agreement, while excluding Mr. Dupree's proffered expert on the
terms of the Loan Agreement. (Pet. at 23-24.) Mr. Dupree
appears to conflate the roles of the two witnesses: the loan
officer testified as a fact witness who negotiated the Loan
Agreement with Mr. Dupree, whereas Mr. Dupree sought to
introduce expert testimony regarding the proper legal
interpretation of the Loan Agreement. The court allowed fact
witnesses involved in the negotiations of the Loan Agreement,
such as the loan officer, to testify about their understanding

of the terms of the Loan Agreement.  But the court deemed it improper for an expert witness to opine on the proper legal interpretation of the Loan Agreement.  *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005) ("an expert 'may not give testimony stating ultimate legal conclusions based on those facts'") (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

The issue raised now is whether Mr. Dupree's trial counsel rendered ineffective assistance by failing to object to the court's foregoing rulings.  Mr. Foley's counsel did, in fact, object to the admissibility of the loan officer's testimony regarding his understanding of the Loan Agreement. (*See* ECF No. 791-2, December 14, 2011 Trial Transcript, at 1997.)  The court overruled the objection, but instructed the jury that "ultimately [the jury] will be called upon to determine the meaning of these terms [in the Loan Agreement]." (*Id.* at 2000.)  The court further explained to the jury that the loan officer was "being offered to explain what his understanding was of the terms." (*Id.*)  Thus, Mr. Dupree's counsel did not render ineffective assistance in failing to object, as there were no further objections to make.  After this court made its rulings, counsel made their objections, and the court overruled those objections but provided a limiting instruction.  The court's rulings with respect to the admissibly

of testimony thereafter became an issue for appeal.  Indeed, Mr. Dupree raised the issue in his appeal.  (*See* CA2 Case No. 13-2314, ECF No. 125, Brief, at 8-9.)  Mr. Dupree's trial counsel was therefore not deficient on this point, nor would further objections have changed the outcome.

Mr. Dupree relies on the Supreme Court's decision in *Simmons v. United States* for the proposition that it is "intolerable that one constitutional right should have to be surrendered in order to assert another."  390 U.S. 377, 394 (1968).  In *Simmons*, one of the defendants testified at a pre-trial hearing regarding a motion to suppress, and the Government subsequently introduced that testimony against the defendant at trial.  *Id.* at 389.  The Supreme Court held that the use of such testimony would ultimately force defendants to choose between asserting their Fourth Amendment right to challenge evidence obtained through an unconstitutional search, and their Fifth Amendment right against self-incrimination.  *Id.* at 393-94.

Such a choice was not present here.  Mr. Dupree asserts that the choice was between his Fifth Amendment right not to testify, and his constitutional right to defend himself. (Pet. at 26-27.)  But Mr. Dupree's defense went beyond just his own testimony.  Accordingly, Mr. Dupree's ineffective assistance of counsel claim regarding his decision to testify on his own behalf likewise fails.

### D.   Failure to Request a *Franks* Hearing

Mr. Dupree also contends that his trial counsel rendered ineffective assistance based on another supposed "falsehood" underlying the criminal charges against him, related to affidavits filed by an FBI agent.  (Pet. at 18-19.)  Mr. Dupree argues that his trial counsel should have requested a *Franks* hearing to address the falsehoods in one or both of these affidavits.  (*Id.*)

The Supreme Court has held that a defendant is entitled to an evidentiary hearing (a "*Franks* hearing") if he can make a substantial preliminary showing that (i) a search warrant affidavit contains a false statement, (ii) the false statement was included intentionally or recklessly, and (iii) the false statement was integral to the probable cause finding. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).  It is not clear whether *Franks* is applicable to false statements in an arrest warrant affidavit, *see United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir. 2003) ("*Franks* doctrine arose in the context of a search warrant, and neither the Supreme Court nor this Court has extended it to arrest warrants"), but the court will assume that it is for the sake of addressing Mr. Dupree's argument.

The initial arrest warrant issued for Mr. Dupree was supported by a sworn affidavit filed by Federal Bureau of

Investigation Special Agent Gavin P. Shea ("Special Agent Shea"), who was one of the primary agents working on the criminal investigation of Mr. Dupree. (ECF No. 1, Sealed Complaint and Affidavit.) On the same date Special Agent Shea filed an affidavit in support of an arrest warrant, he also filed an affidavit in support of a warrant to search the offices of GDC. (ECF NO. 89-4, Affidavit.)

Mr. Dupree argues that "Special Agent Shea's affidavit contain[ed] material misrepresentations and falsehoods which served as a prerequisite for a *Franks* hearing . . . ." (Pet. at 18.) Mr. Dupree's petition does not clarify whether he is referring to the affidavit in support of the arrest warrant, or the affidavit in support of the search warrant. Nor does he specify any particular "misrepresentations" or "falsehoods" in either affidavit. Mr. Dupree's conclusory argument is that the supposed misrepresentations in one or both of the affidavits made their way into the Indictment, and "the Indictment made it even more apparent that the falsehoods and misrepresentations were deliberate." (*Id.*)

"There is, of course, a presumption of validity with respect to [an] affidavit supporting [a] warrant." *Franks*, 438 U.S. at 171. Mr. Dupree has offered no basis on which his trial counsel could have requested a *Franks* hearing. He has not pointed to any specific statement in either of Special Agent

32

Shea's affidavits that was false, much less shown that a false statement was included intentionally or recklessly, or that it was integral to the probable cause finding. "Given the absence of substantial support for Petitioner's allegation that [Special Agent Shea] made false statements in his warrant application, it cannot be said that counsel acted improperly when [they] failed to request a hearing attacking the validity of the . . . warrant[s]." *Armstrong v. Duncan*, 2003 WL 22339490, at *7 (S.D.N.Y. Oct. 14, 2003).

Moreover, the record reflects that Mr. Dupree's trial counsel acted reasonably with respect to the warrants. Counsel for Mr. Dupree and Mr. Watts jointly brought a motion to suppress evidence seized pursuant to the search warrant issued following Special Agent Shea's affidavit in July 2010. (*See* ECF No. 91, Joint Motion to Suppress.) Mr. Dupree's own petition reveals that he asked counsel about the possibility of requesting a *Franks* hearing, but Ms. Sinfelt relayed that "a *Franks* hearing is only warranted where [he could] show that [Special Agent] Shea . . . knew the truth and lied about it." (Pet. at 18.) This reflects counsel's correct interpretation of the *Franks* standard, and establishes that counsel at least considered the possibility of requesting a hearing, but ultimately decided that it would not be worthwhile to do so. This was not ineffective assistance of counsel, but rather, a

33

proper conclusion based on the facts and the law.  "The failure to make demonstrably futile arguments cannot constitute constitutionally ineffective assistance of counsel."  *United States v. Reeves*, 2005 WL 3288012, at *8 (S.D.N.Y. Dec. 2, 2005).

Accordingly, Mr. Dupree has not asserted any viable grounds on which is trial counsel rendered ineffective assistance.  His claims are therefore denied.

**IV. Effectiveness of Mr. Dupree's Appellate Counsel**

In addition to the claims regarding his trial counsel, Mr. Dupree alleges ineffective assistance of his appointed appellate counsel, Mr. Mintz.  Mr. Dupree alleges that Mr. Mintz was "overwhelmed by the scope and complexity of the case," and took too long to file an appellate brief on behalf of Mr. Dupree.  (Supp. Pet. at 4-5.)  According to Mr. Dupree, because Mr. Mintz failed to timely prepare an appellate brief and was dismissed from the case, Mr. Dupree was disadvantaged when the Second Circuit ordered him to file his *pro se* brief on a condensed schedule.  (*Id.* at 8.)

The record does not demonstrate that Mr. Mintz's performance as appellate counsel was deficient under *Strickland*.  Mr. Dupree's primary complaint is that Mr. Mintz did not move quickly enough in filing an appellate brief on behalf of Mr. Dupree.  Mr. Dupree contends that Mr. Mintz "filed twelve

motions in an effort to obtain what was a de facto continuance," but "never submitted the appeal." (*Id.* at 7.) Mr. Dupree's assertions, however, find no support in the record.

First, it appears that the delay in the filing of Mr. Dupree's appellate brief was primarily caused by various administrative delays that prevented Mr. Mintz from obtaining all of the transcripts from the trial court proceedings. Second Circuit Local Rule 31.2(a)(1)(A) requires that an "appellant must notify the clerk in writing of the deadline it requests for appellant's brief" "[w]ithin 14 days after the later of the appellant's receipt of the last transcript, or the appellant's filing of the certificate that no transcript will be ordered . . . ." As Mr. Mintz recounts in his declaration, he was unable to promptly request a due date for Mr. Dupree's brief because it took an unusual amount of time to obtain all of the transcripts from the district court proceedings. (*See* Mintz Decl. ¶¶ 14-16.) At the time Mr. Dupree decided to relieve Mr. Mintz in September 2014, Mr. Mintz had still not received all of the necessary transcripts. (*Id.* ¶ 16.) There is no indication in the record that the delays in obtaining the transcripts were due to any deficient performance on the part of Mr. Mintz. Indeed, it arguably could have been ineffective assistance of counsel for Mr. Mintz to have filed an appellate brief *without* having reviewed the entire record from the court below.

Mr. Dupree complains that Mr. Mintz "filed twelve motions in an effort to obtain what was a de facto continuance" (Supp. Pet. at 7), but these filings were routine letters from Mr. Mintz to the Second Circuit clerk, updating the Second Circuit on the status with respect to obtaining the transcripts (*see, e.g.*, CA2 Case No. 13-2314, ECF Nos. 29, 31, 32, and 34). Thus, Mr. Mintz acted properly to keep the court up to date. Though the delay may have been frustrating to Mr. Dupree, Mr. Mintz states that he also kept Mr. Dupree updated throughout the process. (Mintz Decl. ¶ 10.)

Second, although Mr. Dupree wanted his appeal to move quickly, this court recognizes that the trial court record was complex. More than 25 witnesses testified at Mr. Dupree's three-week trial, and the transcript of the trial is nearly 5,000 pages long. (*See id.* ¶ 2.) In addition to the extensive trial record, there was significant pre-trial and post-trial motion practice. Even if Mr. Mintz had access to the full trial court record immediately, effective assistance requires counsel to take the necessary time to review the underlying record. There is no evidence that Mr. Mintz was, as Mr. Dupree claims, "overwhelmed." Rather, Mr. Mintz's affidavit reflects that he wanted to ensure that he understood the full record so that he could most effectively represent Mr. Dupree. (*E.g., id.* ¶ 10 ("I also explained [to Mr. Dupree] that appeals such as his took

36

a lot of time (particularly when a sufficiency argument was involved) because not raising a viable claim would lead to a waiver.").)  The court thus finds that Mr. Mintz's performance was not deficient.

Even if the delay in filing Mr. Dupree's appellate brief had been caused by appellate counsel's deficient performance, which it was not, there was no prejudice to Mr. Dupree.  A review of the Second Circuit docket shows that Mr. Mintz never missed a court-ordered deadline.  Mr. Dupree claims that he was prejudiced when the Second Circuit, on October 29, 2014, ordered him to file his brief by December 8, 2014.  (Supp. Pet. at 8; *see* CA2 Case No. 13-2314, ECF No. 122, Scheduling Order.)  But the Second Circuit's order was a result of Mr. Dupree's failure to comply with the court's rules.  In the Second Circuit's September 26, 2014 order relieving Mr. Mintz and allowing Mr. Dupree to proceed *pro se*, the court "directed" Mr. Dupree "to review Local Rule 31.2 regarding procedures for setting the filing dates for the submission of briefs." (*Id.*, ECF No. 112, Motion Order.)  Mr. Dupree failed to file a request for a due date, and so the court assigned one, a circumstance not attributable to the actions or inactions of Mr. Mintz.  Mr. Dupree made the decision to relieve Mr. Mintz (even though he had not missed any deadlines in the case), and then failed to follow the court's scheduling rules.  Any prejudice caused by

the court-ordered due date for Mr. Dupree's appellate brief was a consequence of Mr. Dupree's own actions.

Accordingly, Mr. Dupree has not shown that his appellate counsel rendered ineffective assistance.  Even if he had made such a showing, Mr. Dupree has not shown that he was prejudiced as a result.

## **Conclusion**

For the reasons stated above, Mr. Dupree's Section 2255 petitions are respectfully DENIED.  Because Mr. Dupree has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue.  28 U.S.C. § 2253(c); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (discussing certificate of appealability standard); Rules Governing Section 2254 and 2255 Cases, Rule 11 ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").

The Clerk of Court is respectfully directed to enter judgment in favor of Respondent in case number 17-cv-2356, to close that case, to serve Mr. Dupree with a copy of this Memorandum and Order and the judgment, and to note service on the docket.

**SO ORDERED.**

Dated:    Brooklyn, New York
          July 13, 2020

                              _____/s/_____
                              Hon. Kiyo A. Matsumoto
                              United States District Judge